Theodore J. Boutrous, Jr., SBN 132099
    tboutrous@gibsondunn.com
Andrea E. Neuman, SBN 149733
    aneuman@gibsondunn.com
William E. Thomson, SBN 187912
    wthomson@gibsondunn.com
Ethan D. Dettmer, SBN 196046
    edettmer@gibsondunn.com
GIBSON, DUNN & CRUTCHER LLP
333 South Grand Avenue
Los Angeles, CA 90071
Telephone: 213.229.7000
Facsimile: 213.229.7520

Herbert J. Stern (*pro hac vice* pending)
    hstern@sgklaw.com
Joel M. Silverstein (*pro hac vice* pending)
    jsilverstein@sgklaw.com
STERN & KILCULLEN, LLC
325 Columbia Turnpike, Suite 110
P.O. Box 992
Florham Park, NJ 07932-0992
Telephone: 973.535.1900
Facsimile: 973.535.9664

Attorneys for Defendants CHEVRON
CORPORATION and CHEVRON U.S.A., INC.

UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF CALIFORNIA
OAKLAND DIVISION

| | |
|---|---|
| The COUNTY OF SAN MATEO, individually and on behalf of THE PEOPLE OF THE STATE OF CALIFORNIA,<br><br>          Plaintiff,<br><br>          v.<br><br>CHEVRON CORP.; CHEVRON U.S.A., INC.; EXXONMOBIL CORP.; BP P.L.C.; BP AMERICA, INC.; ROYAL DUTCH SHELL PLC; SHELL OIL PRODUCTS COMPANY LLC; CITGO PETROLEUM CORP.; CONOCOPHILLIPS; CONOCOPHILLIPS COMPANY; PHILLIPS 66; PEABODY ENERGY CORP.; TOTAL E&P USA INC.; TOTAL SPECIALTIES USA INC.; ARCH COAL, INC.; ENI S.p.A.; ENI OIL & GAS INC.; RIO TINTO P.C; RIO TINTO LTD.; RIO TINTO ENERGY AMERICA INC.; RIO TINTO MINERALS, INC.; RIO TINTO SERVICES INC.; STATOIL ASA; ANADARKO PETROLEUM CORP.; | CASE NO. _____<br><br>**NOTICE OF REMOVAL BY DEFENDANTS CHEVRON CORPORATION AND CHEVRON U.S.A., INC.**<br><br>[Removal from the Superior Court of the State of California, County of San Mateo, Case No. 17 CIV 03222]<br><br>Action Filed:   July 17, 2017 |

1   OCCIDENTAL PETROLEUM CORP.;
    OCCIDENTAL CHEMICAL CORP.;
2   REPSOL S.A.; REPSOL ENERGY NORTH
    AMERICA CORP.; REPSOL TRADING USA
3   CORP.; MARATHON OIL COMPANY;
    MARATHON OIL CORPORATION;
4   MARATHON PETROLEUM CORP.; HESS
    CORP.; DEVON ENERGY CORP.; DEVON
5   ENERGY PRODUCTION COMPANY, L.P.;
    ENCANA CORP.; APACHE CORP.; and
6   DOES 1 through 100, inclusive,

7            Defendants.

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

Gibson, Dunn &
Crutcher LLP

**TO THE CLERK OF THE ABOVE-TITLED COURT AND TO PLAINTIFF THE COUNTY OF SAN MATEO AND ITS COUNSEL OF RECORD:**

PLEASE TAKE NOTICE THAT Defendants Chevron Corp. and Chevron U.S.A., Inc. (collectively, "the Chevron Parties"), remove this action—with reservation of all defenses and rights—from the Superior Court of the State of California for the County of San Mateo, Case No. 17 CIV 03222, to the United States District Court for the Northern District of California pursuant to 28 U.S.C. §§ 1331, 1334, 1441(a), 1442, 1452, and 1367(a), and 43 U.S.C. § 1349(b).  All other defendants that have been properly joined and served (collectively, "Defendants") join in or have consented to this Notice of Removal.

This Court has original federal question jurisdiction under 28 U.S.C. § 1331, because the Complaint arises under federal laws and treaties, and presents substantial federal questions as well as claims that are completely preempted by federal law.  This Court has supplemental jurisdiction under 28 U.S.C. § 1367(a) over any claims over which it does not have original federal question jurisdiction because they form part of the same case or controversy as those claims over which the Court has original jurisdiction.  As set forth below, removal is proper pursuant to 28 U.S.C. §§ 1441, 1442, 1446, and 1452, and 43 U.S.C. § 1349(b).

In addition, the Complaint is legally without merit, and, at the appropriate time, Defendants will move to dismiss Plaintiff's claims pursuant to Rule 12 of the Federal Rules of Civil Procedure.

Through its Complaint, the County of San Mateo calls into question longstanding decisions by the Federal Government regarding, among other things, national security, national energy policy, environmental protection, development of outer continental shelf lands, the maintenance of a national petroleum reserve, mineral extraction on federal lands (which has produced billions of dollars for the Federal Government), and the negotiation of international agreements bearing on the development and use of fossil fuels.  Many of the Defendants have contracts with the Federal Government to develop and extract minerals from federal lands and to sell fuel and associated products to the Federal Government for the Nation's defense.  The gravamen of the Complaint seeks either to undo all of those Federal Government policies or to extract "compensation" and force Defendants to relinquish

the profits they obtained by having contracted with the Federal Government or relied upon national policies to develop fossil fuel resources.

In the Complaint's view, a state court, on petition by a county, may regulate the nationwide—and indeed, worldwide—economic activity of key sectors of the American economy, those that supply the fuels that power production and innovation, keep the lights on, and that form the basic materials from which innumerable consumer, technological, and medical devices are themselves fashioned. Though nominally asserted under state law, the Complaint puts at issue long-established federal statutory, regulatory, and constitutional issues and frameworks. It implicates bedrock federal-state divisions of responsibility, and appropriates to itself the direction of such federal spheres as nationwide economic development, international relations, and America's national security. Reflecting the uniquely federal interests posed by greenhouse gas claims like these, the Ninth Circuit has recognized that causes of action of the types asserted here are governed by federal common law, not state law.

The Complaint has no basis in law and is inconsistent with serious attempts to address important issues of national and international policy. Accordingly, Plaintiff's Complaint should be heard in this federal forum to protect the national interest by its prompt dismissal.

## I.     TIMELINESS OF REMOVAL

1.     Plaintiff the County of San Mateo filed a Complaint against the Chevron Parties and other named Defendants in the Superior Court for San Mateo County, California, Case No. 17 CIV 03222, on July 17, 2017. The Chevron Parties were served on August 2, 2017. A copy of all process, pleadings, or orders served upon the Chevron Parties is attached as Exhibit A to the Declaration of William E. Thomson, filed concurrently herewith.

2.     This notice of removal is timely under 28 U.S.C. § 1446(b) because it is filed fewer than 30 days after service. 28 U.S.C. § 1446(b). All Defendants that have been served as of this date either join in or have consented to this removal. *See* Thomson Decl. ¶ 4. In addition, consent to this

removal petition is not required as removal does not proceed "solely under 28 U.S.C. § 1441."  28

U.S.C. § 1446(b)(2)(A); *see also, e.g.*, 28 U.S.C. § 1452.[1]

## II.        SUMMARY OF ALLEGATIONS AND GROUNDS FOR REMOVAL

3.        Plaintiff is the County of San Mateo, California.  Plaintiff brings claims against De-

fendants for alleged injuries relating to climate change, including damages and injunctive relief from

alleged sea level rise, storms, and other natural phenomena.  Plaintiff asserts the following claims on

behalf of itself:  public nuisance; private nuisance; strict liability for failure to warn; strict liability for

design defect; negligence; negligence for failure to warn; and trespass.  Plaintiff also purports to as-

sert a public nuisance claim on behalf of the People of the State of California.  In addition to compen-

satory and punitive damages, Plaintiff seeks the "equitable disgorgement of all profits Defendants ob-

tained" through their business of manufacturing, producing, and/or promoting the sale of fossil fuel

products (Compl. ¶ 186), as well as "equitable relief to abate the nuisances complained of" in the

Complaint (Compl., Prayer for Relief).

4.        Multiple Defendants will deny any California court has personal jurisdiction, and

those Defendants properly before the Court will deny any liability as to Plaintiff's individual claims

and as to the claim brought on behalf of the People of California.  Defendants expressly reserve all

rights in this regard.  For purposes of meeting the jurisdictional requirements for removal only, how-

ever, Defendants submit that removal is proper on at least seven independent and alternative grounds.

5.        ***First***, the action is removable under 28 U.S.C. § 1441(a) and 28 U.S.C. § 1331 be-

cause Plaintiff's claims, to the extent that such claims exist, implicate uniquely federal interests and

are governed by federal common law, and not state common law.  *See Nat'l Farmers Union Ins. Cos.*

*v. Crow Tribe of Indians*, 471 U.S. 847, 850 (1985).  The Ninth Circuit has held that comparable

claims, in which a municipality alleged that the defendants' greenhouse gas emissions led to global

---

[1]  In filing or consenting to this Notice of Removal, Defendants do not waive, and expressly pre-
serve, their right to challenge personal jurisdiction in any federal or state court with respect to this
action.  A number of Defendants contend that personal jurisdiction in California is lacking over
them, and these Defendants will move to dismiss for lack of personal jurisdiction at the appropri-
ate time.  *See, e.g.*, *Carter v. Bldg. Material & Const. Teamsters' Union Local 216*, 928 F. Supp.
997, 1000-01 (N.D. Cal. 1996) ("A petition for removal affects only the forum in which the ac-
tion will be heard; it does not affect personal jurisdiction.").

Gibson, Dunn &
Crutcher LLP

warming-related injuries such as coastal erosion, were governed by federal common law.  *See Native Village of Kivalina v. ExxonMobil Corp.*, 696 F.3d 849, 855 (9th Cir. 2012) ("*Kivalina*").  Federal common law applies only in those few areas of the law that so implicate "uniquely federal interests" that application of state law is affirmatively inappropriate.  *See, e.g.*, *Boyle v. United Techs. Corp.*, 487 U.S. 500, 504, 507 (1988); *Am. Elec. Power Co., Inc. v. Connecticut*, 564 U.S. 410, 424 (2011) ("*AEP*") ("borrowing the law of a particular State would be inappropriate").  As a result, the Ninth Circuit's determination in *Kivalina* that federal common law applies to comparable claims of global warming-related tort claims necessarily means that state law should not apply to those types of claims.  Plaintiff's claims, therefore, (to the extent they exist at all) arise under federal common law, not state law, and are properly removed to this Court.

6.     ***Second***, removal is authorized under 28 U.S.C. § 1441(a) and 28 U.S.C. § 1331 because the action necessarily raises disputed and substantial federal questions that a federal forum may entertain without disturbing a congressionally approved balance of responsibilities between the federal and state judiciaries.  *See Grable & Sons Metal Prods., Inc. v. Darue Eng'g & Mfg.*, 545 U.S. 308 (2005).  In fact, the causes of action as alleged in the Complaint attack federal policy decisions and threaten to upset longstanding federal-state relations, second-guess policy decisions made by Congress and the Executive Branch, and skew divisions of responsibility set forth in federal statutes and the United States Constitution.

7.     ***Third***, removal is authorized under 28 U.S.C. § 1441(a) and 28 U.S.C. § 1331 because Plaintiff's claims are completely preempted by the Clean Air Act and/or other federal statutes and the United States Constitution, which provide an exclusive federal remedy for plaintiffs seeking stricter regulations regarding the nationwide and worldwide greenhouse gas emissions put at issue in the Complaint.

8.     ***Fourth***, this Court has original jurisdiction over this lawsuit and removal is proper pursuant to the Outer Continental Shelf Lands Act ("OCSLA"), because this action "aris[es] out of, or in connection with (A) any operation conducted on the outer Continental Shelf which involves ex-

ploration, development, or production of the minerals, or the subsoil or seabed of the outer Continental Shelf, or which involves rights to such minerals." 43 U.S.C. § 1349(b); *see also Tenn. Gas Pipeline v. Houston Cas. Ins. Co.*, 87 F.3d 150, 155 (5th Cir. 1996).

9.     ***Fifth***, Defendants are authorized to remove this action under 28 U.S.C. § 1442(a)(1) because, assuming the truth of Plaintiff's allegations, a causal nexus exists between their actions, taken pursuant to a federal officer's directions, and Plaintiff's claims; they are "persons" within the meaning of the statute; and can assert several colorable federal defenses. *See Leite v. Crane Co.*, 749 F.3d 1117 (9th Cir. 2014).

10.     ***Sixth***, removal is authorized under 28 U.S.C. § 1441(a) and 28 U.S.C. § 1331 because Plaintiff's claims are based on alleged injuries to and/or conduct on federal enclaves.  As such, Plaintiff's claims arise under federal-question jurisdiction and are removable to this Court.  *See* U.S. Const., art. I, § 8, cl. 17; *Durham v. Lockheed Martin Corp.*, 445 F.3d 1247, 1250 (9th Cir. 2006) ("Federal courts have federal question jurisdiction over tort claims that arise on 'federal enclaves.'").

11.     ***Seventh and finally***, removal is authorized under 28 U.S.C. § 1452(a) and 28 U.S.C. § 1334(b) because Plaintiff's state-law claims are related to cases under Title 11 of the United States Code.  Plaintiff alleges that Defendants (defined by Plaintiff to include certain of Defendants' subsidiaries named in the Complaint) engaged in tortious conduct from 1965 to the present, and at least two Defendants, which consent to this Notice of Removal, emerged from Chapter 11 bankruptcy less than a year ago and continue to implement their Chapter 11 plans.  *See PDG Arcos, LLC v. Adams*, 436 F. App'x 739 (9th Cir. 2011).  And because Plaintiff's claims are predicated on historical activities of the Defendants, including predecessor companies and companies that they may have acquired or with which they may have merged, and because there are hundreds of non-joined necessary and indispensable parties, there are many other Title 11 cases that may be related.

12.     For the convenience of the Court and all parties, Defendants will address each of these grounds in additional detail.  Should Plaintiff challenge this Court's jurisdiction, Defendants will further elaborate on these grounds and will not be limited to the specific articulations in this Notice.

### III.   THIS COURT HAS FEDERAL-QUESTION JURISDICTION BECAUSE PLAINTIFF'S CLAIMS ARISE, IF AT ALL, UNDER FEDERAL COMMON LAW

13.     This action is removable because Plaintiff's claims, to the extent that such claims exist, necessarily are governed by federal common law, and not state common law.  28 U.S.C. § 1331 grants federal courts original jurisdiction over "'claims founded upon federal common law as well as those of a statutory origin.'"  *Nat'l Farmers Union*, 471 U.S. at 850 (quoting *Illinois v. City of Milwaukee*, 406 U.S. 91, 100 (1972) ("*Milwaukee I*")).  As the Ninth Circuit explained in holding that similar claims for injuries caused by global warming were governed by federal common law, even "[p]ost-*Erie*, federal common law includes the general subject of environmental law and specifically includes ambient or interstate air or water pollution." *Kivalina*, 696 F.3d at 855.  As Plaintiff's claims arise under federal common law, this Court has federal-question jurisdiction and removal is proper.  That remains true even though Plaintiff's claims in the final analysis fail to state a claim: among other deficiencies, any such federal common law claim has been displaced by the Clean Air Act.  *See, e.g.*, *AEP*, 564 U.S. at 424; *Kivalina*, 696 F.3d at 856-67.

14.     Though "[t]here is no federal *general* common law," *Erie R. Co. v. Tompkins*, 304 U.S. 64, 78 (1938) (emphasis added), federal common law continues to exist, and to govern, in a few subject areas in which there are "uniquely federal interests," *Boyle*, 487 U.S. at 504.  *See generally* Henry J. Friendly, *In Praise of* Erie—*and the New Federal Common Law*, 39 N.Y.U. L. Rev. 383 (1964).  Such uniquely federal interests will require the application of federal common law where, for example, the issue is one that by its nature, is "'within national legislative power'" and there is "a demonstrated need for a federal rule of decision" with respect to that issue.  *AEP*, 564 U.S. at 421 (citation omitted).  Federal common law therefore applies, in the post-*Erie* era, in those discrete areas in which application of state law would be inappropriate and would contravene federal interests.  *Boyle*, 487 U.S. at 504-07.  The decision that federal common law applies to a particular issue thus inherently reflects a determination that state law does *not* apply.  *Nat'l Audubon Soc'y v. Dep't of Water*, 869 F.2d 1196, 1204 (9th Cir. 1988); *see also City of Milwaukee v. Illinois & Michigan*, 451 U.S. 304, 312 n.7 (1981) ("*Milwaukee II*") ("[I]f federal common law exists, it is because state law cannot be used.").

15.     In *Kivalina*, the Ninth Circuit, quoting the Supreme Court's decision in *AEP*, reiterated that federal common law applies to "'subjects within the national legislative power where Congress has so directed or where the basic scheme of the Constitution so demands.'"  696 F.3d at 855 (quoting *AEP*, 564 U.S. at 421) (further citation and internal quotation marks omitted).  Although Congress thus sometimes affirmatively directs the application of federal common law, the *Kivalina* court noted that, "[m]ore often, federal common law develops when courts must consider *federal* questions that are not answered by statutes." *Id.* (emphasis added).  Given that claims asserting injuries from global warming have an intrinsic interstate and transnational character, the Ninth Circuit held that such claims inherently raise federal questions and fall within the settled rule that federal common law governs "the general subject of environmental law and specifically includes ambient or interstate air and water pollution." *Id.* at 855; *see also id.* ("federal common law can apply to transboundary pollution suits" such as the plaintiff's); *AEP*, 564 U.S. at 421 ("Environmental protection is undoubtedly an area within national legislative power, [and] one in which federal courts may fill statutory interstices.").  Thus, while the Ninth Circuit had previously expressed skepticism that federal common law, as opposed to state law, would govern a localized claim for air pollution arising from a specific source within a single state, *see Nat'l Audubon Soc'y*, 869 F.2d at 1203-04, the court in *Kivalina* found that claims arising from injuries allegedly caused by *global* warming implicate interstate and, indeed, international aspects that inherently invoke uniquely federal interests and responsibilities.  *See Kivalina*, 696 F.3d at 856-57; *see also Massachusetts v. EPA*, 549 U.S. 497, 498 (2007) ("The sovereign prerogatives to force reductions in greenhouse gas emissions, to negotiate emissions treaties with developing countries, and (in some circumstances) to exercise the police power to reduce motor-vehicle emissions are now lodged in the Federal Government."); *United States v. Solvents Recovery Serv.*, 496 F. Supp. 1127, 1134 (D. Conn. 1980) (describing Supreme Court jurisprudence recognizing "the strong federal interest in controlling certain types of pollution and protecting the environment").

16.     Although *Kivalina* did not expressly address the viability of the plaintiff's purported alternative common law claims resting on state law (which the district court dismissed without prejudice), the *Kivalina* court's finding that federal common law applied to the municipality's global

warming claims means that state law *cannot* be applied to such claims.  The conclusion that federal common law governs an issue rests, not on a discretionary choice between federal law and state law, but on a determination that the issue is so distinctively federal in nature that application of state law to the issue would risk impairing uniquely federal interests.  *Boyle*, 487 U.S. at 506-07; *see also, e.g.*, *Caltex Plastics, Inc. v. Lockheed Martin Corp.*, 824 F.3d 1156, 1159-60 (9th Cir. 2016) (liability of defense contractor to third party under government contract for weapons systems implicated "uniquely federal interests" in national security that would be impaired if disparate state-law rules were applied); *Nat'l Audubon Soc'y*, 869 F.3d at 1204 ("[I]t is inconsistent to argue 'that both federal and state nuisance law apply to this case.  If state law can be applied, there is no need for federal common law; if federal common law exists, *it is because state law cannot be used.*'") (emphasis added).

17.     Accordingly, the Ninth Circuit's holding in *Kivalina* that federal common law governs global warming-related tort claims such as Plaintiff's here necessarily means that state law cannot govern such claims.  Although Plaintiff purports to style its nuisance and other common law claims as arising under state law, the question of whether a particular common law claim is controlled by federal common law rather than state law is itself a question of law that is governed by federal law as set forth in *Erie* and its progeny.  While Plaintiff contends that its claims arise under California law, the question of which state, if any, may apply its law to address global climate-change issues is a question that is itself a matter of federal law, given the paramount federal interest in avoiding con-flicts of law in connection with ambient air and water.  Moreover, the law is well settled that, in de-termining whether a case arises under federal law and is properly removable, the Plaintiff's proffered position on a question of law is not entitled to any deference but is instead subject to independent and *de novo* review by the court.  *See, e.g.*, *United States v. California*, 932 F.2d 1346, 1349 (9th Cir. 1991) ("The issue of whether state or federal [common] law governs is a question of law and is re-viewable de novo.");  *Flagstaff Med. Ctr., Inc. v. Sullivan*, 962 F.2d 879, 884, 889-91 (9th Cir. 1992) (same); *see also Provincial Gov't of Marinduque v. Placer Dome, Inc.*, 582 F.3d 1083, 1086-87 (9th Cir. 2009) (applying de novo review to removal based on federal common law).

18.     The extent to which the global warming-related tort claims in this case and in *Kivalina* would impair uniquely federal interests is confirmed by comparing these inherently interstate and transnational claims to the more localized pollution claims that the Ninth Circuit in *National Audubon* held were governed by state law.  In *National Audubon*, the claims at issue involved a challenge to the Los Angeles Department of Water and Power's diversion of "four freshwater streams that would otherwise flow into Mono Lake."  869 F.2d at 1198.  This discrete conduct in California allegedly exposed part of Mono Lake's lake bed, increased the lake's "salinity and ion concentration," and led to "air pollution in the form of alkali dust storms from the newly exposed lake bed."  *Id*. at 1198-99.  The Ninth Circuit held that the allegation that some of the dust reached Nevada was not enough to show that the case involved the sort of "interstate dispute previously recognized as requiring resolution under federal law," such that it was "'inappropriate for state law to control.'"  *Id*. at 1204.  Given their essentially localized nature, the claims involved only a "domestic dispute" that did not fit within the interstate paradigms that the Supreme Court had to that point recognized as properly governed by federal common law.  *Id*. at 1205; *cf. Int'l Paper Co. v. Ouellette*, 479 U.S. 481, 497-98 (1987) (holding that New York law applied to pollution claims arising from discharges from a lakeside New York business, even though those effluents flowed to Vermont side of the lake and caused injury there).

19.     In light of the federal nature of the issues raised by global warming, as described in *AEP* and in *Massachusetts v. EPA*, the *Kivalina* court correctly reached a different conclusion with respect to global warming-related tort claims such as those presented here.  Because (as Plaintiff concedes, Compl. ¶ 74) global warming occurs only as the result of the undifferentiated accumulated emissions of all emitters in the world over an extended period of time, any judgment as to the reasonableness of particular emissions, or as to their causal contribution to the overall phenomenon of global warming, inherently requires an evaluation at an interstate and, indeed, transnational level.  Thus, even assuming that state tort law may properly address local source emissions within that specific state, the imposition of tort liability for allegedly unreasonably contributing to *global* warming would require an over-arching consideration of *all* of the emissions traceable to sales of Defendants'

NOTICE OF REMOVAL

Gibson, Dunn &
Crutcher LLP

products in each of the states, and, in fact, in the more than 180 nations of the world.  Given the Federal Government's exclusive authority over foreign affairs and foreign commerce, and its preeminent authority over interstate commerce, tort claims concerning global warming directly implicate uniquely federal interests, and a patchwork of 50 state's common law rules cannot properly be applied to such claims without impairing those interests.  Indeed, the Supreme Court expressly held in *AEP* that in cases like this, "borrowing the law of a particular State would be inappropriate."  564 U.S. at 422.  Such global warming-related tort claims, to the extent they exist, are therefore governed by federal common law.  *Kivalina*, 696 F.3d at 855-56.

20.     Under the principles set forth above, Plaintiff's claims, to the extent they exist at all, are governed by federal common law.  The gravamen of Plaintiff's claims is that "production and use of Defendants' fossil fuel products plays a direct and substantial role in the emissions of greenhouse gas pollution."  Compl. ¶ 2; *see, e.g., id.* ¶¶ 53-54, 58, 75, 78, 181, 207, 220, 254, 261.  Plaintiff's Complaint alleges that Defendants are responsible for "more than one in every five tons of carbon dioxide and methane emitted worldwide," *id.* ¶ 14, and that "greenhouse gas pollution is the dominant factor in each of the independent causes of [global] sea level rise," *id.* ¶ 58; *see also id.* ¶ 78.  As evident from the term "global warming" itself, both the causes and the injuries Plaintiff identifies are not constrained to particular sources, cities, counties, or even states, but rather implicate inherently national and international interests, including treaty obligations and federal and international regulatory schemes.  *See id.* ¶ 3 n.5 (describing other sources of emissions); ¶ 7 (only "20.3%" of $CO_2$ emissions allegedly caused by Defendants); ¶ 78 ($CO_2$ emissions cause "*global* sea level rise") (emphasis added); *see, e.g., Massachusetts*, 549 U.S. at 509, 523-24 (describing Senate rejection of the Kyoto Protocol because emissions-reduction targets did not apply to "heavily polluting nations such as China and India," and EPA's determination that predicted magnitude of future Chinese and Indian emissions "offset any marginal domestic decrease"); *AEP*, 564 U.S. at 427-29 (describing regulatory scheme of the Clean Air Act and role of the EPA); *see also* The White House, Statement by President Trump on the Paris Climate Accord (June 1, 2017), *available at* https://www.whitehouse.gov/the-press-office/2017/06/01/statement-president-trump-paris-climate-accord (announcing United States

Gibson, Dunn &
Crutcher LLP

10

1  withdrawal from Paris Climate Accord based on financial burdens, energy restrictions, and failure to

2  impose proportionate restrictions on Chinese emissions).

3       21.    Indeed, the Complaint itself demonstrates that the unbounded nature of greenhouse

4  gas emissions, diversity of sources, and magnitude of the attendant consequences have catalyzed

5  myriad federal and international efforts to understand and address such emissions.  *See, e.g.*, Compl.

6  ¶ 112.  The paramount federal interest in addressing the worldwide effect of greenhouse gas emis-

7  sions is manifested in the regulatory scheme set forth in the Clean Air Act as construed in *Massachu-*

8  *setts v. EPA*.  *See AEP*, 564 U.S. at 427-29.  Federal legislation regarding greenhouse gas emissions

9  reflects the understanding that "[t]he appropriate amount of regulation in any particular greenhouse

10  gas-producing sector cannot be prescribed in a vacuum: as with other questions of national or interna-

11  tional policy, informed assessment of competing interests is required.  Along with the environmental

12  benefit potentially achievable, our Nation's energy needs and the possibility of economic disruption

13  must weigh in the balance."  *Id.* at 427.  As a "question[] of national or international policy," the

14  question of how to address greenhouse gas emissions that underlies the requested relief at the heart of

15  Plaintiff's claims implicates inherently federal concerns and is therefore governed by federal com-

16  mon law.  *See id.*; *see also Milwaukee II*, 451 U.S. at 312 n.7 ("[I]f federal common law exists, it is

17  because state law cannot be used.").  Because common law claims that rest on injuries allegedly

18  caused by global warming implicate uniquely federal interests, such claims (to the extent they exist at

19  all) must necessarily be governed by federal common law.  This Court therefore has original jurisdic-

20  tion over this action.

21  **IV.    THE ACTION IS REMOVABLE BECAUSE IT RAISES DISPUTED AND**

22            **SUBSTANTIAL FEDERAL ISSUES.**

23       22.    "Except as otherwise expressly provided by Act of Congress, any civil action brought

24  in a State court of which the district courts of the United States have original jurisdiction, may be re-

25  moved . . . to the district court of the United States for the district and division embracing the place

26  where such action is pending."  28 U.S.C. § 1441(a).  Federal district courts, in turn, "have original

27  jurisdiction of all civil actions arising under the Constitution, laws, or treaties of the United States."

28  28 U.S.C. § 1331.  The Supreme Court has held that suits apparently alleging only state-law causes of

action nevertheless "arise under" federal law if the "state-law claim[s] necessarily raise a stated federal issue, actually disputed and substantial, which a federal forum may entertain without disturbing any congressionally approved balance of federal and state judicial responsibilities." *Grable*, 545 U.S. at 314.  Applying this test "calls for a common-sense accommodation of judgment to the kaleidoscopic situations that present a federal issue." *Id.* at 313.

23.    Plaintiff's Complaint attempts to undermine and supplant federal regulation of greenhouse gas emissions and hold a national industry responsible for the alleged consequences of rising ocean levels allegedly caused by global climate change.  There is no question that Plaintiff's claims raise a "federal issue, actually disputed and substantial," for which federal jurisdiction would not upset "any congressionally approved balance of federal and state judicial responsibilities."

24.    The issues of greenhouse gas emissions, global warming, and sea level rising are not unique to the County of San Mateo, the State of California, or even the United States.  Yet what the Complaint attempts to do is to supplant decades of national energy, economic development, and federal environmental protection and regulatory policies by prompting a California state court to take control over an entire industry and its interstate commercial activities, and impose massive damages contrary to the federal regulatory scheme.

25.    Collectively as well as individually, Plaintiff's causes of action depend on the resolution of disputed and substantial federal questions in light of complex national considerations.  For example, the Complaint's first, second, and fifth causes of action all seek relief for an alleged nuisance. Indeed, "the scope and limitations of a complex federal regulatory framework are at stake in this case.  And disposition of whether that framework may give rise to state law claims as an initial matter will ultimately have implications for the federal docket one way or the other." *Bd. of Comm'rs of Se. La. Flood Protection Auth. v. Tenn. Gas Pipeline Co*, 850 F.3d 714, 723 (5th Cir. 2017) (cert. petition pending) ("*Flood Protection Authority*").

26.    Under federal law, federal agencies must "assess both the costs and benefits of [an] intended regulation and, recognizing that some costs and benefits are difficult to quantify, propose or adopt a regulation only upon a reasoned determination that the benefits of the intended regulation justify its costs." Executive Order 12866, 58 Fed. Reg. 190.  In 2010, an interagency working group

published *Social Cost of Carbon for Regulatory Impact Analysis Under Executive Order 12866*, which was designed "to allow agencies to incorporate the social benefits of reducing carbon dioxide ($CO_2$) emissions into cost-benefit analyses of regulatory actions that have small, or 'marginal,' impacts on cumulative global emissions." The interagency working group published updates in 2013, 2015, and 2016. These measures were used by EPA in formulating various regulations regarding emission of greenhouse gases. *See, e.g.*, Final Carbon Pollution Standards for New, Modified and Reconstructed Power Plants, 80 Fed. Reg. 64662, 64751 (Oct. 23, 2015) (supporting its final rule by explaining that "the costs . . . are less than the central estimates of the social cost of carbon" as calculated by the interagency working group). Under California law, were it to apply, nuisance claims require a plaintiff to prove that the defendant's conduct is "unreasonable": in other words, "the gravity of the harm [must] outweigh[] the social utility of the defendant's conduct." *San Diego Gas & Elec. Co. v. Superior Ct.*, 13 Cal. 4th 893, 938 (1996). Plaintiff alleges that Defendants, through their national and, indeed, global activities, "have created, contributed to, and assisted in creating, a condition in San Mateo County, and permitted that condition to persist, which constitutes a nuisance by, *inter alia*, increasing local sea level, increasing the frequency and intensity of flooding, and increasing the frequency and intensity and frequency of storms and storm-related damage to the County and its residents." Compl. ¶ 180; *see also id.* ¶¶ 194, 231. Plaintiff alleges that "[t]he seriousness of rising sea levels and increased weather volatility and flooding is extremely grave, and outweighs the social utility of Defendants' conduct." *Id.* ¶¶ 184, 196, 235. Plaintiff's product liability claims require a similar risk-utility balancing. *See Barker v. Lull Eng'g Co., Inc.*, 20 Cal. 3d 413, 427 (1978).

27. But Congress has directed a number of federal agencies to regulate Defendants' conduct, and in doing so to conduct the same analysis of benefits and impacts that Plaintiff would have the state court undertake in analyzing Plaintiff's claims. The benefits and harms of Defendants' conduct are broadly distributed throughout the Nation, to all residents as well as all state and government entities. Given this diffuse and broad impact, Congress has acted through a variety of federal statutes—primarily but not exclusively, the Clean Air Act—to strike the balance between energy extraction and production and environmental protections. *See* Clean Air Act, 42 U.S.C. § 7401(c) (Con-

gressional statement that the goal of the Clean Air Act is "to encourage or otherwise promote reasonable Federal, State, and local governmental actions . . . for pollution prevention"); *see also, e.g.*, Energy Reorganization Act of 1974, 42 U.S.C. § 5801 (Congressional purpose to "develop, and increase the efficiency and reliability of use of, all energy sources" while "restoring, protecting, and enhancing environmental quality"); Mining and Minerals Policy Act, 30 U.S.C. § 1201 (Congressional purpose to encourage "economic development of domestic mineral resources" balanced with "environmental needs"); Surface Mining Control and Reclamation Act, 30 U.S.C. § 1201 (Congressional findings that coal mining operations are "essential to the national interest" but must be balanced by "cooperative effort[s] . . . to prevent or mitigate adverse environmental effects").

28.     The question of whether the federal agencies charged by Congress to balance energy and environmental needs for the entire Nation have struck that balance in an appropriate way is "inherently federal in character" and gives rise to federal question jurisdiction.  *Buckman Co. v. Plaintiffs' Legal Comm.*, 531 U.S. 341, 347(2001); *see also Pet Quarters, Inc. v. Depository Trust & Clearing Corp.*, 559 F.3d 772, 779 (8th Cir. 2009) (affirming federal question jurisdiction where claims implicated federal agency's acts implementing federal law); *Bennett v. Southwest Airlines Co.*, 484 F.3d 907, 909 (7th Cir. 2007) (federal removal under *Grable* appropriate where claims were "a collateral attack on the validity of" agency action under a highly reticulated regulatory scheme).  Adjudicating these claims in federal court, including whether private rights of action are even cognizable, is appropriate because the relief sought by Plaintiff would necessarily alter the regulatory regime designed by Congress, impacting residents of the Nation far outside the state court's jurisdiction.  *See, e.g.*, *Grable*, 545 U.S. at 312 (claims that turn on substantial federal questions "justify resort to the experience, solicitude, and hope of uniformity that a federal forum offers on federal issues"); *West Virginia ex rel. McGraw v. Eli Lilly & Co.*, 476 F. Supp. 2d 230, 234 (E.D.N.Y. 2007) (removal under *Grable* is appropriate where state common law claims implicate "an intricate federal regulatory scheme . . . requiring some degree of national uniformity in interpretation").

29.     The Complaint also calls into question Federal Government decisions to contract with defendants for the extraction, development, and sale of fossil fuel resources on federal lands.  Such

national policy decisions have expanded fossil fuel production and use, and produced billions of dollars in revenue to the federal treasury. Available, affordable energy is fundamental to economic growth and prosperity generally, as well as to national security and other issues that have long been the domain of the Federal Government. Yet, Plaintiff's claims require a determination that the complained-of conduct—the lawful activity of placing fossil fuels into the stream of interstate and foreign commerce—is unreasonable, and that determination raises a policy question that, under the Constitution and the applicable statutes, treaties, and regulations, is a federal question. *See In re Nat'l Sec. Agency Telecommc'ns*, 483 F. Supp. 2d 934, 943 (N.D. Cal. 2007) (holding that removal jurisdiction existed over case that implicated state-secrets privilege because "the privilege is 'not only a contested federal issue, but a substantial one,' for which there is 'a serious federal interest in claiming the advantages thought to be inherent in a federal forum'" (quoting *Grable*, 545 U.S. at 313)). The cost-benefit analysis required by the claims asserted in the Complaint would thus necessarily entail a usurpation by the state court of the federal regulatory structure of an essential, national industry. "The validity of [Plaintiff's] claims would require that conduct subject to an extensive federal permitting scheme is in fact subject to implicit restraints that are created by state law." *Flood Control Authority*, 850 F.3d at 724; *see also Bader Farms, Inc. v. Monsanto Co.*, No. 16-cv-299, 2017 WL 633815, at *3 (E.D. Mo. Feb. 16, 2017) ("Count VII is in a way a collateral attack on the validity of APHIS's decision to deregulate the new seeds"); *Bennett*, 484 F.3d at 909 (holding that federal removal is proper under *Grable* "when the state proceeding amounted to a collateral attack on a federal agency's action").

30.     Plaintiff's claims also necessarily implicate substantial federal questions by seeking to hold Defendants liable for compensatory and punitive damages, as well as injunctive relief, based on allegations that Defendants have waged a "campaign to obscure the science of climate change" and "disseminat[ed] and funded the dissemination of information intended to mislead elected officials and regulators," which Plaintiff alleges defrauded and interfered with federal decision-making, thereby "delay[ing] efforts to curb these emissions." Compl. ¶ 150; *see also id.* ¶¶ 203-27, 239-67.

31.     To show causation, Plaintiff must establish that federal regulators were misled *and* would have adopted different energy and climate policies absent the alleged misrepresentations.

NOTICE OF REMOVAL

Gibson, Dunn &
Crutcher LLP

Such a liability determination would require a court to construe federal regulatory decision-making standards, and determine how federal regulators would have applied those standards under counter-factual circumstances.  *See id.* ¶ 129 ("GCC and its cohorts staved off greenhouse gas regulation in the U.S., as indicated by U.S. Undersecretary of State Paula Dobriansky's talking points compiled before a 2001 meeting with GCC representations."); *see also Flood Protection Authority*, 850 F.3d at 723 (finding necessary and disputed federal issue in plaintiffs' state-law tort claims because they could not "be resolved without a determination whether multiple federal statutes create a duty of care that does not otherwise exist under state law").

32.     Additionally, Plaintiff alleges that Defendants failed to comply with their duties under the Toxic Substances Control Act, 55 U.S.C. § 1601 *et seq.*:  "Although greenhouse gases are human health hazards (because they have serious consequences in terms of global food production, disease virulence, and sanitation infrastructure, among other impacts), neither Imperial, Exxon, nor any other Defendant has ever filed a disclosure with the U.S. Environmental Protection Agency pursuant to the Toxic Substances Control Act."  Compl. ¶ 96; *see also Boyeson v. S. Carolina Elec. & Gas Co.*, No. 15-cv-4920, 2016 WL 1578950, at *5 (D.S.C. Apr. 20, 2016) ("While Plaintiffs' allegations of negli-gence appear on their face to not reference federal law, federal issues are cognizable as the source for the duty of care resulting from SCE&G's operation and management of water levels at the Lake Mur-ray Dam, and not from the alleged failure to warn.").

33.     Plaintiff's Complaint, which seeks to hold Defendants liable for "billions of dollars" in damages (Compl. ¶ 196) and requests equitable relief requiring Defendants to "abate the nuisance[]" of rising sea levels (*id.*, Prayer for Relief)—despite Defendants' uncontested compliance with state and federal law—necessarily implicates numerous other disputed and substantial federal issues.  Be-yond the strictly jurisdictional character of the points addressed above and herein, it is notable that this litigation places at issue multiple significant federal issues, including but not limited to: (1) whether Defendants can be held liable consistent with the First Amendment for purportedly "championing . . . anti-regulation and anti-science campaigns" that Plaintiff alleges deceived federal agencies (Compl. ¶ 9); (2) whether a state court may hold Defendants liable for conduct that was

global in scale (production of fossil fuels), that allegedly produced effects that are global in scale (increased $CO_2$ levels and rising sea levels), and on that basis, order Defendants to modify their conduct on a global scale (abating rising sea levels), consistent with the constitutional principles limiting the jurisdictional and geographic reach of state law and guaranteeing due process; (3) whether fossil fuel *producers* may be held liable, consistent with the Due Process Clause, for climate change when it is the combustion of fossil fuels—including by Plaintiff and the People of the State of California themselves—that leads to the release of greenhouse gases into the atmosphere; (4) whether a state may impose liability under state common law when the Supreme Court has held that the very same *federal* common law claims are displaced by federal statute, and notwithstanding the commonsense principle that "[i]f a federal common law cause of action has been extinguished by Congressional displacement, it would be incongruous to allow it to be revived *in any form*," *Kivalina*, 696 F.3d at 857 (emphasis added); (5) whether a state court may regulate and burden on a global scale the sale and use of what federal policy has deemed an essential resource, consistent with the United States Constitution's Commerce Clause and foreign affairs doctrine, as well as other constitutional principles; (6) whether a state court may review and assess the validity of acts of foreign states in enacting and enforcing their own regulatory frameworks; and (7) whether a state court may determine the ability to sue based on alleged damages to land, such as coastal property and interstate highways (*see* Compl. ¶¶ 182, 184, 196), which depends on the interpretation of federal laws relating to the ownership and control of property.

      34.    Plaintiff's Complaint also raises substantial federal issues because the asserted claims intrude upon both foreign policy and carefully balanced regulatory considerations at the national level, including the foreign affairs doctrine. Plaintiff seeks to govern extraterritorial conduct and encroach on the foreign policy prerogative of the Federal Government's executive branch as to climate change treaties. "There is, of course, no question that at some point an exercise of state power that touches on foreign relations must yield to the National Government's policy, given the 'concern for uniformity in this country's dealings with foreign nations' that animated the Constitution's allocation of the foreign relations power to the National Government in the first place." *Am. Ins. Assoc. v. Garamendi*, 539 U.S. 396, 413 (2003). Yet, this is the precise nature of Plaintiff's action brought in state

court.  *See United States v. Belmont*, 301 U.S. 324, 331 (1937) ("The external powers of the United States are to be exercised without regard to state laws or policies… [I]n respect of our foreign relations generally, state lines disappear."); *Hines v. Davidowitz*, 312 U.S. 52, 63 (1941) ("Our system of government . . . requires that federal power in the field affecting foreign relations be left entirely free from local interference.").

35.    Through its action, Plaintiff seeks to regulate greenhouse gas emissions worldwide, far beyond the borders of the United States.  This is premised in part, according to Plaintiff, on Defendants' purported campaign to undermine national and international efforts, like the Kyoto Protocol, to rein in greenhouse gas emissions.  Compl. ¶¶ 114, 128-29.  Plaintiff alleges that its injuries are caused by global weather phenomena, such as increases in the Earth's ambient temperatures, ocean temperature, sea level, and extreme storm events, and that Defendants are a substantial contributing factor to such climate change as a result of their collective operations on a worldwide basis, which Plaintiff claims accounts for one-fifth of total global greenhouse gas emissions. *Id.* ¶¶ 14, 164-65. But "[n]o State can rewrite our foreign policy to conform to its own domestic policies.  Power over external affairs is not shared by the States; it is vested in the national government exclusively.  It need not be so exercised as to conform to State laws or State policies, whether they be expressed in constitutions, statutes, or judicial decrees." *United States v. Pink*, 315 U.S. 203, 233-34 (1942).  States have no authority to impose remedial schemes or regulations to address what are matters of foreign affairs.  *Ginergy v. City of Glendale*, 831 F.3d 1222, 1228-29 (9th Cir. 2016) ("It is well established that the federal government holds the exclusive authority to administer foreign affairs.").

## V.    THE ACTION IS REMOVABLE BECAUSE IT IS COMPLETELY PREEMPTED BY FEDERAL LAW

36.    This Court also has original jurisdiction over this lawsuit because Plaintiff requests relief that would alter or amend the rules regarding nationwide—and even worldwide—regulation of greenhouse gas emissions.  This action is completely preempted by federal law.

37.    The Supreme Court has held that a federal court will have jurisdiction over an action alleging only state-law claims where "the extraordinary pre-emptive power [of federal law] converts

an ordinary state common law complaint into one stating a federal claim for purposes of the well-pleaded complaint rule." *Metro. Life Ins. Co. v. Taylor*, 481 U.S. 58, 65 (1987).

38.     A state cause of action is preempted under this "complete preemption" doctrine where a federal statutory scheme "provide[s] the exclusive cause of action for the claim asserted and also set[s] forth procedures and remedies governing that cause of action." *Beneficial Nat'l Bank v. Anderson*, 539 U.S. 1, 8 (2003).  It also requires a determination that the state-law cause of action falls within the scope of the federal cause of action, including where it "duplicates, supplements, or supplants" that cause of action.  *Aetna Health Inc. v. Davila*, 542 U.S. 200, 209 (2004).

39.     Both requirements for complete preemption are present here.  Among other things, Plaintiff's Complaint seeks an "abatement" of a nuisance it alleges Defendants have caused—namely, a rise in sea levels, an increase in the frequency and intensity of flooding, and an increase in the intensity and frequency of storms and storm-related damages.  As such, it seeks regulation of greenhouse gas emissions far beyond the borders of California and even the borders of the United States. This can be accomplished only by a nationwide and global reduction in the emission of greenhouse gases.  Even assuming that such relief can be ordered against Defendants for their production and sale of fossil fuels, which are then combusted by others at a rate Plaintiff claims causes the alleged injuries, this claim must be decided in federal court because Congress has created a cause of action by which a party can seek the creation or modification of nationwide emission standards by petitioning the EPA.  That federal cause of action was designed to provide the exclusive means by which a party can seek nationwide emission regulations.  Because Plaintiff's state causes of action would "duplicate[], supplement[], or supplant[]" that exclusive federal cause of action, they are completely preempted.  "If a federal common law cause of action has been extinguished by Congressional displacement, it would be incongruous to allow it to be revived in any form." *Kivalina*, 696 F.3d at 857.

## A.     The Clean Air Act Provides the Exclusive Cause of Action for Challenging EPA Rulemakings.

40.     The Clean Air Act permits private parties, as well as state and municipal governments, to challenge EPA rulemakings (or the absence of such) and to petition the EPA to undertake new rulemakings. *See Massachusetts*, 549 U.S. at 516-17.  In addition, Congress created an independent

scientific review committee, to include at least one person representing State air pollution control agencies, with a statutory role in the rulemaking process. *See* 42 U.S.C. § 7409(d)(2)(A).

41.     With regard to new rulemakings, the Clean Air Act provides that "any person may petition the Administrator to modify the list of hazardous air pollutants under this subsection by adding or deleting a substance." 42 U.S.C. § 7412(b)(3).  "Within 18 months after receipt of a petition, the Administrator shall either grant or deny the petition by publishing a written explanation of the reasons for the Administrator's decision." *Id.*  In the event of an unfavorable decision, "[a] petition for review . . . may be filed only in the United States Court of Appeals for the District of Columbia." 42 U.S.C. § 7607(b)(1).  This petition for review "shall be filed within sixty days from the date notice of such promulgation, approval, or action appears in the Federal Register." *Id.*

42.     Rulemakings (and petitions for rulemaking) regarding the regulation of nationwide greenhouse gas emissions are subject to the federal statutory and regulatory scheme outlined in detail by the Clean Air Act.  *See Massachusetts*, 549 U.S. at 516-17.

43.     Congress manifested a clear intent that the procedure outlined above regarding petitions for EPA rulemaking be exclusive:  "Action of the Administrator with respect to which review could have been obtained . . . shall not be subject to judicial review in civil or criminal proceedings for enforcement." 42 U.S.C. § 7607(b)(2).

44.     This congressionally provided statutory and regulatory scheme is thus the "exclusive" means for seeking the nationwide regulation of greenhouse gas emissions and "set[s] forth procedures and remedies" for that relief, *Beneficial Nat'l Bank*, 539 U.S. at 8, irrespective of the savings clauses applicable to some other types of claims.  Moreover, in addition to states' ability to participate in the comment process on federal regulations, Congress created a mechanism whereby states can contribute to the rulemaking process.  *See* 42 U.S.C. § 7409(d)(2)(A).

**B.     Plaintiff's Asserted State-Law Causes of Action Duplicate, Supplement, and/or Supplant the Federal Cause of Action.**

45.     Plaintiff asks the Court to order Defendants to "abate the nuisance caused by sea level rise in the County's jurisdiction."  Compl. ¶ 12; *see also id.*, Prayer for Relief (requesting "[e]quitable relief to abate the nuisances complained of herein").

46.     According to Plaintiff's own allegations, the alleged nuisances can be abated only by a global—or at the very least national—reduction in greenhouse gas emissions.  *See* Compl. ¶ 74 ("[I]t is not possible to determine the source of any particular individual molecule of $CO_2$ in the atmosphere attributable to anthropogenic sources because such greenhouse gas molecules do not bear markers that permit tracing them to their source, and because greenhouse gases quickly diffuse and comingle in the atmosphere."); *id.* ¶ 75 (describing "global" greenhouse gas emissions relating to fossil fuel products).  Indeed, Plaintiff's allegations purport to show that Defendants "undertook a momentous effort to evade *international* and *national* regulation of greenhouse gas emissions"—*not* state or local regulations.  *Id.* ¶ 140 (emphases added); *see also id.* ¶ 114 ("Defendants embarked on a decades-long campaign designed to . . . undermine national and international efforts like the Kyoto Protocol to rein in greenhouse gas emissions."); *id.* ¶ 112 (acknowledging, *inter alia*, federal legislative efforts to regulate $CO_2$ and other greenhouse gases that allegedly "prompted Defendants to change their tactics . . . to a public campaign aimed at evading regulation"); *id.* ¶¶ 125, 126(a), 128, 129 (describing alleged efforts to encourage the United States to reject the international Kyoto Protocol); *id.* ¶¶ 134-35 (describing Defendants' alleged lobbying efforts against the federal American Clean Energy and Security Act of 2009, which would have imposed a U.S. cap-and-trade program).

47.     Plaintiff's state-law tort claims are effectively an end-run around a petition for a rulemaking regarding greenhouse gas emissions because they seek to regulate nationwide emissions that Plaintiff concedes conform to EPA's emission standards.  *See, e.g.*, *San Diego Bldg. Trades Council v. Garmon*, 359 U.S. 236, 247 (1959); *Cipollone v. Liggett Grp., Inc.*, 505 U.S. 504, 539 (1992).  The claims would require precisely the cost-benefit analysis of emissions that the EPA is charged with undertaking and would directly interfere with the EPA's determinations.  *See supra* ¶ 26.  Because Congress has established a clear and detailed process by which a party can petition the EPA to establish stricter nationwide emissions standards,  Plaintiff's claims are completely preempted by the Clean Air Act.

48.     Because Congress has provided an exclusive statutory remedy for the regulation of greenhouse gas emissions which provides federal procedures and remedies for that cause of action,

Gibson, Dunn &
Crutcher LLP

and because Plaintiff's claims fall within the scope of the federal cause of action, Plaintiff's claims are completely preempted by federal law and this Court has federal-question jurisdiction.

## VI.     THE ACTION IS REMOVABLE UNDER THE OUTER CONTINENTAL SHELF LANDS ACT

49.     This Court also has original jurisdiction pursuant to the Outer Continental Shelf Lands Act ("OCSLA").  43 U.S.C. § 1349(b); *see Tenn. Gas Pipeline*, 87 F.3d at 155.  This action "aris[es] out of, or in connection with (A) any operation conducted on the outer Continental Shelf which involves exploration, development, or production of the minerals, or the subsoil or seabed of the outer Continental Shelf, or which involves rights to such minerals."  43 U.S.C. § 1349(b); *In re Deepwater Horizon*, 745 F.3d 157, 163 (5th Cir. 2014) ("th[e] language [of § 1349(b)(1)] [i]s straightforward and broad").  The outer continental shelf ("OCS") includes all submerged lands that belong to the United States but are not part of any State.  43 U.S.C. §§ 1301, 1331.

50.     The breadth of federal jurisdiction granted by OCSLA reflects the Act's "expansive substantive reach."  *See EP Operating Ltd. P'ship v. Placid Oil Co.*, 26 F.3d 563, 569 (5th Cir. 1994).  "OCSLA was passed . . . to establish federal ownership and control over the mineral wealth of the OCS and to provide for the development of those natural resources."  *Id.* at 566.  "[T]he efficient exploitation of the minerals of the OCS . . . was . . . a primary purpose for OCSLA."  *Amoco Prod. Co. v. Sea Robin Pipeline Co.*, 844 F.2d 1202, 1210 (5th Cir. 1988).  Indeed, OCSLA declares it "to be the policy of the United States that … the outer Continental Shelf … should be made available for expeditious and orderly development."  43 U.S.C. § 1332(3).  It further provides that "since exploration, development, and production of the minerals of the outer Continental Shelf will have significant impacts on coastal and non-coastal areas of the coastal States … such States, and through such States, affected local governments, are entitled to an opportunity to participate, *to the extent consistent with the national interest*, in the policy and planning decisions made by the Federal Government relating to exploration for, and development and production of, minerals of the outer Continental Shelf."  *Id.* § 1332(4) (emphasis added).

51.     When enacting Section 1349(b)(1), "Congress intended for the judicial power of the United States to be extended to the entire range of legal disputes that it knew would arise relating to

resource development on the [OCS]." *Laredo Offshore Constructors, Inc. v. Hunt Oil. Co.*, 754 F.2d 1223, 1228 (5th Cir. 1985). Consistent with Congress' intent, courts repeatedly have found OCSLA jurisdiction where resolution of the dispute foreseeably could affect the efficient exploitation of minerals from the OCS.[2] *See, e.g.*, *EP Operating*, 26 F.3d at 569-70; *United Offshore v. S. Deepwater Pipeline*, 899 F.2d 405, 407 (5th Cir. 1990).

52.    OCSLA jurisdiction exists even if the Complaint pleads no substantive OCSLA claims. *See, e.g.*, *In re Deepwater Horizon*, 745 F.3d at 163. The Court, moreover, may look beyond the facts alleged in the Complaint to determine that OCSLA jurisdiction exists. *See, e.g.*, *Plains Gas Solutions, LLC v. Tenn. Gas Pipeline Co., LLC*, 46 F. Supp. 3d 701, 703 (S.D. Tex. 2014); *St. Joe Co. v. Transocean Offshore Deepwater Drilling Inc.*, 774 F. Supp. 2d 596, 2011 A.M.C. 2624, 2640 (D. Del. 2011) (citing *Amoco Prod. Co. v. Sea Robin Pipeline Co.*, 844 F.2d 1202, 1205 (5th Cir. 1998)).

53.    Under OCSLA, the Department of Interior administers an extensive federal leasing program aiming to develop and exploit the oil and gas resources of the federal Continental Shelf. 43 U.S.C. § 1334 *et seq.* Pursuant to this authority, the Interior Department "administers more than 5,000 active oil and gas leases on nearly 27 million OCS acres. In FY 2015, production from these leases generated $4.4 billion in leasing revenue . . . . [and] provided more than 550 million barrels of oil and 1.35 trillion cubic feet of natural gas, accounting for about sixteen percent of the Nation's oil production and about five percent of domestic natural gas production." Statement of Abigail Ross Hopper, Director, Bureau of Ocean Energy Management, Before the House Committee on Natural Resources (Mar. 2, 2016), *available at* https://www.boem.gov/FY2017-Budget-Testimony-03-01-2016. Certain Defendants here, of course, participate very substantially in the federal OCS leasing program. For example, from 1947 to 1995, Chevron U.S.A. Inc. produced 1.9 billion barrels of crude oil and 11 billion barrels of natural gas from the federal outer continental shelf in the Gulf of Mexico

---

[2]   As stated in 43 U.S.C. § 1333(a)(1): "The Constitution and laws and civil and political jurisdiction of the United States are extended to the subsoil and seabed of the outer Continental Shelf and to all artificial islands, and all installations and other devices permanently or temporarily attached to the seabed . . . for the purpose of exploring for, developing, or producing resources therefrom . . . to the same extent as if the outer Continental Shelf were an area of exclusive Federal jurisdiction located within a State . . . ."

alone.  U.S. Dep't of Int., Minerals Mgmt. Serv., Gulf of Mex. Region, Prod. by Operator Ranked by Vol. (1947–1995), *available at* https://www.data.boem.gov/Production/Files/Rank%20File%20Gas%201947%-20-%201995.pdf.  In 2016, Chevron U.S.A. produced over 49 million barrels of crude oil and 50 million barrels of natural gas from the outer continental shelf on the Gulf of Mexico.  U.S. Dep't of Int., Bureau of Safety & Envtl. Enf't, Gulf of Mex. Region, Prod. by Operator Ranked by Vol. (2016), *available at* https://www.data.boem.gov/Production/Files/Rank%20File%20Gas%202016.pdf.  Numerous other Defendants conduct, and have for decades conducted, similar oil and gas operations on the federal OCS; indeed, Defendants and their affiliated companies presently hold approximately 32.95% of all outer continental shelf leases.  *See* Bureau of Ocean Energy Management, Lease Owner Information, *available at* https://www.data.boem.gov/Leasing/LeaseOwner/Default.aspx.  For example, certain BP companies and Exxon Mobil currently own lease interests in, and the BP companies operate, "one of the largest deepwater producing fields in the Gulf of Mexico," which is capable of producing up to 250,000 barrels of oil per day.  *See* Thunder Horse Field Fact Sheet (last visited Aug. 21, 2017), *available at* http://www.bp.com/content/dam/bp-country/en_us/PDF/Thunder_Horse_Fact_Sheet_6_14_2013.pdf.  And as noted on the BP website, production from this and other OCS activities will continue into the future.  *Id.* ("BP intends to sustain its leading position as an active participant in all facets of the Deepwater US Gulf of Mexico—as an explorer, developer, and operator.").  A substantial portion of the national consumption of fossil fuel products stems from production on federal lands, as approved by Congress and Executive Branch decision-makers.

54.     The Complaint itself makes clear that a substantial part of Plaintiff's claims "'arise[] out of, or in connection with," Defendants' "operation[s] 'conducted on the outer Continental Shelf" that involve "the exploration and production of minerals."  *In re Deepwater Horizon*, 745 F.3d at 163.  Plaintiff, in fact, challenges *all of* Defendants' "extraction . . . of coal, oil, and natural gas" activities, *e.g.*, Compl. ¶¶ 3, 14, a substantial quantum of which arise from outer continental shelf operations, *see* Ranking Operator by Oil, Bureau of Ocean Energy Mgmt., *available at* https://www.data.boem.gov/Main/HtmlPage.aspx?page=rankOil (documenting Chevron's oil and natural gas production on the federal outer continental shelf from 1947 to 2017).  Plaintiff alleges that

Gibson, Dunn &
Crutcher LLP

24

emissions have risen due to increased outer continental shelf extraction technologies. *See, e.g.*, Compl. ¶¶ 143-44 (discussing arctic offshore drilling equipment and patents which may be relevant to conduct near Alaskan outer continental shelf). And Plaintiff challenges energy projects that occurred in Canadian waters. Compl. ¶¶ 105, 107. Defendants conduct similar activity in American waters and many of the emissions Plaintiff challenges necessarily arise from the use of fossil fuels extracted from the OCS.

55.     The relief sought also arises out of and impacts OCS extraction and development. *See, e.g.*, Compl., Prayer for Relief (seeking damages designed to cripple the energy industry and equitable relief that would no doubt rein in extraction, including that on the OCS). And "any dispute that alters the progress of production activities on the OCS threatens to impair the total recovery of the federally-owned minerals from the reservoir or reservoirs underlying the OCS. Congress intended such a dispute to be within the grant of federal jurisdiction contained in § 1349." *Amoco Prod. Co.*, 844 F.2d at 1211.

## VII.     THE ACTION IS REMOVABLE UNDER THE FEDERAL OFFICER REMOVAL STATUTE

56.     The Federal Officer Removal statute allows removal of an action against "any officer (or any person acting under that officer) of the United States or of any agency thereof . . . for or relating to any act under color of such office." 28 U.S.C. § 1442(a)(1). "A party seeking removal under section 1442 must demonstrate that (a) it is a 'person' within the meaning of the statute; (b) there is a causal nexus between its actions, taken pursuant to a federal officer's directions, and plaintiff's claims; and (c) it can assert a 'colorable federal defense.'" *Durham*, 445 F.3d at 1251 (citations omitted). All three elements are satisfied here for the Chevron Parties and many other Defendants, which have engaged in activities pursuant to the directions of federal officers that, assuming the truth of Plaintiff's allegations, have a causal nexus to Plaintiff's claims, and which have colorable federal defenses to Plaintiff's claims, including, for example, performing pursuant to government mandates and contracts, performing functions for the U.S. military, and engaging in activities on federal lands pursuant to federal leases.

57.     First, Defendants are "persons" within the meaning of the statute.  The Complaint alleges that Defendants are corporations (Compl. ¶ 16), which the Ninth Circuit has held qualify as "person[s]" under the statute.  *See Leite*, 749 F.3d at 1122 n.4.

58.     Second, assuming the truth of Plaintiff's allegations, there is a causal nexus between Defendants' alleged actions, taken pursuant to a federal officer's direction, and Plaintiff's claims.  In *Leite*, the Ninth Circuit held removal proper where a military contractor, which was sued for failing to warn about asbestos in military equipment, showed extensive evidence of federal control over its activities.  This included "detailed specifications governing the form and content of all warnings that equipment manufacturers were required to provide," which the Navy was directly involved in preparing and which could not be altered.  749 F.3d at 1123.  Here, Plaintiff's causation and damages allegations depend on the activities of Defendants over the past decades—many of which were undertaken at the direction of, and under close supervision and control by, federal officials.

59.     To take only one example, the Chevron Parties and other Defendants have long explored for and produced minerals, oil and gas on federal lands pursuant to leases governed by the Outer Continental Shelf Lands Act as described above.  *E.g.*, Exs. B, C.  In doing so, those Defendants were "'acting under' a federal 'official'" within the meaning of Section 1442(a)(1).  *Watson v. Philip Morris Cos., Inc.*, 551 U.S. 142, 153 (2007).  Under OCSLA, the Interior Department is charged with "manag[ing] access to, and . . . receiv[ing] a fair return for, the energy and mineral resources of the Outer Continental Shelf."  Statement of Walter Cruickshank, Deputy Director, Bureau of Ocean Energy Management, Before The Committee On Natural Resources, July, 6, 2016, *available at* https://www.boem.gov/Congressional-Testimony-Cruickshank-07062016/.  To fulfill this statutory obligation, the Interior officials maintain and administer the OCS leasing program, under which parties such as Defendants are required to conduct exploration, development and production activities that, "in the absence of a contract with a private firm, the Government itself would have had to perform."  *Watson*, 551 U.S. at 154.

60.     OCS leases obligate lessees like Defendants to "develop[] . . . the leased area" diligently, including carrying out exploration, development and production activities approved by Inte-

NOTICE OF REMOVAL

Gibson, Dunn &
Crutcher LLP

rior Department officials for the express purpose of "maximiz[ing] the ultimate recovery of hydrocar-bons from the leased area."  Ex. C § 10.  Indeed, for decades Defendants' OCSLA leases have in-structed that "[t]he Lessee *shall comply* with all applicable regulations, orders, written instructions, and the terms and conditions set forth in this lease" and that "[a]fter due notice in writing, the Lessee *shall conduct* such OCS mining activities at such rates as the Lessor may require in order that the Leased Area or any part thereof may be properly and timely developed and produced in accordance with sound operating principles."  Ex. B § 10 (emphasis added).  All drilling takes place "in accord-ance with an approved exploration plan (EP), development and production plan (DPP) or develop-ment operations coordination document (DOCD) [as well as] approval conditions"—all of which must undergo extensive review and approval by federal authorities, and all of which further had to conform to "diligence" and "sound conservation practices."  Ex. C §§ 9, 10.  Federal officers further have reserved the rights to control the rates of mining (Ex. B § 10) and to obtain "prompt access" to facilities and records (Ex. B § 11, Ex. C § 12).  The government also maintains certain controls over how the leased oil/gas/minerals are disposed of once they are removed from the ground, as by pre-conditioning the lease on a right of first refusal to purchase all materials "[i]n time of war or when the President of the United States shall so prescribe" (Ex. B  § 14, Ex. C § 15(d)), and mandating that 20% of all crude and natural gas produced pursuant to drilling leases be offered "to small or inde-pendent refiners" (Ex. C § 15(c)).  The Federal Treasury has reaped enormous financial benefits from those policy decisions in the form of statutory and regulatory royalty regimes that have resulted in billions of dollars of revenue to the Federal Government.

61.     Certain Defendants have also engaged in the exploration and production of fossil fuels pursuant to agreements with federal agencies.  For example, in June 1944, the Standard Oil Company (a Chevron predecessor) and the U.S. Navy entered into a contract "to govern the joint operation and production of the oil and gas deposits . . . of the Elk Hills Reserve," a strategic petroleum reserve maintained by the Navy.  *Chevron U.S.A., Inc. v. United States*, 116 Fed. Cl. 202, 205 (Fed. Cl. 2014).  "The Elk Hills Naval Petroleum Reserve (NPR-1) . . . was originally established in 1912 to provide a source of liquid fuels for the armed forces during national emergencies."  GAO Fact Sheet, Naval Petroleum Reserves – Oil Sales Procedures and Prices at Elk Hills, April Through December

1986 (Jan. 1987) ("GAO Fact Sheet"), *available at* http://www.gao.gov/assets/90/87497.pdf.  In response to the OPEC oil embargo in 1973-74, the Naval Petroleum Reserves Production Act of 1976 (Public Law 94-258, April 5, 1976) was enacted, which "authorized and directed that NPR-1 be produced at the maximum efficient rate for 6 years." *Id.*  In 1977, Congress "transferred the Navy's interests and management obligations to [the Department of Energy]," and Chevron continued its interest in the joint operation until 1997. *Id.*  That contract governing Standard's rights in the reserve granted the Navy authority over how much would be produced from the joint operating area, and when it would be produced.  Indeed, the contract "afford[ed] Navy a means of acquiring complete control over the development of the entire Reserve and the production of oil therefrom" (Ex. D at Recital 6(d)(ii)), as well as "exclusive control over the exploration, prospecting, development, and operation of the Reserve" (*id.* § 3(a)).  One of the goals of the contract was to "place the Reserve in a condition of readiness whereby it will be able promptly to produce oil in substantial quantities whenever the strategic situation of the United States in the future may so require." *Id.* at Recital 6(d)(iii).  Finally, the contract was meant to "result in securing the maximum ultimate recovery of oil, gas, natural gasoline and associated hydrocarbons from the Reserve." *Id.* at Recital 6(d)(vi).  "In accordance with the [Naval Petroleum Reserves Production] [A]ct, the president . . . certifi[ed] that it [was] in the national interest to continue production of NPR-1 at the maximum efficient rate through a second 3-year period ending on April 5, 1988."  GAO Fact Sheet at 3.

62.     Defendants also have supplied motor vehicle fuels under agreements with the federal government, including the Armed Forces.  For instance, CITGO Petroleum Corporation ("CITGO") was a party to fuel supply agreements with the Navy Exchange Service Command ("NEXCOM"), which is a department of the Naval Supply Systems Command of the U.S. Navy.  Among other things, NEXCOM sells goods and services at a savings to active duty military, retirees, reservists, and their families.  Starting in approximately 1988 through approximately 2012, pursuant to its agreements with NEXCOM, CITGO supplied CITGO branded gasoline and diesel fuel to NEXCOM for service stations operated by NEXCOM on Navy bases located in a number of states across the country.  The NEXCOM agreements contained detailed fuel specifications, and CITGO complied with these government specifications in supplying the fuel to NEXCOM.  CITGO also contracted with

NEXCOM to provide demolition, site preparation, design, construction, and related financing services to build new gasoline service stations on Navy bases in the 1990s.

63.     These and other federal activities are encompassed in Plaintiff's Complaint.  *See supra* ¶¶ 49-62.  Plaintiff alleges that the drilling and mining operations Defendants performed led to the sale of fossil fuels—including to the Federal Government—which led to the release of greenhouse gases by end-users.  Furthermore, the oil and gas Defendants extracted—which the Federal Government (i) reserved the right to buy in total in the event of a time of war or whenever the President so prescribed and (ii) has purchased from Defendants to fuel its military operations—is the very same oil and gas that Plaintiff alleges is a defective product giving rise to strict liability.  Accordingly, Plaintiff seeks to hold Defendants liable for the very activities Defendants performed under the control of a federal official, and thus the nexus element has been satisfied.

64.     Third, Defendants intend to raise numerous meritorious federal defenses, including preemption, *see Goncalves By & Through Goncalves v. Rady Children's Hosp. San Diego*, No. 15-55010, --- F.3d ---, 2017 WL 3273868, at *8 (9th Cir. Aug. 2, 2017), the government contractor defense, *see Boyle v. United Techs. Corp.*, 487 U.S. 500 (1988); *Gertz v. Boeing*, 654 F.3d 852 (9th Cir. 2011), and others.  In addition, Plaintiff's claims are barred by the United States Constitution, including the Commerce and Due Process clauses, as well as the First Amendment and the foreign affairs doctrine.  These and other federal defenses are more than colorable.  *See Willingham v. Morgan*, 395 U.S. 402, 407 (1969) (a defendant invoking section 1442(a)(1) "need not win his case before he can have it removed").  Accordingly, removal under Section 1442 is proper.

## VIII.   THE ACTION IS REMOVABLE BECAUSE THIS CASE ARISES FROM ACTS ARISING FROM MULTIPLE FEDERAL ENCLAVES

65.     This Court also has original jurisdiction under the federal enclave doctrine.  The Constitution authorizes Congress to "exercise exclusive legislation in all cases whatsoever" over all places purchased with the consent of a state "for the erection of forts, magazines, arsenals, dockyards, and other needful buildings."  U.S. Const., art. I, § 8, cl. 17.  "Federal courts have federal question jurisdiction over tort claims that arise on 'federal enclaves.'"  *Durham*, 445 F.3d at 1250; *see also Totah v. Bies*, No. C 10-05956 CW, 2011 WL 1324471, at *2 (N.D. Cal. Apr. 6, 2011) (denying

Gibson, Dunn &
Crutcher LLP

motion to remand where defamation claim arose in the Presidio in San Francisco, a federal enclave). The "key factor" in determining whether a federal court has federal enclave jurisdiction "is the location of the plaintiff's injury or where the specific cause of action arose." *Sparling v. Doyle*, 2014 WL 2448926, at *3 (W.D. Tex. May 30, 2014); *see also Fung v. Abex Corp.*, 816 F. Supp. 569, 571 (N.D. Cal. 1992) ("Failure to indicate the federal enclave status and location of the exposure will not shield plaintiffs from the consequences of this federal enclave status."); *Bd. of Comm'rs of Se. La. Flood Protection Auth.-E. v. Tenn. Gas Pipeline Co.*, *LLC*, 29 F. Supp. 3d 808, 831 (E.D. La. 2014) (noting that defendants' "conduct" or "the damage complained of" must occur on a federal enclave). Federal jurisdiction is available if some of the events or damages alleged in the complaint occurred on a federal enclave. *See Durham*, 445 F.3d at 1250; *Bell v. Arvin Meritor, Inc.*, No. 12-00131-SC, 2012 WL 1110001, at *2 (N.D. Cal. Apr. 2, 2012) (finding federal enclave jurisdiction where "some of the[] locations … are federal enclaves"); *Totah*, 2011 WL 1324471, at *2 (holding that court can "exercise supplemental jurisdiction over related claims" that did not arise on federal enclave).

66.     Three requirements exist for land to be a federal enclave: (1) the United States must have acquired the land from a state; (2) the state legislature must have consented to the jurisdiction of the Federal Government; and (3) the United States must have accepted jurisdiction. *Wood v. Am. Crescent Elevator Corp.*, No. 11-397, 2011 WL 1870218, at *2 (E.D. La. May 16, 2011).

67.     Upon information and belief, the federal government owns federal enclaves in the area at issue where Plaintiff's "damage complained of" allegedly occurs. *Tenn. Gas Pipeline*, 29 F. Supp. 3d at 831. Indeed, Plaintiff broadly alleges injuries to huge swaths of the County, *see* Compl. ¶¶ 172-75, and "[f]ailure to indicate the federal enclave status and location of the exposure will not shield plaintiffs from the consequences of this federal enclave status," *Fung*, 816 F. Supp. at 571. Additionally, the "Vulnerability Analysis" on which Plaintiff bases its claims, which ostensibly "analy[zes] [the] overall vulnerability to sea level rise" of the County and "formally identif[ies] actual risks to the County . . . and the consequences associated with taking no action to prevent or mitigate the harms associated with those expected impacts" (Compl. ¶ 171), expressly includes potential damage to federal lands. *See, e.g.*, County of San Mateo Sea Level Rise Vulnerability Assessment at 65 (Apr.

Gibson, Dunn & Crutcher LLP

30

2017) (the "Assessment").  Moreover, upon information and belief, federal property along the coast-line in San Mateo County, such as the Golden Gate National Recreation Area and Mori Point, qualify as federal enclaves.  As "[f]ederal enclaves include 'numerous military bases, federal facilities, and even some national forests and parks,'" federal jurisdiction exists over Plaintiff's claims.  *Azhocar v. Coastal Marine Servs., Inc.*, No. 13-cv-155, 2013 WL 2177784, at *1 (S.D. Cal. May 20, 2013) (quoting *Allison v. Boeing Laser Tech. Servs.*, 689 F.3d 1234, 1235 (10th Cir. 2012)).

68.     On information and belief, Defendants maintain or maintained oil and gas operations on military bases or other federal enclaves such that the Complaint, which bases the claims on the "extracting, refining, processing, producing, promoting and[/or] marketing of fossil fuel products" (Compl. ¶ 14), arises under federal law.  *See, e.g.*, *Humble Pipe Line Co. v. Waggoner*, 376 U.S. 369, 372 (1964) (noting that the United States exercises exclusive jurisdiction over oil and gas rights within Barksdale Air Force Base in Louisiana); *see also Mississippi River Fuel Corp. v. Cocreham*, 390 F.2d 34, 35 (5th Cir. 1968) (on Barksdale AFB, "the reduction of fugitive oil and gas to posses-sion and ownership[] takes place within the exclusive jurisdiction of the United States").  Indeed, as of 2000, approximately 14% of the National Wildlife Refuge System "had oil or gas activities on their land," and these activities were spread across 22 different states.  *See* GAO, *U.S. Fish and Wild-life Service: Information on Oil and Gas Activities in the National Wildlife Refuge* (Oct. 30, 2001), *available at* http://www.gao.gov/new.items/d0264r.pdf.  Furthermore, Chevron and its predecessor companies for many years engaged in production activities on the Elk Hills Reserve—a strategic oil reserve maintained by the Naval Department—pursuant to a joint operating agreement with the Navy.  *See Chevron U.S.A.*, 116 Fed. Cl. at 205.  Pursuant to that agreement, Standard Oil "operat[ed] the lands of Navy and Standard in the Reserve."  Ex. D at 4.

69.     In addition, the Complaint relies upon conduct occurring in the District of Columbia—itself a federal enclave, *see, e.g.*, *Collier v. District of Columbia*, 46 F. Supp. 3d 6 (D.D.C. 2014); *Hobson v. Hansen*, 265 F. Supp. 902, 930 (D.D.C. 1967)—as a basis for Plaintiff's claims.  Indeed, Plaintiff complains that Defendants' supposedly wrongful conduct included a meeting between an industry organization and federal government officials that purportedly contributed to the rejection of the Kyoto Protocol (Compl. ¶ 129) and the "sen[ding of] letters to persuade members of Congress to

vote against the American Clean Energy and Security Act of 2009" (*id.* ¶ 134).  The Complaint also points to Defendants' purported funding of "lobbyists" to influence legislation and legislative priorities.  Here, too, "some of the[] locations" giving rise to Plaintiff's claims "are federal enclaves," further underscoring the presence of federal jurisdiction.  *Bell*, 2012 WL 1110001, at *2.  As the Ninth Circuit contemplated in *Jacobson v. U.S. Postal Serv.*, 993 F.2d 649, 657 (9th Cir. 1992), free speech placed at issue in a federal enclave falls under the jurisdiction of the federal courts.  *Id.* (observing that newspaper vendors were required to obtain permits pursuant to a federal statute to sell newspapers in front of U.S. post office locations, which the Court deemed to be "within the federal enclave").  Because Plaintiff claims that Defendants' speech within the federal enclave of the District of Columbia was, among other alleged causes, the basis of its injury, this Court is the only forum suited to adjudicate the merits of this dispute.

## IX.     THE ACTION IS REMOVABLE UNDER THE BANKRUPTCY REMOVAL STATUTE

70.     The Bankruptcy Removal Statute allows removal of "any claim or cause of action in a civil action other than a proceeding before the United States Tax Court or a civil action by a governmental unit to enforce such governmental unit's police or regulatory power, to the district court for the district where such civil action is pending, if such district court has jurisdiction of such claim or cause of action under section 1334 of this title."  28 U.S.C. § 1452(a).  Section 1334, in turn, provides that "the district courts shall have original but not exclusive jurisdiction of all civil proceedings, arising under Title 11, or arising in or related to cases under title 11" of the United States Code.  28 U.S.C. § 1334(b).  The Ninth Circuit has emphasized that "'related to' jurisdiction is very broad, including nearly every matter directly or indirectly related to the bankruptcy."  *Sasson v. Sokoloff* (*In re Sasson*), 424 F.3d 864, 868 (9th Cir. 2005).  An action is thus "related to" a bankruptcy case if it "'could conceivably have any effect on the estate being administered in bankruptcy.'"  *PDG Arcos, LLC*, 436 F. App'x at 742 (quoting *In re Feitz*, 852 F.2d 455, 457 (9th Cir. 1988)).  Where a Chapter 11 plan has been confirmed, there must be a "close nexus" between the post-confirmation case and the bankruptcy plan for related-to jurisdiction to exist.  *In re Pegasus Gold Corp.*, 394 F.3d 1189, 1194 (9th Cir. 2005) (citing *In re Resorts Int'l, Inc.*, 372 F.3d 154, 166-67 (3d Cir. 2004)).  "[A] close

Gibson, Dunn & Crutcher LLP

nexus exists between a post-confirmation matter and a closed bankruptcy proceeding sufficient to support jurisdiction when the matter 'affect[s] the interpretation, implementation, consummation, execution, or administration of the confirmed plan.'"  *In re Wilshire Courtyard*, 729 F.3d 1279, 1289 (9th Cir. 2013) (quoting *Pegasus Gold*, 394 F.3d at 1194).

71.    At least two of the Defendants in this case—Peabody Energy Corporation ("Peabody") and Arch Coal, Inc. ("Arch") (Compl. ¶¶ 22, 24)—emerged from Chapter 11 bankruptcy in the United States Bankruptcy Court for the Eastern District of Missouri (the "Bankruptcy Court") less than one year ago and are implementing their confirmed bankruptcy plans.  Arch and its subsidiaries filed for Chapter 11 bankruptcy protection on January 11, 2016, and their plan of reorganization was confirmed on September 15, 2016 and became effective on October 5, 2016.  *See generally In re Arch Coal, Inc*., Case No. 16-40120, Dkt. 1334 (Bankr. E.D. Mo. Sept. 15, 2016).  The plan continues to be administered in the Bankruptcy Court.  Upon information and belief, given that all of Plaintiff's claims relate to conduct "between 1965 and 2015" (Compl. ¶ 7), prior to Arch's bankruptcy filing, Arch contends that all of Plaintiff's claims were discharged by the plan and that Plaintiff has violated the Bankruptcy Court's order confirming the plan.  In similar fashion, Plaintiff's claims against Peabody were discharged by its confirmed Chapter 11 plan.  *See generally In re Peabody Energy Corp.*, Case No. 16-42529, Dkt. 2763 (Bankr. E.D. Mo. Mar. 15, 2017).  The Bankruptcy Courts in both Chapter 11 cases have retained exclusive jurisdiction to hear and determine all such matters.  As a result, there is federal jurisdiction under 28 U.S.C. § 1334(b).

72.    Plaintiff also alleges that it will have to "diver[t] . . . tax dollars away from other public services to [address] sea level rise" and that it will incur "costs associated with addressing sea level rise caused by Defendants" totaling "*billions of dollars* over the next several decades." Compl. ¶¶ 197.c, 197.e, 236.c, 236.e. (emphasis added).  Plaintiff alleges that "Defendants, individually *and together*, have substantially and measurably contributed to Plaintiff's sea level rise-related injuries, *id*. ¶ 80, and seeks compensatory damages, punitive damages, disgorgement of profits, costs of suit, and attorneys' fees based on alleged conduct dating back to 1965.  *See, e.g.*, Compl. ¶¶ 187, 199, 213-14, 224-26, 244-46, 248, 251, 258, 264-65, 267; *see also id.*, Prayer for Relief.  Accordingly, and without conceding that Plaintiff's allegations have any substantive merit, Plaintiff's

1    broad claims have the required "close nexus" with Peabody's and Arch's bankruptcy plans to support

2    federal jurisdiction.  *Wilshire Courtyard*, 729 F.3d at 1289; *see also In re Dow Corning Corp.*, 86

3    F.3d 482, 493-94 (6th Cir. 1996).

4          73.    Additionally, Plaintiff's claims are predicated on historical activities of Defendants,

5    including predecessor companies and companies that Defendants may have acquired or with which

6    they may have merged, as well as numerous unnamed but now bankrupt entities.  Because there are

7    hundreds of non-joined necessary and indispensable parties, there are many other Title 11 cases that

8    may be related.

9          74.    Finally, Plaintiff's action is not one to enforce its police or regulatory powers, but ra-

10   ther one to protect its "pecuniary interest."  *City & Cnty. of San Francisco v. PG&E Corp.*, 433 F.3d

11   1115, 1124 (9th Cir. 2006).  As demonstrated by Plaintiff's request for "billions of dollars" in com-

12   pensatory damages, "punitive and exemplary damages," and "equitable disgorgement of all profits

13   Defendants obtained through their" alleged conduct (*see, e.g.*, Compl. ¶¶ 186, 196(e), 235(e)), Plain-

14   tiff's action is pecuniary.  *See also id.* ¶¶ 184(c), 196(c), 235(c) (alleging the substantial "tax dollars"

15   diverted to addressing sea level rise); *id.* ¶ 172 (alleging that "[m]inor storms alone could account for

16   millions of dollars in property damages").[3]  These allegations, along with the Complaint's extensive

17   allegations regarding private property (*see id.* ¶¶ 64, 170, 172, 175, 196(d), 220(e), 224, 235(b)-(d),

18   264), make clear that Plaintiff's action is brought to reap a financial windfall for discrete and identifi-

19   able individuals or entities.  *See PG&E Corp.*, 433 F.3d at 1125 n.11.

20   **X.     THIS COURT HAS JURISDICTION AND REMOVAL IS PROPER**

21         75.    Based on the foregoing allegations from the Complaint, this Court has original juris-

22   diction over this action under 28 U.S.C. § 1331.  Accordingly, removal of this action is proper under

23   28 U.S.C. §§ 1334, 1441, 1442, 1452, and 1446, as well as 43 U.S.C. § 1349(b).

24

25

26   [3]  The pecuniary nature of the case is further highlighted by the fact that Plaintiff has entered into a
     contingency-fee arrangement with a private law firm.  As counsel for plaintiffs in a nearly identi-

27   cal lawsuit admitted, "'[t]axpayers are not being asked to bear the risks of this lawsuit.'"  Jenna
     Greene, The Recorder, "New Tactic in Climate Change Litigation Could Cost Energy Companies

28   Billions.  Or Not" (June 20, 2017), *available at* http://www.there-
     corder.com/id=1202793545435/New-Tactic-in-Climate-Change-Litigation-Could-Cost-Energy-
     Companies-Billions-Or-Not?slreturn=20170703142614.

Gibson, Dunn &
Crutcher LLP

34

76.     The United States District Court for the Northern District of California is the appropriate venue for removal pursuant to 28 U.S.C. § 1441(a) because it embraces the place where Plaintiff originally filed this case, in the Superior Court of California for the County of San Mateo.  *See* 28 U.S.C. § 84(a); 28 U.S.C. § 1441(a).  Pursuant to Local Rule 3-2(d), the action should be assigned to either the San Francisco or Oakland divisions of this Court.

77.     All defendants that have been properly joined and served have consented to the removal of the action, *see* Thomson Decl., ¶ 4, and there is no requirement that any party not properly joined and served consent.  *See City of Ann Arbor Employees' Ret. Sys. v. Gecht*, No. C-06-7453EMC, 2007 WL 760568, at *8 (N.D. Cal. Mar. 9, 2007); 28 U.S.C. § 1446(b)(2)(A) (requiring consent only from "all defendants who have been properly joined and served").[4]  Pursuant to 28 U.S.C. § 1446(a), a copy of all process, pleadings, and orders served on the Chevron Parties is attached as Exhibit A to the Thomson Declaration.

78.     Upon filing this Notice of Removal, Defendants will furnish written notice to Plaintiff's counsel, and will file and serve a copy of this Notice with the Clerk of the Superior Court of California for the County of San Mateo, pursuant to 28 U.S.C. § 1446(d).

Accordingly, Defendants remove to this Court the above action pending against them in the Superior Court of California for the County of San Mateo.

Respectfully submitted,

Dated: August 24, 2017                    GIBSON, DUNN & CRUTCHER LLP


                                          By:   */s/ Theodore J. Boutrous, Jr.*
                                                Theodore J. Boutrous, Jr.

                                          *Attorneys for Defendants Chevron Corporation and Chevron U.S.A., Inc.*

---

[4]  In addition, bankruptcy removal under 28 U.S.C. § 1452 and federal officer removal "represent[] an exception to the general rule . . . that all defendants must join in the removal petition." *Ely Valley Mines, Inc. v. Hartford Accident & Indem. Co.*, 644 F.2d 1310, 1315 (9th Cir. 1981).

Gibson, Dunn &
Crutcher LLP