Theodore J. Boutrous, Jr. (SBN 132099)
  tboutrous@gibsondunn.com
Andrea E. Neuman (SBN 149733)
  aneuman@gibsondunn.com
William E. Thomson (SBN 187912)
  wthomson@gibsondunn.com
Ethan D. Dettmer (SBN 196046)
  edettmer@gibsondunn.com
Joshua S. Lipshutz (SBN 242557)
  jlipshutz@gibsondunn.com
Anne Champion (*pro hac vice*)
  achampion@gibsondunn.com
GIBSON, DUNN & CRUTCHER LLP
333 South Grand Avenue
Los Angeles, CA 90071
Telephone: 213.229.7000
Facsimile: 213.229.7520

Herbert J. Stern (*pro hac vice*)
  hstern@sgklaw.com
Joel M. Silverstein (*pro hac vice*)
  jsilverstein@sgklaw.com
STERN & KILCULLEN, LLC
325 Columbia Turnpike, Suite 110
Florham Park, NJ 07932-0992
Telephone: 973.535.1900
Facsimile: 973.535.9664

Attorneys for Defendants CHEVRON
CORPORATION and CHEVRON U.S.A., INC.

## UNITED STATES DISTRICT COURT
### NORTHERN DISTRICT OF CALIFORNIA
### SAN FRANCISCO DIVISION

| | |
|---|---|
| The COUNTY OF SAN MATEO, individually and on behalf of THE PEOPLE OF THE STATE OF CALIFORNIA,<br><br>Plaintiff,<br><br>v.<br><br>CHEVRON CORP., et al.,<br><br>Defendants. | First Filed Case:   No. 3:17-cv-4929-VC<br>Related Case:   No. 3:17-cv-4934-VC<br>Related Case:   No. 3:17-cv-4935-VC<br><br>**DEFENDANTS' JOINT OPPOSITION TO MOTION TO REMAND**<br><br>CASE NO. 3:17-CV-4929-VC<br><br><u>HEARING</u><br><br>DATE: FEBRUARY 15, 2018<br>TIME: 10:00 AM<br>LOCATION: COURTROOM 4, 17TH FLOOR<br>THE HONORABLE VINCE CHHABRIA |

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

The CITY OF IMPERIAL BEACH, a
municipal corporation, individually and on
behalf of THE PEOPLE OF THE STATE OF
CALIFORNIA,

        Plaintiff,

      v.

CHEVRON CORP., et al.,

            Defendants.

CASE NO. 3:17-CV-4934-VC

The COUNTY OF MARIN, individually and
on behalf of THE PEOPLE OF THE STATE
OF CALIFORNIA,

        Plaintiff,

      v.

CHEVRON CORP., et al.,

         Defendants.

CASE NO. 3:17-CV-4935-VC

*[Additional Counsel Listed on Signature Page]*

Gibson, Dunn &
Crutcher LLP

DEFENDANTS' JOINT OPPOSITION TO MOTION TO REMAND
Case Nos. 3:17-cv-4929-VC, 3:17-cv-4934-VC, 3:17-cv-4935-VC

# TABLE OF CONTENTS

I.      INTRODUCTION ................................................................................................. 1

II.     LEGAL STANDARDS.......................................................................................... 5

III.    ARGUMENT ......................................................................................................... 6

        A. Plaintiffs' Claims Arise, If at All, Under Federal Common Law ....................... 6

               1.      Under *AEP* and *Kivalina*, Public Nuisance Claims Based on Global
                       Warming Are Governed by Federal Common Law .......................... 7

               2.      These Cases Fall Squarely Within *AEP* and *Kivalina* ..................... 9

               3.      Plaintiffs' Efforts to Distinguish *AEP* and *Kivalina* Are Unavailing ............ 10

               4.      Federal Common Law Is Not an "Ordinary Preemption Defense"; It
                       Provides an Independent Basis for Federal-Question Jurisdiction ................ 12

               5.      Even If Federal Common Law Has Been Displaced by Statute, That
                       Does Not Create State Common-Law Claims ................................ 13

        B. These Cases Raise Disputed, Substantial Federal Interests Under *Grable* ....... 14

               1.      Plaintiffs' Claims Necessarily Raise Multiple Federal Issues ....................... 15

               2.      The Federal Issues Are Disputed and Substantial.......................... 26

               3.      Federal Jurisdiction Does Not Upset Principles of Federalism .................... 27

        C.  These Actions Are Removable Because They Are Completely Preempted by
            Federal Law.................................................................................................... 29

        D.  The Actions Are Removable Because They Are Based on Defendants' Activities
            on Federal Lands and at the Direction of the Federal Government ................................. 34

               1.      The Actions Are Removable Under the Outer Continental Shelf Lands
                       Act.................................................................................................... 34

               2.      The Actions Are Removable Because Plaintiffs' Claims Arise on
                       Federal Enclaves ............................................................................. 38

               3.      The Actions Are Removable Under the Federal Officer Statute .................... 41

        E. The Actions Are Removable Under the Bankruptcy Removal Statute ............................. 48

               1.      Plaintiffs' Lawsuits Are "Related to" Bankruptcy Proceedings .................... 48

               2.      Plaintiffs' Police Powers Argument Fails........................................ 52

               3.      The Court Should Decline to Relinquish Jurisdiction on Equitable
                       Grounds............................................................................................ 54

IV.     CONCLUSION..................................................................................................... 55

# TABLE OF AUTHORITIES

**Cases**

*Aetna Health Inc. v. Davila,*
    542 U.S. 200 (2004) ..............................................................................................4, 29

*Akin v. Ashland Chem. Co.,*
    156 F.3d 1030 (10th Cir. 1998) ....................................................................................42

*Allen v. Southland Plumbing, Inc.,*
    201 Cal. App. 3d 60 (1988) ..........................................................................................51

*Am. Elec. Power Co. v. Connecticut,*
    564 U.S. 410 (2011) ..........................................................6, 7, 8, 9, 10, 12, 14, 21, 30, 33

*Am. Ins. Ass'n v. Garamendi,*
    539 U.S. 396 (2003) ..........................................................................1, 15, 16, 17, 27, 29

*Am. Motorcycle Ass'n v. Super. Ct. of L.A. Cty.,*
    20 Cal. 3d 578 (1978) ..................................................................................................51

*Amoco Prod. Co. v. Sea Robin Pipeline Co.,*
    844 F.2d 1202 (5th Cir. 1988) ..............................................................................34, 36, 37

*Anderson v. Crown Cork & Seal,*
    93 F. Supp. 2d 697 (E.D. Va. 2000) ..............................................................................39

*ARCO Envtl. Remediation, L.L.C. v. Dep't of Health & Envtl. Quality of Mont.,*
    213 F.3d 1108 (9th Cir. 2000) ........................................................................................6

*Arizona v. Manypenny,*
    451 U.S. 232 (1981) ......................................................................................................42

*Asante Techs., Inc. v. PMC-Sierra, Inc.,*
    164 F. Supp. 2d 1142 (N.D. Cal. 2001) ........................................................................32

*Azhocar v. Coastal Marine Servs., Inc.,*
    2013 WL 2177784 (S.D. Cal. May 20, 2013) ..............................................................38

*Bader Farms, Inc. v. Monsanto Co.,*
    2017 WL 633815 (E.D. Mo. Feb. 16, 2017) ..........................................................21, 25

*Bailey v. Monsanto Co.,*
    176 F. Supp. 3d 853 (E.D. Mo. 2016) ....................................................................46, 47

*Ballard v. Ameron Int'l Corp.,*
    2016 WL 6216194 (N.D. Cal. Oct. 25, 2016) ..............................................................39

*Bd. of Comm'rs of the Se. La. Flood Prot. Auth.-E. v. Tenn. Gas Pipeline Co.,*
   850 F.3d 714 (5th Cir. 2017) ................................................................4, 20, 22, 25, 27

*Beneficial Nat'l Bank v. Anderson,*
   539 U.S. 1 (2003) ...................................................................................................29

*Bennett v. Sw. Airlines Co.,*
   484 F.3d 907 (7th Cir. 2007) .............................................................................22, 26

*Benson v. Russell's Cuthand Creek Ranch, Ltd.,*
   183 F. Supp. 3d 795 (E.D. Tex. 2016) .......................................................................46

*Botsford v. Blue Cross & Blue Shield of Mont., Inc.,*
   314 F.3d 390 (9th Cir. 2002) .............................................................................32, 33

*Boyeson v. S.C. Elec. & Gas Co.,*
   2016 WL 1578950 (D.S.C. Apr. 20, 2016) .................................................................25

*Boyle v. United Techs. Corp.,*
   487 U.S. 500 (1988) ..............................................................................................3, 17

*Buckman Co. v. Pls.' Legal Comm.,*
   531 U.S. 341 (2001) ...............................................................................................24

*Cal. Dump Truck Owners Ass'n v. Nichols,*
   784 F.3d 500 (9th Cir. 2015) .........................................................................28, 31, 33

*California v. Gen. Motors Corp.,*
   2007 WL 2726871 (N.D. Cal. Sept. 17, 2007) .......................................................3, 29

*California v. Watt,*
   668 F.2d 1290 (D.C. Cir. 1981) ...............................................................................44

*Camacho v. Autoridad de Telefonos de P.R.,*
   868 F.2d 482 (1st Cir. 1989) ....................................................................................48

*Caponio v. Boilermakers Local 549,*
   2017 WL 1477133 (N.D. Cal. Apr. 25, 2017) ............................................................33

*Cerny v. Marathon Oil Corp.,*
   2013 WL 5560483 (W.D. Tex. Oct. 7, 2013) ..............................................................32

*Chevron U.S.A., Inc. v. United States,*
   110 Fed. Cl. 747 (2013) .........................................................................................43

*Cipollone v. Liggett Grp., Inc.,*
   505 U.S. 504 (1992) ...............................................................................................37

*City & Cty. of S.F. v. PG&E Corp.,*
   433 F.3d 1115 (9th Cir. 2006) ...........................................................................52, 53

*City of Milwaukee v. Illinois,*
    451 U.S. 304 (1981) ..................................................................................................10

*Collier v. District of Columbia,*
    46 F. Supp. 3d 6 (D.D.C. 2014) ..............................................................................39

*Collins v. D.R. Horton, Inc.,*
    505 F.3d 874 (9th Cir. 2007) ...................................................................................53

*Cont'l Ins. Co. v. Kawasaki Kisen Kasha Ltd.,*
    542 F. Supp. 2d 1031 (N.D. Cal. 2008) ..................................................................32

*N.C. ex rel. Cooper v. Tenn. Valley Auth.,*
    615 F.3d 291 (4th Cir. 2010) .......................................................................10, 31, 33

*County of Santa Clara v. Astra USA, Inc.,*
    401 F. Supp. 2d 1022 (N.D. Cal. 2005) ..................................................................25

*Cramer v. Logistics Co.,*
    2015 WL 222347 (W.D. Tex. Jan. 14, 2015) .........................................................40

*Crosby v. Nat'l Foreign Trade Council,*
    530 U.S. 363 (2000) ...........................................................................................15, 16

*Ctr. for Biological Diversity v. Nat'l Highway Traffic Safety Admin.,*
    538 F.3d 1172 (9th Cir. 2008) .................................................................................19

*Cuomo v. Crane Co.,*
    771 F.3d 113 (2d Cir. 2014) ....................................................................................48

*In re Deepwater Horizon,*
    745 F.3d 157 (5th Cir. 2014) ..............................................................6, 34, 35, 36, 37

*In re Dow Corning Corp.,*
    86 F.3d 482 (6th Cir. 1996) .....................................................................................51

*Durham v. Lockheed Martin Corp.,*
    445 F.3d 1247 (9th Cir. 2006) ...........................................................6, 38, 41, 42

*EP Operating Ltd. P'ship v. Placid Oil Co.,*
    26 F.3d 563 (5th Cir. 1994) ............................................................................4, 34, 36

*Erie R. Co. v. Tompkins,*
    304 U.S. 64 (1938) .....................................................................................................7

*Ethridge v. Harbor House Rest.,*
    861 F.2d 1389 (9th Cir. 1988) ...................................................................................5

*Evangelatos v. Super. Ct. of L.A. Cty.,*
    44 Cal. 3d 1188 (1988) ............................................................................................51

Gibson, Dunn &
Crutcher LLP

*Exxon Mobil Corp. v. Allapattah Servs., Inc.*,
  545 U.S. 546 (2005) ..........................................................................................................5

*Fadhliah v. Societe Air Fr.*,
  987 F. Supp. 2d 1057 (C.D. Cal. 2013) ...........................................................................32

*In re Fietz*,
  852 F.2d 455 (9th Cir. 1988)..............................................................................................6

*Flo & Eddie, Inc. v. Bill Graham Archives LLC*,
  2009 WL 10671057 (C.D. Cal. 2008)...............................................................................21

*Fossen v. Blue Cross & Blue Shield of Mont., Inc.*,
  660 F.3d 1102 (9th Cir. 2011)..........................................................................................32

*Franchise Tax Bd. of State of Cal. v. Constr. Laborers Vacation Tr. for S. Cal.*,
  463 U.S. 1 (1983) .........................................................................................................6, 29

*Fung v. Abex Corp.*,
  816 F. Supp. 569 (N.D. Cal. 1992) .....................................................................................5

*Gaus v. Miles, Inc.*,
  980 F.2d 564 (9th Cir. 1992)...............................................................................................5

*Gillette v. Peerless Ins. Co.*,
  2013 WL 3983872 (C.D. Cal. July 31, 2013) ..................................................................51

*Gingery v. City of Glendale*,
  831 F.3d 1222 (9th Cir. 2016)..........................................................................................27

*Goncalves By & Through Goncalves v. Rady Children's Hosp. San Diego*,
  865 F.3d 1237 (9th Cir. 2017)......................................................................6, 42, 46, 47, 48

*Grable & Sons Metal Prods., Inc. v. Darue Eng'g & Mfg.*,
  545 U.S. 308 (2005).....................................................................3, 14, 15, 24, 27, 28

*Greene v. Citigroup, Inc.*,
  215 F.3d 1336, 2000 WL 647190 (10th Cir. 2000) ..........................................................42

*Grynberg Prod. Corp. v. British Gas, p.l.c.*,
  817 F. Supp. 1338 (E.D. Tex. 1993)................................................................................26

*Gunn v. Minton*,
  568 U.S. 251 (2013).............................................................................................14, 26, 27

*Gutierrez v. Mobil Oil Corp.*,
  798 F. Supp. 1280 (W.D. Tex. 1992)................................................................................32

*Hall v. N. Am. Van Lines, Inc.*,
  476 F.3d 683 (9th Cir. 2007).............................................................................................32

DEFENDANTS' JOINT OPPOSITION TO MOTION TO REMAND
CASE NOS. 3:17-CV-4929-VC, 3:17-CV-4934-VC, 3:17-CV-4935-VC

*Her Majesty The Queen In Right of the Province of Ont. v. City of Detroit*,
  874 F.2d 332 (6th Cir. 1989)............................................................................32

*High Country Conservation Advocates v. U.S. Forest Serv.*,
  52 F. Supp. 3d 1174 (D. Colo. 2014) ..............................................................19

*Hines v. Davidowitz*,
  312 U.S. 52 (1941)...........................................................................................27

*Humble Oil & Ref. Co. v. Calvert*,
  464 S.W.2d 170 (Tex. Civ. App. 1971) ...........................................................39

*Humble Pipe Line Co. v. Waggoner*,
  376 U.S. 369 (1964).............................................................................................5

*Illinois v. City of Milwaukee*,
  406 U.S. 91 (1972)........................................................................................7, 12

*International Paper Co. v. Ouellette*,
  479 U.S. 481 (1987).................................................................10, 11, 12, 14, 31

*Jograj v. Enter. Servs., LLC*,
  2017 WL 3841833 (D.D.C. Sept. 1, 2017) ......................................................39

*Jones v. Union Pac. R.R. Co.*,
  79 Cal. App. 4th 1053 (2000) ..........................................................................23

*Klausner v. Lucas Film Entm't Co.*,
  2010 WL 1038228 (N.D. Cal. Mar. 19, 2010)............................................38, 39

*Oregon ex rel. Kroger v. Johnson & Johnson*,
  832 F. Supp. 2d 1250 (D. Or. 2011) ................................................................21

*Kurns v. R.R. Friction Prods. Corp.*,
  565 U.S. 625 (2012).........................................................................................28

*Lalonde v. Delta Field Erection*,
  1998 WL 34301466 (M.D. La. Aug. 6, 1998) ................................................47

*Laredo Offshore Constructors, Inc. v. Hunt Oil Co.*,
  754 F.2d 1223 (5th Cir. 1985).....................................................................34, 37

*Legg v. Wyeth*,
  428 F.3d 1317 (11th Cir. 2005)..........................................................................5

*Leite v. Crane*,
  749 F.3d 1117 (9th Cir. 2014).........................................................38, 42, 45, 47

*Luther v. Countrywide Home Loans Servicing LP*,
  533 F.3d 1031 (9th Cir. 2008)............................................................................5

*Massachusetts v. EPA*,
    549 U.S. 497 (2007) ...........................................................................................9, 28, 29

*McKay v. City & Cty. of S.F.*,
    2016 WL 7425927 (N.D. Cal. Dec. 23, 2016) .............................................................22, 28

*Metro. Life Ins. Co. v. Taylor*,
    481 U.S. 58 (1987) ...........................................................................................................4

*Meyers v. CBS Corp.*,
    2015 WL 13504685 (5th Cir. Oct. 28, 2015) .................................................................47

*Meyers v. Chesterton*,
    2015 WL 2452346 (E.D. La. May 20, 2015) ..................................................................47

*In re Miles*,
    430 F.3d 1083 (9th Cir. 2005) .......................................................................................32

*Mont. Envtl. Info. Ctr. v. Office of Surface Mining*,
    2017 WL 3480262 (D. Mont. Aug. 14, 2017) ...............................................................19

*In re MTBE Products Liability Litig.*,
    488 F.3d 112 (2d Cir. 2007) ...........................................................................................47

*Nat. Res. Def. Council, Inc. v. Hodel*,
    865 F.2d 288 (D.C. Cir. 1988) .......................................................................................46

*Nat'l Audubon Soc'y v. Dep't of Water*,
    869 F.2d 1196 (9th Cir. 1988) ..................................................................................10, 11

*Nat'l Farmers Union Ins. Cos. v. Crow Tribe of Indians*,
    471 U.S. 845 (1985) ...................................................................................................3, 12

*In re: Nat'l Football Leagues Sunday Ticket Antitrust Litig.*,
    2016 WL 1192642 (C.D. Cal. Mar. 28, 2016) ..............................................................21

*Native Vill. of Kivalina v. ExxonMobil Corp.*,
    663 F. Supp. 2d 863 (N.D. Cal. 2009) .............................................................................8

*Native Vill. of Kivalina v. ExxonMobil Corp.*,
    696 F.3d 849 (9th Cir. 2012)........................................................3, 6, 7, 8, 9, 12, 14, 21

*New Eng. Legal Found. v. Costle*,
    666 F.2d 30 (2d Cir. 1981) .............................................................................................31

*New SD, Inc. v. Rockwell Int'l Corp.*,
    79 F.3d 953 (9th Cir. 1996)........................................................................................6, 13

*In re NSA Telecomms. Recs. Litig.*,
    483 F. Supp. 2d 934 (N.D. Cal. 2007) ......................................................................21, 26

*Parke v. Cardsystems Sols., Inc.*,
2006 WL 2917604 (N.D. Cal. Oct. 11, 2006) ................................................................52

*Parra v. PacifiCare of Ariz., Inc.*,
715 F.3d 1146 (9th Cir. 2013) ........................................................................................9

*PDG Los Arcos, LLC v. Adams*,
436 F. App'x 739 (9th Cir. 2011) ..................................................................................49

*In re Peabody Energy Corp.*,
2017 WL 4843724 (Bankr. E.D. Mo. Oct. 24, 2017) ....................................................50

*In re Pegasus Gold Corp.*,
394 F.3d 1189 (9th Cir. 2005)......................................................................................6, 49

*People v. ConAgra Grocery Prods. Co.*,
17 Cal. App. 5th 51 (2017) ............................................................................................20

*Perez v. Consol. Tribal Health Project, Inc.*,
2013 WL 1191242 (N.D. Cal. Mar. 21, 2013)..............................................................47

*Pet Quarters, Inc. v. Depository Tr. & Clearing Corp.*,
559 F.3d 772 (8th Cir. 2009)..........................................................................................22

*Reed v. Fina Oil & Chem. Co.*,
995 F. Supp. 705 (E.D. Tex. 1998) ................................................................................47

*Ronquille v. Aminoil Inc.*,
2014 WL 4387337 (E.D. La. Sept. 4, 2014) ..................................................................36

*Rosseter v. Indus. Light & Magic*,
2009 WL 210452 (N.D. Cal. Jan. 27, 2009) ..................................................................39

*In re Roundup Products Liability Litig.*,
2017 WL 3129098 (N.D. Cal. July 5, 2017)..................................................................21

*Ruppel v. CBS Corp.*,
701 F.3d 1176 (7th Cir. 2012)...................................................................................42, 46

*S. Coast Air Quality Mgmt. Dist. v. E.P.A.*,
472 F.3d 882 (D.C. Cir. 2006) ......................................................................................30

*Sam L. Majors Jewelers v. ABX, Inc.*,
117 F.3d 922 (5th Cir. 1997)..........................................................................................13

*San Diego Bldg. Trades Council v. Garmon*,
359 U.S. 236 (1959)........................................................................................................37

*San Diego Gas & Elec. Co. v. Super. Ct.*,
13 Cal. 4th 893 (1996) ............................................................................................17, 22

*Sasson v. Sokoloff (In re Sasson)*,
    424 F.3d 864 (9th Cir. 2005)...........................................................................................49

*Savoie v. Huntington Ingalls, Inc.*,
    817 F.3d 457 (5th Cir. 2016)....................................................................................42, 47

*Sierra Club v. U.S. Dep't of Energy*,
    867 F.3d 189 (D.C. Cir. 2017) .......................................................................................19

*Smallwood v. Ill. Cent. R.R. Co.*,
    385 F.3d 568 (5th Cir. 2004)............................................................................................5

*Sparling v. Doyle*,
    2014 WL 2448926 (W.D. Tex. May 30, 2014)...............................................................40

*Sprint Commc'ns, Inc. v. Jacobs*,
    134 S. Ct. 584 (2013) .....................................................................................................54

*State of New York et al. v. EPA*,
    Case No. 17-1185 (D.C. Cir. 2017) ...............................................................................30

*State v. Monsanto Co.*,
    2017 WL 3492132 (W.D. Wash. July 28, 2017) ............................................................41

*Stephenson v. Nassif*,
    160 F. Supp. 3d 884 (E.D. Va. 2015)..............................................................................46

*Stiefel v. Bechtel Corp.*,
    497 F. Supp. 2d 1138 (S.D. Cal. 2007) ...........................................................................39

*STMicroelectronics, Inc. v. Harari*,
    2008 WL 3929553 (N.D. Cal. Aug. 26, 2008) ................................................................40

*Takacs v. Am. Eurocopter, L.L.C.*,
    656 F. Supp. 2d 640 (W.D. Tex. 2009)............................................................................46

*Taylor v. Lockheed Martin Corp.*,
    78 Cal. App. 4th 472 (2000) ...........................................................................................40

*Tenn. Gas Pipeline v. Hous. Cas. Ins. Co.*,
    87 F.3d 150 (5th Cir. 1996).............................................................................................36

*Tex. Indus., Inc. v. Radcliff Materials, Inc.*,
    451 U.S. 630 (1981) ...................................................................................7, 13, 14, 21

*Texaco Expl. & Prod., Inc. v. AmClyde Engineered Prod. Co.*,
    448 F.3d 760 (5th Cir. 2006)...........................................................................................36

*Totah v. Bies*,
    2011 WL 1324471 (N.D. Cal. Apr. 6, 2011) ..................................................................40

*United Offshore Co. v. S. Deepwater Pipeline Co.*,
   899 F.2d 405 (5th Cir. 1990)................................................................................36

*United States v. Gaskell*,
   134 F.3d 1039 (11th Cir. 1998).........................................................................39

*United States v. Hollingsworth*,
   783 F.3d 556 (5th Cir. 2015).............................................................................39

*United States v. Pink*,
   315 U.S. 203 (1942)..........................................................................................27

*United States v. Robertson*,
   638 F. Supp. 1202 (E.D. Va. 1986)...................................................................39

*United States v. Standard Oil Co.*,
   332 U.S. 301 (1947)...................................................................................3, 6, 17

*United States v. Standard Oil Co. of Cal.*,
   545 F.2d 624 (9th Cir. 1976).............................................................................43

*United States v. State Tax Comm'n of Miss.*,
   412 U.S. 363 (1973)..........................................................................................39

*In re Valley Health Sys.*,
   584 F. App'x 477 (9th Cir. 2014) .....................................................................51

*Wabakken v. Cal. Dep't of Corr. & Rehab.*,
   801 F.3d 1143 (9th Cir. 2015)..........................................................................53

*In re Wash. Mut., Inc. Sec., Derivative & ERISA Litig.*,
   2009 WL 3711614 (W.D. Wash. Nov. 2, 2009) ..............................................51

*Watson v. Phillip Morris Co.*,
   551 U.S. 142 (2007)....................................................................................45, 46

*Wayne v. DHL Worldwide Express*,
   294 F.3d 1179 (9th Cir. 2002)....................................................................12, 13

*WildEarth Guardians v. Jewell*,
   738 F.3d 298 (D.C. Cir. 2013) .........................................................................19

*Willis v. Buffalo Pumps, Inc.*,
   2013 WL 1316715 (S.D. Cal. Mar. 29, 2013) .................................................42

*In re Wilshire Courtyard*,
   729 F.3d 1279 (9th Cir. 2013)..........................................................................49

*Woodward Governor Co. v. Curtiss Wright Flight Sys., Inc.*,
   164 F.3d 123 (2d Cir. 1999).............................................................................12

Gibson, Dunn &
Crutcher LLP

*Worth v. Universal Pictures, Inc.*,
   5 F. Supp. 2d 816 (C.D. Cal. 1997)................................................................................32

**Statutes**

5 U.S.C. § 553 ..........................................................................................................................30

10 U.S.C. § 7422 ......................................................................................................................44

15 U.S.C. § 717b(a) ..................................................................................................................19

16 U.S.C. § 1451 ......................................................................................................................18

28 U.S.C. § 1334 ...............................................................................................................5, 6, 48

28 U.S.C. § 1367 ........................................................................................................................5

28 U.S.C. § 1441 ......................................................................................................................13

28 U.S.C. § 1442 .......................................................................................................4, 41, 42, 48

28 U.S.C. § 1452 .........................................................................................................5, 48, 52, 54

30 U.S.C. § 21a .........................................................................................................................18

30 U.S.C. § 201 ........................................................................................................................20

30 U.S.C. § 207 ........................................................................................................................20

30 U.S.C. § 1201 ......................................................................................................................18

42 U.S.C. §§ 4321 *et seq.* .......................................................................................................18

42 U.S.C. § 6201 *et seq.* .........................................................................................................20

42 U.S.C. § 6231 ......................................................................................................................44

42 U.S.C. § 6234 ......................................................................................................................44

42 U.S.C. § 6240 ......................................................................................................................44

42 U.S.C. § 7401 *et seq.* .........................................................................................18, 28, 30, 32

42 U.S.C. § 13384 ....................................................................................................................17

42 U.S.C. § 13389 ....................................................................................................................18

43 U.S.C. § 1331 *et seq.* ............................................................................................4, 25, 34, 44

43 U.S.C. § 1701 ......................................................................................................................18

43 U.S.C. § 1802 .................................................................................................................37, 46

Gibson, Dunn &
Crutcher LLP

Cal. Civ. Code § 3482 ................................................................................................22, 23

Cal. Civ. Code § 3479 ........................................................................................................23

Pub. L. No. 94–258, 90 Stat. 303 ......................................................................................44

Pub. L. No. 105-276, 112 Stat. 2461 (1998) .....................................................................16

Pub. L. No. 106-74, 113 Stat. 1047 (1999) .......................................................................16

Pub. L. No. 106-377, 114 Stat. 1441 (2000) .....................................................................16

**Other Authorities**

1975–1976 Op. Atty. Gen. Fla. 198 (1975) .......................................................................39

61 Op. Att'y Gen. Md. 441 (1976) .....................................................................................39

75 Op. Att'y Gen. Fla. 198 (1975) .....................................................................................39

80 Op. Att'y Gen. Me. 15 (1980) .......................................................................................39

Brad Plumer, *Just How Far Can California Possibly Go on Climate?*, N.Y. Times
    (July 26, 2017) ..........................................................................................................30

R.H. Fallon, Jr. et al., Hart & Wechsler's The Federal Courts & the Federal System
    (7th ed. 2015) .............................................................................................................14

S. Res. 98, 105th Cong. (1997) .........................................................................................16

**Treatises**

Restatement (Second) of Torts ...........................................................................................22

**Regulations**

10 C.F.R. § 626.6 ...............................................................................................................20

30 C.F.R. § 250.180 ...........................................................................................................44

30 C.F.R. § 550 ......................................................................................................18, 25, 44

30 C.F.R. § 745 ..................................................................................................................18

43 C.F.R. § 3101 ................................................................................................................18

43 C.F.R. § 3162.1(a) ........................................................................................................18

43 C.F.R. § 3480 ................................................................................................................20

79 Fed. Reg. 32,260 (June 4, 2014) ..................................................................................19

Exec. Order No. 12,866...............................................................................................................18

Exec. Order No. 13783.................................................................................................................19

**Constitutional Provisions**

U.S. CONST. art. I § 8, cl. 17 ........................................................................................................6

1  ## I.  INTRODUCTION

2  These cases belong in federal court.  At their core, they are federal lawsuits that necessarily

3  raise federal questions.  Plaintiffs—two California counties and a city represented by the same private

4  law firm—seek to reshape the Nation's longstanding national economic and foreign policies by hold-

5  ing a selected group of energy companies liable for harms alleged to have been caused by worldwide

6  fossil fuel production and global greenhouse gas emissions by countless nonparties.  Through selec-

7  tive pleading and strategic omission, Plaintiffs endeavor to deprive Defendants of a federal forum.

8  But Plaintiffs cannot avoid the comprehensive role federal law plays in their core allegations.

9  These cases implicate longstanding federal government policies, concerning matters of

10  uniquely national importance, including the Nation's supply of energy, foreign affairs, and the global

11  environment.  A stable energy supply is critical for the preservation of our general welfare, economy,

12  and national security.  Accordingly, for more than a century Congress has enacted laws promoting the

13  production of fossil fuels, and for nearly half a century, the federal government has aimed to decrease

14  our country's reliance on foreign oil imports.[1]  The federal government has opened up federal lands

15  and coastal areas to fossil fuel extraction, established strategic petroleum reserves, contracted with

16  fossil fuel providers to develop those resources, and consumed a large volume of fossil fuels, with the

17  Department of Defense being the United States' largest user of fossil fuels.  During this time, the U.S.

18  has enacted a series of environmental statutes and regulations designed to strike the appropriate—and

19  evolving—balance between protecting the environment and ensuring the energy supply needed to

20  serve our economic and national security needs.  The U.S. has also engaged in extensive, ongoing ne-

21  gotiations with other countries to craft a workable international framework for responding to global

22  warming, carefully researching and evaluating how government regulations and international com-

23  mitments could affect the economy, national security, and foreign relations without crippling eco-

24  nomic growth.  Yet these lawsuits take issue with all of these federal decisions, threatening to upend

25  the federal government's longstanding energy and environmental policies and "compromis[ing] the

26  very capacity of the President to speak for the Nation with one voice in dealing with other govern-

27  ments" about climate change.  *Am. Ins. Ass'n v. Garamendi*, 539 U.S. 396, 424 (2003).

28

[1]  *See, e.g.*, Thomson Decl. ¶¶ 3–12 & Exs. 1–10 (excerpting and attaching exemplar statements).

Gibson, Dunn &
Crutcher LLP

APPENDIX TO DEFENDANTS' JOINT OPPOSITION TO MOTION TO REMAND
CASE NOS. 3:17-CV-4929-VC, 3:17-CV-4934-VC, 3:17-CV-4935-VC

At bottom, this case is about *global* emissions.  In seeking remand, Plaintiffs assert that their requested remedies—"money damages and abatement measures"—redress only alleged "real property injuries within Plaintiffs' geographic jurisdictions," and they disclaim any intent "to regulate conduct across the globe."  Plaintiffs' Motion to Remand, No. 17-cv-4929, ECF No. 157 at 3, 33 (hereinafter "Mot.").  But Plaintiffs seek to hold Defendants liable for the same undifferentiated global conduct, alleging harms resulting from decades of accumulation of greenhouse gases in the global atmosphere, the vast majority of which occurs outside of California and has no relation to Defendants.  They allege that "Defendants, through their extraction, promotion, marketing, and sale of their fossil fuel products, caused approximately 20% of global fossil fuel product-related $CO_2$ between 1965 and 2015, with contributions currently continuing unabated."  Compl. ¶ 75.[2]  Plaintiffs admit that "it is not possible to determine the source of any particular individual molecule of $CO_2$ in the atmosphere . . . because greenhouse gasses quickly diffuse and comingle in the atmosphere."  *Id*. ¶ 74.  They claim, however, that "ambient air and ocean temperature and sea level responses to those emissions . . . can be attributed to Defendants on an individual and aggregate basis," *id*. ¶ 77, through "cumulative carbon analysis," which they claim "allows an accurate calculation of net annual $CO_2$ and methane emissions attributable to each Defendant by quantifying the amount and type of fossil fuels products each Defendant extracted and placed into the stream of commerce," *id*. ¶ 74.  Plaintiffs thus purport to attribute to each Defendant the greenhouse gas emissions for *all* fossil fuels Defendants extracted and sold, no matter where in the world the conduct occurred.  *Id*. ¶¶ 14–36.

Plaintiffs' claims are therefore in no way limited to harms caused by fossil fuels extracted, refined, sold, marketed, or consumed in California.  In fact, Plaintiffs have not even attempted to plead facts that would permit the Court to make these distinctions.  Rather, Plaintiffs' claims depend on Defendants' nationwide and global activities and the activities of consumers of fossil fuels worldwide, which include not only entities like the federal government, U.S. military, and foreign governments, but also hospitals, schools, factories, and individual households.  As such, Plaintiffs' claims require adjudication of whether the costs allegedly imposed on the specific political subdivisions Plaintiffs

---

[2]   Citations to "Compl." refer to the Complaint filed in No. 17-cv-4929-VC, ECF No. 1-2; corresponding paragraphs from the related cases are identified in the Appendix.

represent are outweighed by "the social utility of Defendants' conduct"—and not just the social bene-fit provided to the Plaintiff jurisdictions (which is substantial), or even to California, but to the United States and the entire world. *Id.* ¶ 184; *see also id.* ¶¶ 196, 222, 235.  Thus, "[t]he rights and duties Plaintiffs seek to vindicate, and their entitlement to relief" cannot and do not "stem entirely from Cal-ifornia law," as Plaintiffs contend.  Mot. 21.  After all, Plaintiffs target *global* warming, and the trans-national conduct that term entails.  This is why earlier, similar lawsuits were brought in federal court under federal law, and why, when they were dismissed, those plaintiffs did not pursue the claims in state courts.  *See, e.g.*, *Native Vill. of Kivalina v. ExxonMobil Corp.*, 696 F.3d 849 (9th Cir. 2012); *California v. Gen. Motors Corp.*, 2007 WL 2726871 (N.D. Cal. Sept. 17, 2007).  Removal here was proper and the motion to remand should be denied.

 ***First,*** **federal common law necessarily governs Plaintiffs' claims**.  Even "[p]ost-*Erie*, fed-eral common law includes the general subject of environmental law and specifically includes ambient or interstate air and water pollution."  *Kivalina*, 696 F.3d at 855.  The Supreme Court has held for decades that cases like this one, which raise "'uniquely federal interests,'" "are governed exclusively by federal law."  *Boyle v. United Techs. Corp.*, 487 U.S. 500, 504 (1988).  Federal courts have origi-nal jurisdiction over "'claims founded upon federal common law,'" and so removal is proper.  *Nat'l Farmers Union Ins. Cos. v. Crow Tribe of Indians*, 471 U.S. 845, 850 (1985) (quoting *Illinois v. City of Milwaukee*, 406 U.S. 91, 100 (1972) ("*Milwaukee I*")).  That is true regardless of whether these claims are ultimately viable; for now, the only question before this Court is whether this uniquely federal case belongs in federal court.  *See United States v. Standard Oil Co.*, 332 U.S. 301, 309–10 (1947) ("state law" cannot "control" where "the question is one of federal policy," due to "considera-tions of federal supremacy in the performance of federal functions, [and] of the need for uniformity").

 ***Second***, **suits facially alleging only state-law claims "arise under" federal law if the "state-law claim[s] necessarily raise a stated federal issue,** actually disputed and substantial, which a federal forum may entertain without disturbing any congressionally approved balance of federal and state judicial responsibilities."  *Grable & Sons Metal Prods., Inc. v. Darue Eng'g & Mfg.*, 545 U.S. 308, 314 (2005).  Plaintiffs seek to supplant federal domestic and foreign policy on greenhouse gas emissions to hold a selected group of energy companies liable for the alleged consequences of rising

1    ocean levels on a discrete portion of the U.S. coast.  As a result, an element of their state-law nui-

2    sance claims unavoidably questions the reasonableness of the balance struck by federal energy pol-

3    icy, specifically as it pertains to carbon emissions.  Moreover, greenhouse gas emissions, global

4    warming, and sea level rise are not unique to Plaintiffs, California, or even the United States.  Thus,

5    "the scope and limitations of a complex federal regulatory framework are at stake in this case, and

6    disposition of . . . whether that framework may give rise to state law claims as an initial matter will

7    ultimately have implications for the federal docket one way or the other."  *Bd. of Comm'rs of the Se.*

8    *La. Flood Prot. Auth.-E. v. Tenn. Gas Pipeline Co.*, 850 F.3d 714, 725 (5th Cir. 2017).

9           ***Third***, **Plaintiffs' claims are completely preempted by the Clean Air Act ("CAA") and**

10   **other federal statutes**, which provide an exclusive federal remedy for stricter regulation of nation-

11   wide and worldwide greenhouse gas emissions.  Federal courts have jurisdiction over state-law

12   claims where the "extraordinary pre-emptive power [of federal law] converts an ordinary state com-

13   mon law complaint into one stating a federal claim for purposes of the well-pleaded complaint rule."

14   *Metro. Life Ins. Co. v. Taylor*, 481 U.S. 58, 65 (1987).  Congress allows parties to seek stricter na-

15   tionwide emission standards by petitioning the Environmental Protection Agency ("EPA"), and that

16   is the exclusive means by which a party can seek such relief.  And although the CAA reserves to the

17   states some authority to regulate certain emissions within their own borders, Plaintiffs' claims, which

18   seek to impose liability for worldwide or national emissions, go far beyond that limited authority.

19   Because these claims would "duplicate[], supplement[], or supplant[]" federal law, they are com-

20   pletely preempted.  *Aetna Health Inc. v. Davila*, 542 U.S. 200, 209 (2004).

21          ***Fourth***, **this Court has jurisdiction under various jurisdiction-granting statutes and doc-**

22   **trines,** including the Outer Continental Shelf Lands Act ("OCSLA"), 43 U.S.C. § 1349(b), a statute

23   with its own removal provision that federal courts interpret "broadly," reflecting the Act's "expansive

24   substantive reach."  *EP Operating Ltd. P'ship v. Placid Oil Co.*, 26 F.3d 563, 568–69 (5th Cir. 1994).

25   The **Federal Officer removal statute** allows removal of an action against "any officer (or any person

26   acting under that officer) of the United States or of any agency thereof . . . for or relating to any act

27   under color of such office."  28 U.S.C. § 1442(a)(1).  Many Defendants have contracted with the fed-

28   eral government to develop and extract minerals from federal lands under federal leases and to sell

fuel and associated products to the federal government.  It is similarly well settled that federal courts have federal question jurisdiction over claims arising on **federal enclaves**.  *Humble Pipe Line Co. v. Waggoner*, 376 U.S. 369, 372–73 (1964) (noting that the United States exercises exclusive jurisdiction over oil and gas rights within Barksdale Air Force Base in Louisiana); *Fung v. Abex Corp.*, 816 F. Supp. 569, 571 (N.D. Cal. 1992).  Plaintiffs' claims are also "related to" cases under Title 11 of the United States Code and thus removable under 28 U.S.C. § 1452(a) and 28 U.S.C. § 1334(b) because Plaintiffs have asserted claims against two Defendants implementing confirmed **bankruptcy** plans (Arch and Peabody), and have purported to base liability on the activities of Defendants' unnamed worldwide and historical subsidiaries and affiliates and "DOES 1 through 100," many of which are currently, or have recently been, bankrupt.

In sum, the Complaints attack what are fundamentally federal issues of national energy and environmental policy and foreign affairs.  Federal jurisdiction is present and removal was proper.[3]

## II.     LEGAL STANDARDS

"The removal process was created by Congress to protect defendants."  *Legg v. Wyeth*, 428 F.3d 1317, 1325 (11th Cir. 2005).  "[T]he Federal courts should not sanction devices intended to prevent the removal to a Federal court where one has that right, and should be equally vigilant to protect the right to proceed in the Federal court as to permit the state courts, in proper cases, to retain their own jurisdiction."  *Smallwood v. Ill. Cent. R.R. Co.*, 385 F.3d 568, 573 (5th Cir. 2004) (en banc) (citation omitted).  A removing party has the initial burden of showing that removal is proper.  *Gaus v. Miles, Inc.*, 980 F.2d 564, 566 (9th Cir. 1992) (per curiam).  But once the defendant makes that showing, it is the plaintiff's "burden to prove that an express exception to removal exists."  *Luther v. Countrywide Home Loans Servicing LP*, 533 F.3d 1031, 1034 (9th Cir. 2008).  Because district courts have supplemental jurisdiction over related claims, 28 U.S.C. § 1367(a), all that is required for proper removal is federal jurisdiction over a single claim.  *Exxon Mobil Corp. v. Allapattah Servs., Inc.*, 545 U.S. 546, 563 (2005).

A plaintiff "cannot defeat removal by masking or 'artfully pleading' a federal claim as a state

---

[3]   A number of Defendants contend that personal jurisdiction is lacking over them and that process and service of process were insufficient.  These Defendants do not waive these objections, and will move to dismiss on these grounds at the appropriate time.

claim." *Ethridge v. Harbor House Rest.*, 861 F.2d 1389, 1403 (9th Cir. 1988) (citations omitted). Under the artful-pleading doctrine, federal jurisdiction exists "(1) where federal law completely preempts state law; (2) where the claim is necessarily federal in character; or (3) where the right to relief depends on the resolution of a substantial, disputed federal question." *ARCO Envtl. Remediation, L.L.C. v. Dep't of Health & Envtl. Quality of Mont.*, 213 F.3d 1108, 1114 (9th Cir. 2000) (citations omitted); *see also Franchise Tax Bd. of State of Cal. v. Constr. Laborers Vacation Tr. for S. Cal.*, 463 U.S. 1, 9–11 (1983). As a consequence, removal jurisdiction exists over what a complaint labels "purely state law claims" if federal common law actually governs the dispute, because "[w]hen federal law applies, . . . it follows that the question arises under federal law, and federal question jurisdiction exists." *New SD, Inc. v. Rockwell Int'l Corp.*, 79 F.3d 953, 954–55 (9th Cir. 1996).

Further, various statutes have their own removal standards. Courts broadly construe the right to removal under OCSLA, the federal officer removal statute, and the federal enclave doctrine. *See, e.g.*, *Goncalves By & Through Goncalves v. Rady Children's Hosp. San Diego*, 865 F.3d 1237, 1244 (9th Cir. 2017) (federal officer removal "interpret[ed] . . . broadly in favor of removal"); *In re Deepwater Horizon*, 745 F.3d 157, 163 (5th Cir. 2014) (breadth of federal OCSLA jurisdiction reflects the Act's "expansive substantive reach"); *Durham v. Lockheed Martin Corp.*, 445 F.3d 1247, 1250 (9th Cir. 2006) (discussing federal enclaves); *see also* U.S. CONST. art. I § 8, cl. 17. And 28 U.S.C. § 1334(b) confers jurisdiction over proceedings "related to" bankruptcy. *In re Fietz*, 852 F.2d 455, 456–57 (9th Cir. 1988) ("related to" jurisdiction exists before confirmation of a bankruptcy plan when an action "could conceivably have any effect on the estate being administered in bankruptcy") (emphasis omitted); *In re Pegasus Gold Corp.*, 394 F.3d 1189, 1191 (9th Cir. 2005) ("related to" jurisdiction exists after confirmation when "there is a sufficiently close nexus . . . between the [case to be removed] and the original bankruptcy proceeding").

## III.   ARGUMENT

### A.   Plaintiffs' Claims Arise, If at All, Under Federal Common Law

Supreme Court and Ninth Circuit precedent confirm that Plaintiffs' global-warming-based public nuisance claims are governed by federal common law. *See Am. Elec. Power Co. v. Connecticut*, 564 U.S. 410, 421–22 (2011) ("*AEP*"); *Kivalina*, 696 F.3d at 855–56; *cf. Standard Oil*, 332 U.S.

at 305–06.  Because federal common law governs these claims regardless of how they are pleaded, these actions are within this Court's original jurisdiction.

> **1.      Under *AEP* and *Kivalina*, Public Nuisance Claims Based on Global Warming Are Governed by Federal Common Law**

Although "[t]here is no federal general common law," *Erie R. Co. v. Tompkins*, 304 U.S. 64, 78 (1938), there remain "some limited areas" in which the governing legal rules will be supplied, not by state law, but by "what has come to be known as 'federal common law.'"  *Tex. Indus., Inc. v. Radcliff Materials, Inc.*, 451 U.S. 630, 640 (1981) (quoting *Standard Oil*, 332 U.S. at 308).  One such area is where "our federal system does not permit the controversy to be resolved under state law" because the subject matter implicates "uniquely federal interests," including where "*the interstate or international nature of the controversy makes it inappropriate for state law to control*."  *Id.* at 640–41 (emphasis added); *see also AEP*, 564 U.S. at 421 (federal common law applies to those subjects "where the basic scheme of the Constitution so demands").  The paradigmatic example of such an inherently interstate or international controversy, in which federal common law rather than state law will control, is a "transboundary pollution suit[]."  *See Kivalina*, 696 F.3d at 855.

Public nuisance claims asserting global-warming-related injuries necessarily arise from activities and emissions in all 50 states and globally, and thus the Supreme Court and Ninth Circuit have found them to be governed by federal common law.  *See AEP*, 564 U.S. at 421; *Kivalina*, 696 F.3d at 855–56.  As the Supreme Court explained, a public nuisance claim alleging pollution from multiple states involves "an overriding federal interest in the need for a uniform rule of decision" and calls "for applying federal law."  *Milwaukee I*, 406 U.S. at 105 n.6.  In fact, the uniquely federal interest in interstate and international environmental matters is so strong and pervasive that federal common law must be applied not merely to a single element or issue in such cases, but to define the underlying cause of action.  *See id.* at 98–101 (public nuisance claims concerning interstate emissions arise under federal common law and fall within the district courts' original federal question jurisdiction under § 1331); *Kivalina*, 696 F.3d at 855 (outlining the elements of a "public nuisance" claim "[u]nder federal common law").  Adhering to this longstanding line of cases, the Supreme Court and the Ninth Circuit have both squarely held that public nuisance claims asserting global-warming-related injuries—like those asserted by Plaintiffs here—are governed by federal common law.

*AEP.*  In *AEP*, plaintiffs, including eight states, sued five electric utilities, contending that "defendants' carbon-dioxide emissions" substantially contributed to global warming and "created a 'substantial and unreasonable interference with public rights,' in violation of the federal common law of interstate nuisance, or, in the alternative, of state tort law."  564 U.S. at 418.  Like Plaintiffs here, the *AEP* plaintiffs "alleged that public lands, infrastructure, and health were at risk from climate change," and they sought to hold defendants liable for contributing to climate change.  *Id.* at 418–19.  The district court dismissed the claims as raising nonjusticiable political questions, but the Second Circuit reversed, holding that federal common law governed and that plaintiffs had stated a claim.  *Id.* at 419.

The Supreme Court agreed that federal common law governs a public nuisance claim involving "'air and water in their ambient or interstate aspects,'" and it flatly rejected the notion that global-warming nuisance claims could be governed by state law rather than uniform federal law:  "[B]orrowing the law of a particular State would be inappropriate."  *AEP*, 564 U.S. at 421–22.

*Kivalina.*  In *Kivalina*, the Ninth Circuit held that federal common law governed a public nuisance claim nearly identical to Plaintiffs' here.  696 F.3d at 855–56.  An Alaskan village asserted a public nuisance claim for damages to village property and infrastructure as a result of "sea levels ris[ing]" and other impacts allegedly resulting from the defendant energy companies' "emissions of large quantities of greenhouse gases."  *Id.* at 853–54.  The village asserted this public nuisance claim under federal common law and, in the alternative, state law.  *Native Vill. of Kivalina v. ExxonMobil Corp.*, 663 F. Supp. 2d 863, 869 (N.D. Cal. 2009).  The district court dismissed the federal claims and declined to exercise supplemental jurisdiction over the state-law claims.  *Kivalina*, 696 F.3d at 854–55.

On appeal, a threshold issue was whether federal common law applied to plaintiffs' nuisance case.  The Ninth Circuit, citing *AEP* and *Milwaukee I*, held that it did:  "[F]ederal common law includes the general subject of environmental law and specifically includes ambient or interstate air and water pollution."  *Id.* at 855.  Given the interstate and transnational character of any claim asserting damage from the worldwide accumulation of carbon dioxide emissions, the suit fell within the rule that "transboundary pollution suits" are governed by "federal common law."  *Id.*

Gibson, Dunn &
Crutcher LLP

**2.     These Cases Fall Squarely Within *AEP* and *Kivalina***

Under *AEP* and *Kivalina*, federal common law governs Plaintiffs' public nuisance claims for global-warming-related injuries, which assertedly arise from the interstate and worldwide emissions associated with the use of fossil fuel products extracted, produced, and promoted by Defendants and their subsidiaries.  *See* Compl. ¶ 9.[4]  Federal common law applies to claims like these because they inherently implicate interstate and international concerns that invoke uniquely federal interests and responsibilities.  *Kivalina*, 696 F.3d at 855–56; *see also Massachusetts v. EPA*, 549 U.S. 497, 519–20 (2007) (holding that the sovereign prerogatives to force other states' reductions in greenhouse gas emissions, negotiate emissions treaties, and in some circumstances exercise the police power to re-duce motor-vehicle emissions are lodged in the federal government).

Plaintiffs' public nuisance claims, which inescapably require a global assessment of the rea-sonableness of Defendants' worldwide production, sale, and use of fossil fuels, are quintessential "transboundary pollution suits," *Kivalina*, 696 F.3d at 855, and are therefore governed by federal common law.  Indeed, Plaintiffs' global-warming-related claims are facially based on the worldwide accumulation of greenhouse gas emissions over the course of decades and even centuries, resulting in part from the use of fossil fuel products extracted by Defendants anywhere in the world and con-sumed anywhere in the world.  *See, e.g.*, Compl. ¶¶ 3, 14, 74.

Adjudicating Plaintiffs' claims would necessarily require determining "what amount of car-bon dioxide emissions is unreasonable" in light of what is "practical, feasible and economically via-ble."  *AEP*, 564 U.S. at 428.  Given the nature of the phenomenon at the crux of Plaintiffs' claims and the boundless scope of potential defendants and plaintiffs, this is a task far different from a viable "abatement" action under state nuisance law.  Any judgment as to whether Defendants' contribution to worldwide emissions and "[t]he seriousness of the harm to Plaintiff[s] outweighs the benefit" and

---

[4]  Defendants do not concede that, as a substantive matter, Plaintiffs have adequately pleaded that each Defendant is liable for the actions of its separate subsidiaries and affiliates.  For purposes of as-sessing this Court's *jurisdiction*, however, the substantive adequacy of the Complaints is irrelevant.  *See Parra v. PacifiCare of Ariz., Inc.*, 715 F.3d 1146, 1151 (9th Cir. 2013).  Accordingly, for pur-poses of this motion only, Defendants assume *arguendo* Plaintiffs' theory and, in describing the ac-tions of "Defendants" herein, Defendants include the actions of their subsidiaries and affiliates.

"social utility of Defendants' conduct," Compl. ¶¶ 196, 235, raises an inherently federal question implicating the federal government's unique interests in setting national and international policy regarding energy, the environment, the economy, and national security. *See AEP*, 564 U.S. at 427.

### 3.   Plaintiffs' Efforts to Distinguish *AEP* and *Kivalina* Are Unavailing

Plaintiffs try to distinguish *AEP* and *Kivalina* on the ground that they did not expressly "consider[] the relationship between federal common law and state law," and contend that *AEP* and *Kivalina* left open the possibility that *some* global-warming-based public nuisance claims might be governed by state law, and that they have pleaded such a claim. Mot. 8–10. Plaintiffs are wrong for several reasons.

*First*, the decision that federal common law applies to a particular cause of action *necessarily* reflects a determination that state law does *not* apply. "[I]f federal common law exists, it is because state law cannot be used." *City of Milwaukee v. Illinois*, 451 U.S. 304, 313 n.7 (1981) ("*Milwaukee II*"); *see also Nat'l Audubon Soc'y v. Dep't of Water*, 869 F.2d 1196, 1204–05 (9th Cir. 1988) ("true interstate disputes [concerning pollution] *require* application of federal common law" to "the exclusion of state law") (emphasis added). Accordingly, by holding that a global-warming-related public nuisance claim was governed by federal common law, *AEP* and *Kivalina* necessarily establish that state law *cannot* be applied. Thus, despite the state-law label Plaintiffs put on their claims, they are *necessarily* governed by federal common law.

*Second*, *AEP* held that "borrowing the law of a particular State would be *inappropriate*" to adjudicate an interstate and transnational global-warming-related public nuisance claim; such a claim could *only* be governed by a uniform "*federal* rule of decision." 564 U.S. at 422 (emphases added).

*Third*, insofar as the Court in *AEP* declined to address whether plaintiffs could assert separate state-law claims under "the law of each State where the defendants operate power plants," 564 U.S. at 429, that theory is not viable here. *AEP* referenced a narrow theory based on *International Paper Co. v. Ouellette*, 479 U.S. 481, 492–94 (1987), which held that, in displacing federal common law remedies, the Clean Water Act ("CWA") preserved the possibility that state common law could be applied to further limit a defendant's emissions *within that source state*. *See also N.C. ex rel. Cooper v. Tenn. Valley Auth.*, 615 F.3d 291, 306 (4th Cir. 2010) (*Ouellette* analysis applies to the CAA). But

Gibson, Dunn &
Crutcher LLP

"the CWA precludes a court from applying the law of an affected State against an out-of-state source." *Ouellette*, 479 U.S. at 494.  Moreover, because "interstate pollution is primarily a matter of federal law," *id.* at 492, no other state common law remedies (beyond regulation of in-state sources) were permissible.

Plaintiffs have not pleaded a claim falling within *Ouellette*'s narrow confines—nor could they.  Plaintiffs do not allege that they were injured as a result of localized conduct to which they seek to apply the law of the source state.  Rather, Plaintiffs have pleaded *omnibus* public nuisance claims uniformly addressing all production and emissions in all jurisdictions—*i.e.*, they have pleaded *precisely* the claim that *AEP* and *Kivalina* held must be governed by federal common law.  Nor could they do otherwise given the nature of the phenomenon at issue.  Indeed, Plaintiffs' theory is, and by its nature must be, that "greenhouse gasses [*sic*] quickly diffuse and commingle in the atmosphere," and emissions of $CO_2$ due to the use of Defendants' products indiscriminately combine with all of the other emissions of $CO_2$ from all other worldwide sources over the last several centuries, such that it is "not possible to determine the source of any particular individual molecule of $CO_2$ in the atmosphere."  Compl. ¶¶ 74, 149.  Their claimed injuries necessarily hinge on the collective effect of worldwide emissions, thereby implicating the kind of "interstate dispute previously recognized as requiring resolution under federal law," such that it is "inappropriate for state law to control."  *Nat'l Audubon Soc'y*, 869 F.2d at 1204.

Moreover, allowing Plaintiffs' claims to be governed by state law would permit any plaintiff alleging injury due to global warming to proceed under each or all of the nation's 50 different state laws.  As the Solicitor General explained in *AEP*, "resolving such claims would require each court to consider numerous and far-reaching technological, economic, scientific, and policy issues" to decide "whether and to what extent each defendant should be deemed liable under general principles of nuisance law for some share of the injuries associated with global climate change."  Br. for the TVA as Resp't Supporting Pet'rs, *AEP*, 564 U.S. 410 (2011) (No. 10-174), 2011 WL 317143, at *37.  Such consideration could lead to "widely divergent results" based on "different assessments of what is 'reasonable.'"  *Id.*; *see also Ouellette*, 479 U.S. at 496–97 ("[d]ischargers would be forced to meet not only the statutory limitations of all states potentially affected by their discharges but also the

common law standards developed through case law of those states," making it "virtually impossible to predict the standard for a lawful discharge"). Such a result would run counter to *Ouellette*, which warned against subjecting out-of-state sources "to a variety of" "vague and indeterminate" state common law nuisance standards and allowing states to "do indirectly what they could not do directly— regulate the conduct of out-of-state sources." *Ouellette*, 479 U.S. at 495–96 (citations omitted).[5]

### 4. Federal Common Law Is Not an "Ordinary Preemption Defense"; It Provides an Independent Basis for Federal-Question Jurisdiction

Because Plaintiffs' public nuisance claims are governed by federal common law, it is well established that those claims "aris[e] under the 'laws' of the United States within the meaning of § 1331(a)." *Milwaukee I*, 406 U.S. at 99. As the Supreme Court explained, § 1331 grants federal courts original jurisdiction over "claims founded upon federal common law as well as those of a statutory origin." *Nat'l Farmers*, 471 U.S. at 850; *see also Woodward Governor Co. v. Curtiss Wright Flight Sys., Inc.*, 164 F.3d 123, 126 (2d Cir. 1999) ("It is beyond dispute that if federal common law governs a case, that case presents a federal question within the subject matter jurisdiction of the federal courts ….").

Plaintiffs' contention that Defendants' argument is a non-jurisdictional "ordinary preemption defense" that renders the complaint non-removable under the "well-pleaded complaint rule" misunderstands the nature of that rule and federal common law more generally. Mot. 10–13. The well-pleaded complaint rule provides that "federal jurisdiction exists only when a federal question is presented on the face of the plaintiff's properly pleaded complaint." *Wayne v. DHL Worldwide Express*, 294 F.3d 1179, 1183 (9th Cir. 2002) (citation omitted). But that doctrine does not prevent removal here because a federal question *is* presented on the face of Plaintiffs' complaint. As explained above,

---

[5] Plaintiffs may suggest that federal common law cannot govern their claims because they assert Defendants are *indirectly* liable for worldwide emissions and no federal common law precedent has recognized such a claim. This argument fails because it confuses the threshold question whether federal common law standards *govern* Plaintiffs' claims with the separate question whether, under those standards, Plaintiffs have stated a viable cause of action. *AEP* made precisely this distinction, by first deciding that the interstate nature of the controversy required application of federal common law (and that it would be "inappropriate" to borrow state law as the federal rule of decision), *before* turning to the question whether plaintiffs had stated a claim. 564 U.S. at 421–23. So, too, in *Kivalina*, where the Ninth Circuit held that plaintiffs' derivative theory of indirect liability—based on allegations that defendants had "conspir[ed] to mislead the public about the science of global warming"—was "dependent upon the success" of the underlying public nuisance claim, and therefore both claims were equally governed by federal common law. 696 F.3d at 854, 858.

Plaintiffs' claims, which seek to use state courts to adjudicate claimed injuries from interstate, trans-boundary greenhouse gas emissions, *sound only in federal law*.

Plaintiffs wrongly contend that the applicability of federal common law depends on whether Congress completely preempted state law causes of action.  Mot. 12–13.  There are "two categories" of cases in which federal common law applies: (1) where Congress directs application of federal common law rather than state law (including where Congress has completely preempted state law); and (2) where the nature of the issue implicates "uniquely federal interests" requiring application of federal common law even without congressional directive.  *Tex. Indus.*, 451 U.S. at 640.  Here, federal common law is grounded in the second category, and therefore is not dependent on preemption principles.

Finally, Plaintiffs' efforts to cloak these interstate and transboundary emissions suits with erroneous state-law labels are of no moment.  Indeed, the Ninth Circuit has repeatedly found that a federal common-law claim improperly labeled as a state-law claim is still subject to removal.  *See, e.g.*, *New SD*, 79 F.3d at 954–55 (holding that removal jurisdiction existed over plaintiff's purported "purely state law claims" because "[w]hen federal law applies, … it follows that the question arises under federal law"); *Wayne*, 294 F.3d at 1184 (noting that despite pleading state-law claims, "[f]ederal jurisdiction would exist in this case if the claims arise under federal common law"); *Sam L. Majors Jewelers v. ABX, Inc.*, 117 F.3d 922, 928–29 (5th Cir. 1997) (removal of state-law negligence claim was appropriate because "federal common law governed the liability of air carriers for lost or damaged goods").  Accordingly, these actions may be removed.  28 U.S.C. § 1441(a).

### 5. Even If Federal Common Law Has Been Displaced by Statute, That Does Not Create State Common-Law Claims

Plaintiffs wrongly assert that, because *AEP* and *Kivalina* held federal common law remedies are displaced by the comprehensive remedial scheme of the CAA, state law may fully take the place of the now-displaced federal common law.  Mot. 8–10.  This argument would turn *Erie* on its head.  A claim is governed by federal common law when, *inter alia*, it implicates "uniquely federal interests" that make it "inappropriate for state law to control."  *Tex. Indus.*, 451 U.S. at 640–41.  The fact that Congress then enacts a statutory scheme that so comprehensively addresses the subject as to leave no room for federal common law innovation does not somehow mean that *state* common law

now springs into force.  If anything, enactment of a comprehensive federal statutory framework in an area already recognized as being governed by federal common law underscores the federal character of the field, reinforcing the notion that it is "inappropriate for state law to control" except to the extent that Congress authorizes it.  *Id.* at 641.[6]  As noted in *Ouellette*, "it is clear that the only state suits that remain available are those specifically preserved by the Act."  479 U.S. at 492.  Accordingly, Plaintiffs' nuisance claims can arise only under federal common law—not state law.

## B.   These Cases Raise Disputed, Substantial Federal Interests Under *Grable*

The Court should deny Plaintiffs' remand motion because the claims depend on the resolution of substantial, disputed federal questions relating to the extraction, processing, promotion, and consumption of global energy resources.  The Supreme Court has "recognized for nearly 100 years that in certain cases federal-question jurisdiction will lie over state-law claims that implicate significant federal issues." *Grable*, 545 U.S. at 312.

"[F]ederal jurisdiction over a state law claim will lie if a federal issue is:  (1) necessarily raised, (2) actually disputed, (3) substantial, and (4) capable of resolution in federal court without disrupting the federal-state balance approved by Congress."  *Gunn v. Minton*, 568 U.S. 251, 258 (2013) (citing *Grable*, 545 U.S. at 313–14).  Applying this test "calls for a 'common-sense accommodation of judgment to [the] kaleidoscopic situations' that present a federal issue" and thus "justify resort to the experience, solicitude, and hope of uniformity that a federal forum offers on federal issues." *Grable*, 545 U.S. at 312–13 (quoting *Gully v. First Nat'l Bank in Meridian*, 299 U.S. 109, 117 (1936)); *see also* R.H. Fallon, Jr. et al., Hart & Wechsler's The Federal Courts & the Federal System 832 (7th ed. 2015) (under *Grable*, the Court exercises discretion "to tailor jurisdiction to the practical needs of the particular situation").  Plaintiffs' claims are inextricably bound up with uniquely federal interests involving national security, foreign affairs, energy policy, and environmental regulation.  If these cases do not "justify resort to the experience, solicitude, and hope of uniformity that a federal forum

---

[6]   Contrary to Plaintiffs' insinuation, Mot. 8–9, neither *AEP* nor *Kivalina* adopted Plaintiffs' novel position.  The *AEP* Court merely noted that the scope of the claims available under state law, if any, had not been briefed and would not be addressed.  *See* 564 U.S. at 429.  Nothing in the Court's opinion suggests that state law may *substitute* for federal common law whenever Congress displaces federal common law.  And Judge Pro's comment in *Kivalina* that the village could try to "pursue whatever remedies it may have under state law to the extent their claims are not preempted" says nothing about the actual existence and scope of any state law remedies.  696 F.3d at 866 (Pro, J., concurring).

Gibson, Dunn & Crutcher LLP

DEFENDANTS' JOINT OPPOSITION TO MOTION TO REMAND
CASE NOS. 3:17-CV-4929-VC, 3:17-CV-4934-VC, 3:17-CV-4935-VC

offers on federal issues," *Grable*, 545 U.S. at 312, it is hard to imagine one that does.

### 1.   Plaintiffs' Claims Necessarily Raise Multiple Federal Issues

Plaintiffs argue that their claims concerning the extraction and promotion of fossil fuel energy do not necessarily raise federal issues because, supposedly, "[n]one . . . depends on federal law to create the right to relief, none incorporates a federal tort duty that Defendants allegedly violated, and none turns on the application or interpretation of federal law in any way."  Mot. 23.  But Plaintiffs' claims have a significant impact on foreign affairs, necessarily depend on the reasonableness of Defendants' actions under federal cost-benefit analyses, are thinly veiled attacks on federal foreign relations and regulatory decisions, and implicate duties to disclose imposed by federal statutes and regulations.  Any one of these issues suffices under *Grable*.

### a.   Plaintiffs' Claims Have a Significant Impact on Foreign Affairs

Plaintiffs' claims raise substantial federal issues because they have far "more than [an] incidental effect on foreign affairs."  *Garamendi*, 539 U.S. at 418; *see also Crosby v. Nat'l Foreign Trade Council*, 530 U.S. 363, 374–80 (2000).  Because Plaintiffs' claims implicate the "exercise of state power that touches on foreign relations" in a significant way, the state law basis "must yield to the National Government's policy, given the 'concern for uniformity in this country's dealings with foreign nations' that animated the Constitution's allocation of the foreign relations power to the National Government in the first place."  *Garamendi*, 539 U.S. at 413 (quoting *Banco Nacional de Cuba v. Sabbatino*, 376 U.S. 398, 427 n.25 (1964)).

How to address climate change has been the subject of international negotiations for decades, from the adoption of the United Nations Framework Convention on Climate Change in 1992 through the adoption of the Paris Agreement in 2016, and to this day.  As President Obama declared in 2013:

> Just as no country is immune from the impacts of climate change, no country can meet this challenge alone.  That is why it is imperative for the United States to couple action at home with leadership internationally.  America must help forge a truly global solution to this global challenge by galvanizing international action to significantly reduce emissions, prepare for climate impacts, and drive progress through the international negotiations.[7]

The United States' role in these delicate negotiations has evolved over time but has always

---

[7]   Thomson Decl., Ex. 11.

DEFENDANTS' JOINT OPPOSITION TO MOTION TO REMAND
CASE NOS. 3:17-CV-4929-VC, 3:17-CV-4934-VC, 3:17-CV-4935-VC

sought to balance environmental policy with robust economic growth.  After President Clinton signed the Kyoto Protocol in 1997, for example, the U.S. Senate rejected it 95-0, out of concern it would cause serious harm to the economy and did not regulate the emissions of developing nations.  *See* S. Res. 98, 105th Cong. (1997).  Congress enacted a series of laws barring EPA from implementing or funding the Protocol.  *See* Pub. L. No. 105-276, 112 Stat. 2461, 2496 (1998); Pub. L. No. 106-74, 113 Stat. 1047, 1080 (1999); Pub. L. No. 106-377, 114 Stat. 1441, 1441A-41 (2000).  President Trump cited similar economic concerns when he withdrew the U.S. from the Paris Agreement. Thomson Decl., Ex. 12.

Plaintiffs seek to replace these international negotiations and Congressional and Executive decisions with their own preferred foreign policy, using the ill-suited tools of California common law and private litigation.  Indeed, while Plaintiffs concede that "a city's police power can only be applied within its own territory," Mot. 5 n.2, their claims not only ignore corporate separateness but purport to reach all of Defendants' production, much of which takes place overseas and certainly outside of California.  *See* Thomson Decl. ¶¶ 30–40 & Exs. 28–38.  Even when *states*—as opposed to municipalities—have similarly enacted laws seeking to supplant or supplement foreign policy, the Supreme Court has held that state law can play no such role.

In *Crosby*, for example, Massachusetts passed a law barring state entities from transacting with companies doing business in Burma in an effort to spur that country to improve its human rights record.  530 U.S. at 366–70.  But because the law "undermine[d] the President's capacity . . . for effective diplomacy" by "compromis[ing] the very capacity of the President to speak for the Nation," the Supreme Court struck it down.  *Id.* at 381, 388.  As the Court explained, "the President's maximum power to persuade rests on his capacity to bargain for the benefits of access to the entire national economy without exception for enclaves fenced off willy-nilly by inconsistent political tactics."  *Id.* at 381.  In other words, the Court held, "the President's effective voice" on matters of foreign affairs must not "be obscured by state or local action."  *Id.*  Likewise, in *Garamendi*, the Court invalidated California's statutory effort to encourage Holocaust reparations by European insurance carriers based on "the likelihood that state legislation will produce . . . more than incidental effect in conflict with express foreign policy of the National Government . . . ."  539 U.S. at 420.  "Quite

simply," the Court explained, "if the California law is enforceable the President has less to offer and less economic and diplomatic leverage as a consequence." *Id.* at 424 (alterations omitted).

States and local governments have roles to play in combatting climate change. *See infra* Section III.C. But where, as here, state common law is used in litigation against private companies in a way that may substantially affect U.S. foreign policy, there is no denying the "uniquely federal" nature of the lawsuit. *Boyle*, 487 U.S. at 504. The "federal judicial power" must remain "unimpaired for dealing independently, wherever necessary or appropriate, with essentially federal matters" like the ones at issue here. *See Standard Oil*, 332 U.S. at 307.

> **b.      Plaintiffs' Claims Require Federal-Law-Based Cost-Benefit Analyses**

Plaintiffs' nuisance claims also require determining whether the harms caused by Defendants' conduct in extracting, refining, and promoting fossil fuels outweigh the benefits of that conduct to society. *See San Diego Gas & Elec. Co. v. Super. Ct.*, 13 Cal. 4th 893, 938 (1996) (an element of a nuisance claim is that the defendant's conduct was "unreasonable" because "the gravity of the harm outweighs the social utility of the defendant's conduct") (citing Restatement (Second) of Torts §§ 826–31 (1979)) ("Restmt."); *see also* Compl. ¶¶ 184 ("The seriousness of rising sea levels and increased weather volatility and flooding is extremely grave, and outweighs the social utility of Defendants' conduct."); 196 (same); 222 ("Defendants' fossil fuel products are defective because the risks they pose to consumers and to the public . . . outweigh their benefits.").

But Congress has *already* weighed, and continues to weigh, the costs and benefits of fossil fuels, directing federal agencies to permit—and even promote—maximum production of fossil fuels while balancing environmental protection, including protection from greenhouse gas impacts. For decades, federal law has required agencies to weigh the costs and benefits of fossil fuel extraction. *See, e.g.*, 42 U.S.C. § 13384 ("[T]he Secretary shall transmit a report to Congress containing a comparative assessment of alternative policy mechanisms for reducing the generation of greenhouse gases. Such assessment shall include a short-run and long-run analysis of the social, economic, energy, environmental, competitive, and agricultural costs and benefits, including costs and benefits for jobs and competition, and the practicality" of various "mechanisms" for reducing greenhouse gases);

*id.* § 13389(c)(1).[8]  These federal statutes are not, as Plaintiffs would have it, merely the "factual backdrop of federal regulation," Mot. 22; rather, these statutes require exactly the kind of cost-benefit analysis that Plaintiffs would have the state court do.

And these Congressional directives have regulatory teeth.  All federal agencies must assess the costs and benefits of significant regulations, where applicable, and impose a regulation "only upon a reasoned determination that the benefits . . . justify its costs."  Exec. Order No. 12,866, 58 Fed. Reg. 51,735 (Sept. 30, 1993).  But energy production regulation has even more detailed cost-benefit analysis standards.  For example, the Bureau of Land Management requires federal oil and gas lessees to drill "in a manner which . . . results in maximum ultimate economic recovery of oil and gas with minimum waste," 43 C.F.R. § 3162.1(a), but reserves the power to impose "reasonable measures" to "minimize adverse impacts to other resource values," including ecological values, *id.* § 3101.1–2.  Likewise, regulations governing offshore oil and gas drilling require regulation of leases to maximize recovery of energy resources and prevent waste, while minimizing damage to the environment.  *See* 30 C.F.R. § 550.120.  And the Interior Secretary must seek "maximum economic recovery" from federal leases, *id.* § 745.13(j), without delegating to states the Secretary's duty to comply with federal laws and regulations, including environmental laws like the CAA, *id.* § 745.13(b).

Over time, agencies have developed mechanisms to incorporate carbon emissions impacts on climate change, primarily through a "social cost of carbon" metric—which Plaintiffs expressly invoke (Compl. ¶ 148)—for regulatory cost-benefit analyses.  *See* Notice of Removal, ECF No. 1 ¶ 26 ("NOR").  This is reflected, for example, in Executive Order No. 13783, issued by President Trump

---

[8]  A non-exhaustive list of federal laws calling for this balancing include:  Clean Air Act, 42 U.S.C. § 7401(c) (intent "to encourage or otherwise promote reasonable . . . governmental actions . . . for pollution prevention"); Mining and Minerals Policy Act, 30 U.S.C. § 21a (intent to encourage "economic development of domestic mineral resources" including oil and gas balanced with "environmental needs"); Coastal Zone Management Act, 16 U.S.C. § 1451 (balancing "[t]he national objective of attaining a greater degree of energy self-sufficiency" with "[i]mportant ecological . . . values in the coastal zone"); Federal Lands Policy Management Act, 43 U.S.C. § 1701(a) (requiring "the public lands be managed in a manner which recognizes the Nation's need for domestic sources of minerals" including oil and gas while "protect[ing] the quality of . . . ecological, environmental, air and atmospheric, water resource, and archeological values"); Surface Mining Control and Reclamation Act, 30 U.S.C. § 1201 (finding that coal mining is "essential to the national interest" but must be balanced by "effort[s] . . . to prevent or mitigate adverse environmental effects"); National Environmental Policy Act, 42 U.S.C. §§ 4321–70 (requiring disclosure and evaluation of known or foreseeable environmental impacts of federal action, including permitting of private conduct).

on March 28, 2017, which provides that federal agencies are to ensure that estimates of the social cost of carbon are conducted consistent with guidance in OMB Circular A-4, noting that the Circular's estimation methodologies have been "widely accepted for more than a decade."[9]  Although the magnitude and methodologies for estimating the social cost of carbon may evolve over time, the fact is that federal agencies routinely incorporate this metric into analysis of regulatory proposals.  *See, e.g.*, Thomson Decl., Ex. 13 (discussing social cost of carbon estimation methodology).  Other federal agencies have begun to develop models to account for the climate change impacts of federally permitted activities.  For example, the Department of Energy released a technical document on the "life cycle"—from the wellhead to the power plant—of greenhouse gas emissions associated with domestically produced liquefied natural gas ("LNG") that is exported for electrical generation.  *See Life Cycle Greenhouse Gas Perspective on Exporting Liquefied Natural Gas from the United States*, 79 Fed. Reg. 32,260 (June 4, 2014).  This document is now a part of DOE's environmental assessment of whether proposed LNG export licenses are "consistent with the public interest," as required by 15 U.S.C. § 717b(a).  *See, e.g.*, *Sierra Club v. U.S. Dep't of Energy*, 867 F.3d 189, 195–96 (D.C. Cir. 2017) (holding agency analysis of climate change impacts of LNG export license was adequate in part because it relied on "life cycle" document).  And as regulatory analysis has begun to incorporate carbon impacts, federal courts have regularly assessed whether agency action adequately accounted for these costs and set aside agency action that failed to do so.  *See, e.g.*, *WildEarth Guardians v. Jewell*, 738 F.3d 298, 311 (D.C. Cir. 2013); *Ctr. for Biological Diversity v. Nat'l Highway Traffic Safety Admin.*, 538 F.3d 1172, 1198, 1200 (9th Cir. 2008); *Mont. Envtl. Info. Ctr. v. Office of Surface Mining*, 2017 WL 3480262, at *15 (D. Mont. Aug. 14, 2017); *High Country Conservation Advocates v. U.S. Forest Serv.*, 52 F. Supp. 3d 1174, 1196 (D. Colo. 2014).

Moreover, the federal government actively participates in promoting fossil fuel exploration and use through its regulatory, taxing, and purchasing powers.  As noted above, several federal regulatory regimes require maximum economic recovery, or minimization of waste, of regulated energy resources.  *See supra* at 18.  For example, the Federal Coal Leasing Act Amendments to the Mineral

---

[9]   Exec. Order No. 13783, Promoting Energy Independence and Economic Growth, § 5 (Mar. 28, 2017), reprinted in 82 Fed. Reg. 16,093 (Mar. 31, 2017).

Gibson, Dunn & Crutcher LLP

Leasing Act condition federal leases on "diligent development" to achieve "maximum economic recovery of the coal within the proposed leasing tract." 30 U.S.C. §§ 201(a)(3)(C); 207(b)(1); *see also* 43 C.F.R. § 3480.0-5(a)(21) (defining "maximum economic recovery" to mean that "all profitable portions of a leased Federal coal deposit must be mined"). The government also maintains the Strategic Petroleum Reserve, purchasing fuel from producers, including some Defendants here. *See* 10 C.F.R. § 626.6. It loans fuel to consumer-facing distributors, again including some Defendants here, to ensure adequacy of domestic fuel supplies. *See* Energy Policy and Conservation Act of 1975, 42 U.S.C. § 6201 *et seq.*; Thomson Decl., Ex. 14.

Federal law would necessarily govern the cost-benefit analysis required by Plaintiffs' nuisance claims. Adjudicating these claims would require interpretation of federal regulations and federal agencies' balance between energy and environmental needs, and assessment of Defendants' compliance with the same. The Fifth Circuit recently held that similar claims give rise to federal jurisdiction. *See Tenn. Gas*, 850 F.3d at 720. The Fifth Circuit determined that a state agency's "state law causes of action" against energy companies for alleged ecological harms "necessarily raise federal issues sufficient to justify federal jurisdiction." *Id.* at 721, 725–26. There, as here, the plaintiff argued that its claims rested on state law that "set[] forth" requirements that were "apparently similar" to federal standards. *Id.* at 722–23. The Fifth Circuit rejected that argument, as the plaintiff cited no case in which a state court had used the state law on which the plaintiff relied "as the basis for the tort liability that the Board would need to establish." *Id.* at 723. Plaintiffs' effort to distinguish this case, Mot. 24–25, fails because they identify no basis for concluding that California law does or could supply adequate standards for determining which persons in the world may be held liable for the effects of global warning.[10] Accordingly, any basis for liability "would have to be drawn from federal law." *Tenn. Gas*, 850 F.3d at 723.

Nor does the applicability of *Grable* turn on whether the cost-benefit analyses required by

---

[10] The California Court of Appeal's decision in *People v. ConAgra Grocery Prods. Co.*, 17 Cal. App. 5th 51 (2017) is inapposite because it dealt with a product (lead paint) the use of which was not alleged to have interstate effects. Indeed, in *ConAgra*, there was no claim that application of lead paint in buildings in other states combined with the application of lead paint in California to create a world-wide phenomenon akin to global warming; on the contrary, the claim was simply that the defendants were ultimately liable for applications of lead paint in California buildings that created noxious conditions in those very same California buildings. *Id.* at 65–66

Plaintiffs' claims are "uniquely" federal, *see Tex. Indus.*, 451 U.S. at 640; *AEP*, 564 U.S. at 421; it suffices that the analyses undisputedly implicate "significant" federal issues.  Plaintiffs do not dispute that their "nuisance claims will require 'the same analysis of benefits and impacts' from fossil fuels that federal agencies conduct under several statutes." Mot. 24.  They argue instead that remand is required because they do not expressly invoke governing federal standards. *See id.* 21–26.  But the "artful pleading" doctrine keeps a plaintiff from "attempt[ing] to defeat removal by omitting to plead necessary federal questions" in the complaint. *In re: Nat'l Football Leagues Sunday Ticket Antitrust Litig.*, 2016 WL 1192642, at *3 (C.D. Cal. Mar. 28, 2016); *see also Flo & Eddie, Inc. v. Bill Graham Archives LLC*, 2009 WL 10671057, at *2 (C.D. Cal. 2008). The artful-pleading rule applies when, *inter alia*, the claim "presents a substantial federal question." *Flo & Eddie*, 2009 WL 10671057, at *2.  In fact, Plaintiffs admit that a federal issue can be "'embedded' in the complaint itself" even when the complaint does not expressly invoke that issue. Mot. 26 (discussing the state-secrets privilege and *In re NSA Telecomms. Recs. Litig.*, 483 F. Supp. 2d 934 (N.D. Cal. 2007)).  When, as here, "the vindication of a right under state law necessarily turns on some construction of federal law," it "presents a substantial federal question," and "[r]emoval is proper." *Flo & Eddie*, 2009 WL 10671057, at *2 (citation omitted).[11]

### c.   Plaintiffs' Claims Are a Collateral Attack on Federal Decisions

Federal jurisdiction under *Grable* also exists where, as here, suits amount to a "collateral attack" on a federal agency's regulatory decisions. *Bader Farms, Inc. v. Monsanto Co.*, 2017 WL 633815, at *3 (E.D. Mo. Feb. 16, 2017).  This principle is particularly salient in public nuisance

---

[11]  Neither *In re Roundup Products Liability Litigation*, 2017 WL 3129098 (N.D. Cal. July 5, 2017) (Chhabria, J.), nor *Oregon ex rel. Kroger v. Johnson & Johnson*, 832 F. Supp. 2d 1250 (D. Or. 2011), supports Plaintiffs' position. Mot. 22–24.  The *Kroger* court noted the likely presence of at least one necessary federal issue, but held that other *Grable* requirements were not met in light of Supreme Court decisions permitting similar claims under state law. *See Kroger*, 832 F. Supp. 2d at 1256–57 (relying on *Merrell Dow*'s conclusion that federal issues in state tort suits against drug manufacturers generally do not support federal jurisdiction).  And unlike in *Roundup*, Defendants here do not assert federal jurisdiction from mere "burdens and obligations" imposed by federal law, but rather that Plaintiffs' claims upend and supplant federal-law-based cost-benefit analyses. *See Roundup*, 2017 WL 3129098, at *1.  More fundamentally, those cases do not support Plaintiffs because these cases involves national and international environmental regulation—a matter "meet for federal governance." *AEP*, 564 U.S. at 422; *see also Kivalina*, 696 F.3d at 855 (federal law "includes the general subject of environmental law and specifically includes ambient or interstate air and water pollution.").

cases, where courts are hesitant to find that conduct undertaken pursuant to "a comprehensive set of legislative acts or administrative regulations" is actionable. Restmt. § 821B cmt. f; *see San Diego Gas*, 13 Cal. 4th at 938 (relying on Restatement to define nuisance tort); *see also* Cal. Civ. Code § 3482 ("Nothing which is done or maintained under the express authority of a statute can be deemed a nuisance."). For good reason: In the context of a comprehensive scheme of regulation, nuisance claims amount to "a collateral attack on an entire regulatory scheme . . . premised on the notion that [the scheme] provides inadequate protection." *Tenn. Gas*, 850 F.3d at 724 (alteration in original).

In general, Plaintiffs' public nuisance claims seek a different balancing of social harms and benefits than that struck by Congress, pursuant to a comprehensive scheme of federal statutes and regulations that both promote and constrain production and promotion of fossil fuel energy. Plaintiffs concede that their claims require "'the same analysis of benefits and impacts' from fossil fuels that federal agencies conduct under several statutes." Mot. 24. Federal court jurisdiction over these claims, which attack the merits of that balancing, is required under *Grable*. *See id.* at 725 (removal under *Grable* appropriate where "the scope and limitations of a complex federal regulatory framework are at stake" in state law claims). Plaintiffs barely address this argument in their motion to remand, Mot. 25 n.12, even though numerous cases have held that such collateral attacks on federal regulatory decision-making fall within Congress's grant of arising-under jurisdiction. *See Pet Quarters, Inc. v. Depository Tr. & Clearing Corp.*, 559 F.3d 772, 779 (8th Cir. 2009) (complaint "presents a substantial federal question because it directly implicates actions taken by" a federal agency); *McKay v. City & Cty. of S.F.*, 2016 WL 7425927, at *4–6 (N.D. Cal. Dec. 23, 2016) (denying remand and finding *Grable* jurisdiction because state-law claims were "tantamount to asking the Court to second guess the validity of the FAA's decision"); *cf. Bennett v. Sw. Airlines Co.*, 484 F.3d 907, 909 (7th Cir. 2007) (recognizing that *Grable* approved of federal jurisdiction "when the state proceeding amounted to a collateral attack on a federal agency's action"). Plaintiffs' claims boil down to an assertion that federal agencies have not struck the *proper* balance in weighing these competing interests; but that is clearly an attack on the merits, and not a claim wholly unrelated to the obligations of federal law. In fact, Plaintiffs would have a state court re-do federal officials' weighing of the costs

and benefits of Defendants' activities.  Plaintiffs' claims are thus a collateral attack on federal regulation of energy and the environment.

Moreover, California statutes on which Plaintiffs rely only confirm that such substantial federal issues are "necessarily raised" by Plaintiffs' nuisance claims.  Plaintiffs plead nuisance under California Civil Code § 3479, which defines the claim in part as "[a]nything which . . . *unlawfully* obstructs the free passage or use, in the customary manner, of any navigable lake, or river, bay, stream, canal, or basin, or any public park, square, street, or highway."  Cal. Civ. Code § 3479 (emphasis added); *see* Compl. ¶¶ 182, 186 (invoking § 3479 and alleging that Defendants' "unlawful and outrageous conduct" created conditions that "obstruct and threaten to obstruct the free passage and use of navigable lakes, rivers, bays, streams, canals, basins, public parks, squares, streets, and/or highways within" their jurisdictions).  Thus, *unlawfulness* is an element of Plaintiffs' nuisance claims.  And California Civ. Code § 3482 further specifies that "nothing done or maintained under the express authority of a statute can be deemed a nuisance," which includes things "done or maintained" under federal regulations promulgated under federal statutes.  *Jones v. Union Pac. R.R. Co.*, 79 Cal. App. 4th 1053, 1067–68 (2000) (examining whether a nuisance claim was barred by § 3482 because the conduct allegedly giving rise to the alleged nuisance was authorized by federal regulations).  Accordingly, Plaintiffs' nuisance claims necessarily raise substantial federal questions, notably, whether and to what extent the levels of global emissions to which Plaintiffs allege Defendants substantially contributed exceed the levels authorized by the CAA and other statutes.

### d.    Plaintiffs' Promotion Claims Implicate Federal Law Duties to Disclose

Plaintiffs attempt to sidestep *Grable* by alleging that the entire federal balancing of harms and benefits is a sham because Defendants failed to disclose material facts to federal regulators.  Compl. ¶ 1 (alleging a "coordinated, multi-front effort to conceal and deny their own knowledge of [fossil fuel] threats, discredit the growing body of publicly available scientific evidence, and persistently create doubt in the minds of . . . regulators" and others); *see also id.* ¶¶ 129, 150, 211, 242.  The purported goal of this effort was to fool those federal agencies and avoid regulation that might have curtailed Defendants' activities and avoided the alleged impacts to Plaintiffs.  *See* Compl. ¶¶ 150, 181.d (Defendants "fund[ed] the dissemination of information intended to mislead . . . elected officials and

regulators" thereby "delay[ing] efforts to curb these emissions"); *id.* ¶ 136 (alleging that lobbying group emails "evidence an effort to influence EPA regulations that would have mitigated reliance on Defendants' fossil fuel products by requiring renewable fuel production"); ECF No. 171 (recognition by Cities of San Francisco and Oakland that "the San Mateo actions allege that Defendants should be held liable for undermining international treaties, federal regulation and legislation on global warming"); *see also* Compl. ¶¶ 119, 127, 181.e.

Thus, establishing that Defendants misled federal regulators about the known harms of fossil fuel energy production is central to Plaintiffs' allegations. *See* Compl. ¶ 9 ("Defendants' production, promotion, marketing, and use of fossil fuel products, simultaneous concealment of the known hazards of those products, and their championing of anti-regulation and anti-science campaigns, actually and proximately caused Plaintiffs' injuries."); *id.* ¶ 141 ("As a result of Defendants' tortious, false and misleading conduct, . . . policy-makers[] have been deliberately and unnecessarily deceived about" the effects of Defendants' products on climate change and sea levels); *id.* ¶ 129 (alleging that these efforts to "prevent regulation have been successful"). Put another way, Plaintiffs' claims rest on the premise that Defendants had a duty to inform federal regulators about known harms; that their statements were material to the regulators' decision not to curtail Defendants' conduct; and that Defendants' omissions made regulators unable to perform their duties. These questions of duty, materiality, and foreseeable impact are necessarily governed by the federal law regulating Defendants' conduct. Federal law governs claims of fraud on federal agencies, and "the relationship between a federal agency and the entity it regulates is inherently federal in character because the relationship originates from, is governed by, and terminates according to federal law." *Buckman Co. v. Pls.' Legal Comm.*, 531 U.S. 341, 347 (2001); *see also Grable*, 545 U.S. at 314–15 (removal of state law claim challenging compatibility of agency action with federal statute).

Plaintiffs argue that remand is required because they have not alleged any duty to disclose that is governed by federal statutes or regulations. Mot. 22. This assertion cannot be squared with the plain language of their Complaints, which expressly invoke the Toxic Substances Control Act as imposing a duty of disclosure that Defendants allegedly breached. Compl. ¶ 96 ("Although greenhouse gases are human health hazards . . . neither Imperial, Exxon, nor any other Defendant has ever filed a

1    disclosure with the U.S. Environmental Protection Agency pursuant to the Toxic Substances Control

2    Act."). Moreover, Plaintiffs' allegations implicate other duties to disclose imposed by federal law.

3    For example, OCSLA requires the Secretary of the Interior to promulgate and administer regulations

4    that comply with the CAA's National Ambient Air Quality Standards ("NAAQS") to govern offshore

5    activities. *See* 43 U.S.C. § 1334(a)(8). These regulations are found at 30 C.F.R. §§ 550.302–04 and

6    govern the disclosure of information to federal regulators about air emissions.

7         To understand if Defendants' alleged misrepresentations and omissions affected their relation-

8    ship with their federal regulators will require the Court to construe federal law to determine what reg-

9    ulators should have been told and how they would have responded. *See Tenn. Gas*, 850 F.3d at 723

10    (finding necessary and disputed federal issue because state tort claims could not "be resolved without

11    a determination whether multiple federal statutes create a duty of care that does not otherwise exist

12    under state law"); *Bader Farms*, 2017 WL 633815, at *3 (denying remand where plaintiff alleged

13    federal agency failed to regulate "due to defendant's fraudulent concealment," since federal law

14    "identifies the duty to provide information [to federal regulators] and the materiality of that infor-

15    mation"); *Boyeson v. S.C. Elec. & Gas Co*., 2016 WL 1578950, at *5 (D.S.C. Apr. 20, 2016) (re-

16    moval proper where "allegations of negligence appear on their face to not reference federal law, [but]

17    federal issues are cognizable as the source for the duty of care . . . ").

18         The court reached a similar conclusion in *County of Santa Clara v. Astra USA, Inc.*, 401 F.

19    Supp. 2d 1022 (N.D. Cal. 2005). There, Santa Clara sued pharmaceutical companies in state court,

20    alleging that the companies had overcharged for drugs. *Id.* at 1024. To skirt the federal statutes, reg-

21    ulations, and contracts controlling what the companies could lawfully charge—and so to avoid litigat-

22    ing in federal court—the County argued that its claims required only a determination whether the

23    companies "acted unfairly and fraudulently when they allegedly 'misrepresented and failed to dis-

24    close . . . the true facts regarding their prices.'" *Id.* at 1026. The court concluded that federal-ques-

25    tion jurisdiction under *Grable* supported removal because "there is simply no way to ignore federal

26    law." *Id.* at 1027. Because federal law is the standard by which Plaintiffs' allegations of duty, mate-

27    riality, and causation must be judged, federal jurisdiction is proper.

28

Gibson, Dunn &
Crutcher LLP

DEFENDANTS' JOINT OPPOSITION TO MOTION TO REMAND
CASE NOS. 3:17-CV-4929-VC, 3:17-CV-4934-VC, 3:17-CV-4935-VC

### 2.       The Federal Issues Are Disputed and Substantial

Plaintiffs cannot deny that the federal questions presented here are actually disputed.  The Complaints make that dispute plain.  *See, e.g.*, Compl. ¶¶ 182, 212, 222, 235.  Plaintiffs mischaracter-ize their complaints, saying that they "do not ask that th[e] federal regulatory decisions" cited in the Notices of Removal "be amended or supplanted at all."  Mot. 27.  But Plaintiffs' entire pleading— which questions whether, pursuant to a host of federal statutes, regulators should have struck the bal-ance between the harms and benefits of Defendants' conduct differently or would have done so in the absence of Defendants' "campaign of disinformation regarding global warming and the climactic ef-fects of fossil fuel products," Compl. ¶ 222.c—is a collateral attack on federal energy policy that ex-pressly encouraged the conduct Plaintiffs now claim constitutes a public nuisance.  *See supra* Sec-tions III.B.1(a)–(c).

The necessary federal questions raised in this case are substantial issues warranting a federal forum under *Grable*.  As Plaintiffs acknowledge, Mot. 26, the Court must consider "the importance of the issue to the federal system as a whole."  *Gunn*, 568 U.S. at 260.  The issues here are of great importance:  This case sits at the intersection of federal energy and environmental regulations, and implicates foreign policy and national security.  The substantiality inquiry is satisfied when the fed-eral issues in a case concern even one of those subjects.  *See Bennett*, 484 F.3d at 910 (*Grable* "thought a federal forum especially appropriate for contests arising from a federal agency's perfor-mance of duties under federal law, doubly so given the effect on the federal Treasury"); *In re Nat'l Sec. Agency Telecomms. Records Litig.*, 483 F. Supp. 2d 934, 943 (N.D. Cal. 2007) (state-law privacy claims conferred federal jurisdiction because of the application of the state secrets doctrine); *Gryn-berg Prod. Corp. v. British Gas, p.l.c.*, 817 F. Supp. 1338, 1356 (E.D. Tex. 1993) ("[Q]uestions of international relations are almost always substantial.").  That the federal issues in this case concern all three subjects leaves no doubt that the issues are substantial enough to support federal jurisdiction un-der *Grable*.

Contrary to Plaintiffs' assertion, Mot. 26–27, the federal issues in this case are nothing like the "fact-bound and situation-specific" legal malpractice question at issue in *Gunn*.  568 U.S. at 263.  Plaintiffs' effort to hold a selection of large energy companies liable for the effects of global climate

change, given decades of federal policy under which Defendants' conduct was lawful and encouraged, would have effects far beyond California.  The issues are of great "importance . . . to the federal system as a whole," making federal jurisdiction appropriate.  *Gunn*, 568 U.S. at 260.  As in *Tennessee Gas*, "the validity of [Plaintiffs'] claims would require that conduct subject to an extensive federal permitting scheme is in fact subject to implicit restraints that are created by state law."  850 F.3d at 724.  "The implications for the federal regulatory scheme of the sort of holding that [Plaintiffs seek[]] would be significant, and thus the issues are substantial."  *Id.*

### 3.  Federal Jurisdiction Does Not Upset Principles of Federalism

Federal jurisdiction here is fully "consistent with congressional judgment about the sound division of labor between state and federal courts."  *Grable*, 545 U.S. at 313.  Federal jurisdiction comports with principles of federalism because the issues embedded in Plaintiffs' claims are traditional federal issues:  specifically, regulation of vital national resources, foreign policy and national security, and federal revenue collection.  Federal courts are the traditional forums for adjudicating such claims.  The sheer volume of significant federal issues that must be adjudicated if Plaintiffs' claims proceed reinforces the propriety of federal jurisdiction here.  *See* NOR ¶ 33.

In fact, permitting state courts to hear these claims would threaten the balance in federal-state relations.  "Power over external affairs is not shared by the States; it is vested in the national government exclusively."  *United States v. Pink*, 315 U.S. 203, 233 (1942).  State governments must yield to the federal government in foreign affairs so that this exclusively national power is "entirely free from local interference."  *Hines v. Davidowitz*, 312 U.S. 52, 63 (1941); *see also Gingery v. City of Glendale*, 831 F.3d 1222, 1228 (9th Cir. 2016) ("It is well established that the federal government holds the exclusive authority to administer foreign affairs.").  Even more so should foreign policy matters be free from state *judicial* interference.  Indeed, it would be inappropriate for the Supreme Court—let alone a state court—"to judge the wisdom of the National Government's [foreign] policy; dissatisfaction should be addressed to the President or, perhaps, Congress."  *Garamendi*, 539 U.S. at 427.

Plaintiffs deny that they seek "to govern extraterritorial conduct," asserting that they "request only damages, and abatement of the nuisances within their borders."  Mot. 32.  But the monetary relief Plaintiffs seek is without question intended to have a regulatory effect on Defendants' world-

wide conduct.  "[S]tate regulation can be . . . effectively exerted through an award of damages, and [t]he obligation to pay compensation can be, indeed is designed to be, a potent method of governing conduct and controlling policy."  *Kurns v. R.R. Friction Prods. Corp.*, 565 U.S. 625, 637 (2012).  But the "sovereign prerogatives" to force reductions in greenhouse gas emissions, negotiate emissions agreements, and exercise the police power to reduce emissions "are now lodged in the Federal Government."  *Massachusetts*, 549 U.S. at 519.  The "balance of federal and state judicial responsibilities" requires a federal forum here.  *Grable*, 545 U.S. at 314.  And Plaintiffs' claim that "redressing the kinds of knowing marketing and promotion campaigns undertaken by defendants here falls directly within the traditional police power of the states," Mot. 28, ignores that Congress intended federal courts to resolve claims substantially similar to those asserted here.[12]

Indeed, Congress has made clear that collateral challenges to CAA emissions standards belong exclusively in federal court.  *See, e.g.*, 42 U.S.C. § 7607(b).  The CAA was designed to "channel[] review of final EPA action exclusively to the courts of appeals, regardless of how the grounds for review are framed."  *Cal. Dump Truck Owners Ass'n v. Nichols*, 784 F.3d 500, 506 (9th Cir. 2015) (emphasis omitted).  Similarly, Congress vested the federal judiciary with jurisdiction to hear private enforcement actions under the CAA.  *See* 42 U.S.C. § 7604(a).  Thus, contrary to Plaintiffs' argument, Mot. 28, this *is* a case in which Congress provided federal courts with jurisdiction to hear challenges "akin" to those brought by the plaintiffs.  *See, e.g.*, *McKay*, 2016 WL 7425927, at *5 (finding *Grable* met for state law claims based on pollution by changed flight paths over residences; retaining jurisdiction "would reinforce the proper division between state and federal regulation of air flight" and remanding would result in state court "potentially . . . examining the validity of federal regulations").[13]

---

[12]  *Grable* rejected the notion that because no federal cause of action was available, "no federal jurisdiction" existed.  *Grable & Sons Metal Prods., Inc. v. Darue Eng'g & Mfg.*, 545 U.S. 308, 317 (2005).  While the absence of a federal claim might weigh against federal jurisdiction in a "garden variety state tort" suit, *id.* at 318, this is not such a case.  Denying a federal forum here would entail "threatening structural consequences," *id.* at 319, for the federal system.

[13]  Plaintiffs point to cases in which courts have remanded state law claims implicating different federal statutes, such as the Food, Drug, and Cosmetic Act, 21 U.S.C. § 301 *et seq.*, and the Americans with Disabilities Act, 42 U.S.C. § 12101, *et seq.*, Mot. 29, but unlike here, the claims asserted in

C.   **These Actions Are Removable Because They Are Completely Preempted by Federal Law**

Complete preemption occurs when federal law has a "preemptive force . . . so powerful as to displace entirely any state cause of action," such that "any complaint that comes within the scope of the federal cause of action necessarily 'arises under' federal law," even if it asserts only state-law claims. *Franchise Tax Bd.*, 463 U.S. at 23–24. Complete preemption provides two separate bases for removal here.

To begin, there is complete preemption based on the foreign affairs doctrine. For the reasons set forth above, *supra* Section III.B.1(a), litigating in state court the inherently transnational activity challenged by these complaints would inevitably intrude on the foreign affairs power of the federal government and is completely preempted. *See Garamendi*, 539 U.S. at 418 ("[S]tate action with more than incidental effect on foreign affairs is preempted, even absent any affirmative federal activity in the subject area of the state [action], and hence without any showing of conflict."); *see also Gen. Motors Corp.*, 2007 WL 2726871, at *14 (dismissing claims against automakers because the federal government "ha[s] made foreign policy determinations regarding the United States' role in the international concern about global warming," and a "global warming nuisance tort would have an inextricable effect on . . . foreign policy").

Plaintiffs' claims are also completely preempted by the CAA, which "provide[s] the exclusive cause of action for the claim asserted." *See Beneficial Nat'l Bank v. Anderson*, 539 U.S. 1, 8 (2003). Permitting a state-law cause of action here "would pose an obstacle to the purposes and objectives of Congress," by "duplicat[ing], supplement[ing], or supplant[ing] the [pre-emptive] civil enforcement remedy." *See Aetna Health Inc.*, 542 U.S. at 209, 217 (citations omitted).

Plaintiffs contend their claims are outside the CAA because they "do not seek to enjoin any emissions, enforce or invalidate any Clean Air Act permit . . . nor create any other restriction whatsoever on air pollution conceivably governed by the Act." Mot. 16. That is disingenuous at best. The undeniable intent of Plaintiffs' claims is to set nationwide and global emissions standards. Indeed,

---

those cases did not threaten to undermine the carefully calibrated regulatory regime in a field involving uniquely federal interests and "sovereign prerogatives." *Massachusetts v. EPA*, 549 U.S. 497, 519 (2007).

Gibson, Dunn &
Crutcher LLP

any state-law liability would necessarily require a finding that billions of actors exceeded some "acceptable" or "reasonable" global level of emissions as a result of Defendants' production and promotion of fossil fuels.  This Court would thus be required to determine the level at which global emissions became actionable.  Plaintiffs have even suggested that the Court set the global cap at "a 15% annual reduction [in CO2 emissions]" which they say "will be required to restore the Earth's energy balance" and thus stop the growth of the alleged nuisance.  *See* Compl. ¶ 151.  Because California accounts for only 1% of such emissions, Plaintiffs necessarily seek at least a 14% reduction from sources outside of California.[14]

The CAA provides the exclusive vehicle for regulating nationwide emissions.  It establishes a system by which federal and state resources are deployed to "protect and enhance the quality of the Nation's air resources so as to promote the public health and welfare and the productive capacity of its population." 42 U.S.C. § 7401(b)(1).  At the heart of this system are the emission limits, permitting, and related programs set by EPA, which reflect the CAA's dual goals of protecting both public health and welfare and the nation's productive capacity.  Once set, the CAA provides specific procedures for any person, including private parties and State and local governments, to challenge or change nationwide emissions standards or permitting requirements.  42 U.S.C. §§ 7607(b), (d).  Indeed, the State of California and local governments within California have recently exercised these rights.  *See, e.g.*, *State of New York et al. v. EPA*, Case No. 17-1185 (D.C. Cir. Aug. 1, 2017) (challenge filed by 15 states—including California—to EPA decision extending deadline for promulgating initial area designations for the 2015 ozone NAAQS); *S. Coast Air Quality Mgmt. Dist. v. EPA*, 472 F.3d 882, 886 (D.C. Cir. 2006) (challenge brought to EPA's 2004 ozone NAAQS implementation rule).  In addition, a party can petition EPA to set new emission standards or modify existing ones.  *See* 5 U.S.C. § 553(e).  If unhappy with the results, the party may seek review in federal court.  42 U.S.C. § 7607(b)(1); *see also AEP*, 564 U.S. at 425 ("States and private parties may petition for a rulemaking on the matter, and EPA's response will be reviewable in federal court.").

These procedures are the exclusive means for judicial review.  42 U.S.C. § 7607(e).  As the

---

[14]  Brad Plumer, *Just How Far Can California Possibly Go on Climate?*, N.Y. Times (July 26, 2017), https://www.nytimes.com/2017/07/26/climate/california-climate-policy-cap-trade.html (last visited Dec. 21, 2017).

DEFENDANTS' JOINT OPPOSITION TO MOTION TO REMAND
CASE NOS. 3:17-cv-4929-VC, 3:17-cv-4934-VC, 3:17-cv-4935-VC

Gibson, Dunn &
Crutcher LLP

Ninth Circuit explained:  The CAA "channels review of final EPA action exclusively to the courts of appeals, *regardless of how the grounds for review are framed*."  *Cal. Dump Truck Owners*, 784 F.3d at 506 (emphasis in original).  Following this logic, the Second Circuit rejected an action "alleg[ing] that [a power company] maintained a common law nuisance by burning oil containing 2.8% sulphur" when the "use of high sulphur fuel was authorized specifically by the EPA" because "[a]ll claims against the validity of performance standards approved by final decision of the Administrator must be addressed to the courts of appeals on direct appeal."  *New Eng. Legal Found. v. Castle*, 666 F.2d 30, 31, 33 (2d Cir. 1981).

Although the CAA's cooperative federalism approach authorizes states to establish standards and set certain requirements in state implementation plans and federally-enforceable state permits for the purpose of attaining and maintaining the CAA's air quality goals, those standards can only be applied within state boundaries.  "Application of an affected State's law to an out-of-state source . . . would undermine the important goals of efficiency and predictability" underlying the federal regulatory system.  *See Ouellette*, 479 U.S. at 496.  This is the core insight of *Ouellette*, which held that Vermont landowners could not sue under Vermont law for harm from water pollution discharged by a New York source.  Applying Vermont law to the New York source "would compel the source to adopt different control standards and a different compliance schedule from those approved by the EPA, even though the affected State had not engaged in the same weighing of the costs and benefits."  *Id.* at 495.  "The inevitable result of such suits would be that Vermont and other States could do indirectly what they could not do directly—regulate the conduct of out-of-state sources"—because defendants "would have to change [their] methods of doing business and controlling pollution to avoid the threat of ongoing liability."  *Id.*

The Fourth Circuit described the problem:  "If courts across the nation were to use the vagaries of public nuisance doctrine to overturn the carefully enacted rules governing airborne emissions, it would be increasingly difficult to determine what standards govern."  *N.C. ex rel. Cooper*, 615 F.3d at 298.  "An EPA-sanctioned state permit may set one standard, a judge in a nearby state another, and a judge in another state a third.  Which standard is the hapless source to follow?"  *Id.* at 302.  Because

the global emissions at issue here indisputably cross state lines, allowing any state to regulate the effects of such emissions would allow the most restrictive State to impose new standards on the whole nation, rendering the CAA superfluous.  Indeed, there would be *no* effective federal standard.

Plaintiffs' arguments to the contrary are unpersuasive.  *First*, they accuse Defendants of "rely[ing] in unspecified ways on the Clean Air Act's regulatory scheme as a whole—an approach that finds no support in controlling precedent . . . ."  Mot. 19.  This is wrong as a matter of fact and law:  Particular provisions of the CAA that completely preempt Plaintiffs' claims are clear,[15] and in any event, it is precisely where federal law "as a whole" regulates a particular subject matter that complete preemption is *most likely* to be found.  *See Fossen v. Blue Cross & Blue Shield of Mont., Inc.*, 660 F.3d 1102, 1108 (9th Cir. 2011) (complete preemption applies where Congress "sets forth a comprehensive civil enforcement scheme that completely preempts state-law causes of action within the scope of these civil enforcement provisions") (citations and alterations omitted).

*Second*, Plaintiffs note that the Supreme Court has recognized complete preemption in only three contexts.  Mot. 14 & n.8.  But federal courts in California have found many statutes to completely preempt state-law causes of action.[16]  And while Plaintiffs point to cases that declined to find that the CAA completely preempted particular state-law claims, *see* Mot. 14 n.9, those cases are distinguishable because, unlike Plaintiffs' claims here, those state-law claims regulated only *in-state* emissions.  *See, e.g.*, *Her Majesty The Queen In Right of the Province of Ont. v. City of Detroit*, 874 F.2d 332, 343 (6th Cir. 1989) ("[P]laintiffs are suing a Michigan facility under Michigan law."); *Cerny v. Marathon Oil Corp.*, 2013 WL 5560483, at *8 (W.D. Tex. Oct. 7, 2013) ("[S]ource state nuisance claims are not preempted."); *Gutierrez v. Mobil Oil Corp.*, 798 F. Supp. 1280, 1284 (W.D.

---

[15]  As Plaintiffs well know and have advocated for, EPA has regulated greenhouse gas emissions under several provisions of the CAA, including 42 U.S.C. §§ 7411, 7465, and 7521.

[16]  *See, e.g.*, *Hall v. N. Am. Van Lines, Inc.*, 476 F.3d 683, 688–89 (9th Cir. 2007) (Carmack Amendment); *In re Miles*, 430 F.3d 1083, 1092 (9th Cir. 2005) (Section 303(i) of the Bankruptcy Code); *Botsford v. Blue Cross & Blue Shield of Mont., Inc.*, 314 F.3d 390, 399 (9th Cir. 2002) (Federal Employees Health Benefits Act); *Fadhliah v. Societe Air Fr.*, 987 F. Supp. 2d 1057, 1061 (C.D. Cal. 2013) (Montreal Convention); *Cont'l Ins. Co. v. Kawasaki Kisen Kasha Ltd.*, 542 F. Supp. 2d 1031, 1037 (N.D. Cal. 2008) (federal maritime law and Carriage of Goods by Sea Act); *Asante Techs., Inc. v. PMC-Sierra, Inc.*, 164 F. Supp. 2d 1142, 1150–52 (N.D. Cal. 2001) (U.N. Convention on Contracts for the International Sale of Goods); *Worth v. Universal Pictures, Inc.*, 5 F. Supp. 2d 816, 823 (C.D. Cal. 1997) (Copyright Act).

Gibson, Dunn &
Crutcher LLP

Tex. 1992) ("[S]tates have the right and jurisdiction to regulate activities occurring within the confines of the state.").

*Third*, Plaintiffs contend that their claims are not completely preempted because "Congress specifically intended to preserve state law remedies related to air pollution, particularly when such remedies impose standards that are *higher* than those in the Clean Air Act." Mot. 16. This misreads the CAA's savings clauses. As explained earlier, the CAA permits only a limited role for state common law, and it cannot extend to the sort of inherently multi-state and multi-national emissions issues that Plaintiffs seek to address here. The CAA "entrusts such complex balancing to EPA in the first instance, in combination with state regulators." *AEP*, 564 U.S. at 427. This is sensible: "The expert agency is surely better equipped to do the job than individual . . . judges issuing ad hoc, case-by-case injunctions." *Id*. at 428. "Where Congress has chosen to grant states an extensive role in the [CAA's] regulatory regime . . . , field and conflict preemption principles caution at a minimum against according states a wholly different role and allowing state nuisance law to contradict joint federal-state rules so meticulously drafted." *N.C. ex rel. Cooper*, 615 F.3d at 303.

*Fourth*, Plaintiffs contend that the CAA does not completely preempt their claims because it "does not provide a right to compensatory damages." Mot. 18. But "a mismatch in remedies or the elements of claims is not sufficient to avoid . . . complete preemption . . . ." *Caponio v. Boilermakers Local 549*, 2017 WL 1477133, at *1 (N.D. Cal. Apr. 25, 2017). And while Plaintiffs insist that "the Clean Air Act does *not* contain[] a private cause of action that could encompass the state law tort claims Plaintiffs assert," Mot. 18, it is immaterial whether the CAA "encompass[es]" the state-law cause of action, so long as it provides an exclusive federal remedy. *See Cal. Dump Truck Owners*, 784 F.3d at 506 (the CAA was designed to "channel[] review of final EPA action exclusively to the courts of appeals, *regardless of how the grounds for review are framed*" (emphasis in original)).[17]

---

[17] To the extent Plaintiffs suggest that the CAA cannot completely preempt their state-law claims because it provides only for administrative relief (rather than relief from a court in the first instance), *see* Mot. 19, the Ninth Circuit has flatly rejected that position. *Botsford v. Blue Cross & Blue Shield of Mont., Inc.*, 314 F.3d 390, 397 (9th Cir. 2002), (Federal Employees Health Benefits Act completely preempted state-law claim due to "[t]he existence of a detailed administrative enforcement scheme, coupled with Congress's decision to vest [an agency] with the power to enforce remedies . . . .").

1    Because Plaintiffs' suits necessarily aim to impose nationwide and even international emis-

2    sion standards, they fall within the completely preemptive scope of the foreign affairs doctrine and

3    the CAA.  These cases therefore "arise under" federal law, and removal is proper.

**D.**    **The Actions Are Removable Because They Are Based on Defendants' Activities on Federal Lands and at the Direction of the Federal Government**

        **1.**    **The Actions Are Removable Under the Outer Continental Shelf Lands Act**

    This Court has jurisdiction over these cases under OCSLA, 43 U.S.C. § 1331, *et seq.*, which

grants federal district courts original jurisdiction over actions that "aris[e] out of, or in connection

with . . . *any operation* conducted on the outer Continental Shelf [OCS]," "which *involves explora-*

*tion, development, or production* of the minerals, of the subsoil and seabed of the [OCS], or which

involves rights to such minerals."  43 U.S.C. § 1349(b)(1) (emphasis added).  Courts have adopted a

"broad reading of the jurisdictional grant of section 1349."  *EP Operating Ltd. P'ship*, 26 F.3d at 569;

*see also Laredo Offshore Constructors, Inc. v. Hunt Oil Co.*, 754 F.2d 1223, 1228–29 (5th Cir. 1985)

(OCSLA jurisdiction in dispute over nonpayment of contract for construction of OCS platform);

*Amoco Prod. Co. v. Sea Robin Pipeline Co.*, 844 F.2d 1202, 1203–04 (5th Cir. 1988) (OCSLA juris-

diction in contract dispute over sale of natural gas from the OCS).  Plaintiffs do not dispute that De-

fendants[18] have significant operations on the OCS—indeed, they specifically identify some of those

activities and allege that *all* of Defendants' extraction and production activities—which necessarily

include those on the OCS—were a factor that caused Plaintiffs' injuries.  *See, e.g.*, Compl. ¶¶ 14,

18(b), 79.  Accordingly, both elements of OCSLA jurisdiction are satisfied:  (1) Defendants' com-

plained-of activities "constituted an 'operation' 'conducted on the [OCS]' that involved the explora-

tion and production of minerals," and (2) the "case 'arises out of, or in connection with' the opera-

tion."  *Deepwater Horizon*, 745 F.3d at 163.

    Defendants easily satisfy the first prong of OCSLA's jurisdictional test.  Defendants and/or

their affiliates operate a large share of the "more than 5,000 active oil and gas leases on nearly 27

---

[18]  As noted earlier, in assessing its removal jurisdiction, the Court must assume *arguendo* that Plaintiffs are correct in contending that all of the actions of Defendants' various subsidiaries and affiliates (some of which occurred on the OCS and in federal enclaves) may be imputed to the parent companies that Plaintiffs have chosen to sue.  *See supra* n.4.  Several of the actual Defendants sued here (as opposed to their affiliates) deny that they have any such operations in the OCS or in the U.S.

million OCS acres" administered by the Department of the Interior ("DOI") under OCSLA.  NOR

¶ 53.  Defendants historically have produced a substantial volume of oil and gas from the OCS—fed-

eral data suggests as much as a third of domestic production in some years.  *See id.*[19]  Plaintiffs do

not dispute that many Defendants have significant operations on the OCS—indeed they specifically

identify some of those operations—and Plaintiffs concede that their Complaints "do not distinguish

between fossil fuels by location of extraction."  Mot. 36; *see* Compl. ¶¶ 14 ("[B]etween 1965 and

2015, the named Defendants extracted from the earth enough fossil fuel materials . . . to account for

more than one in every five tons of $CO_2$ and methane emitted worldwide."); 79 (asserting that analy-

sis of Defendants' contributions to global warming "considers only the volume of raw material actu-

ally extracted from the Earth by these Defendants.").  *See also id.*  ¶¶ 18(b), 28(a), 30(a), 142, 144–

145 (identifying OCS operations of various Defendants).  The allegedly tortious activities thus indis-

putably include operations conducted on the OCS that involve the "exploration and production of

minerals."  *Deepwater Horizon*, 745 F.3d at 163.

The allegations of the Complaints also easily satisfy the second prong of the jurisdictional test

because, under Plaintiffs' own theory, their claims arise out of or in connection with OCS operations.

The Complaints claim much more than a "mere connection," Mot. 35, between Plaintiffs' alleged in-

juries and Defendants' OCS activities.  On the contrary, Plaintiffs allege that their injuries were the

direct result of Defendants' *fossil-fuel extraction* because those fuels, when combusted, emit green-

house gases that accumulate in the atmosphere and lead to global warming, which, in turn, causes ris-

ing sea levels that have allegedly injured Plaintiffs.  Compl. ¶¶ 7–9.  Plaintiffs allege that their inju-

ries were caused by *all* Defendants' "extraction [and] production . . . of coal, oil and natural gas," no

matter where it occurs.  *Id.* ¶ 3.  Plaintiffs' "attribution" analysis sweeps in all of Defendants' oil and

gas production, including that on the OCS, in establishing each Defendant's purported liability.  *Id.*

¶¶ 62–63, 72–77, 164.  A significant portion of Defendants' extraction occurred on the OCS, and

Plaintiffs' allegations specifically incorporate, and rely upon, some of those operations.  *See, e.g.*, *id.*

---

[19]  In 2005, a DOI official testified before Congress that leases on the OCS accounted for 30 percent of America's domestic oil production.  Thomson Decl., Ex. 15.  For example, BOEM data suggests that leases on the OCS associated with subsidiaries or affiliates of Defendants Chevron, Shell, Exxon, and BP have produced over 4 billion barrels of crude oil and over 29 billion MCF of natural gas.  Couvillion Decl. ¶¶ 9, 12 & Ex. C.

DEFENDANTS' JOINT OPPOSITION TO MOTION TO REMAND
CASE NOS. 3:17-CV-4929-VC, 3:17-CV-4934-VC, 3:17-CV-4935-VC

Gibson, Dunn &
Crutcher LLP

¶ 18(b) (alleging that BP "operat[es] oil and gas extraction and refining projects in the Gulf of Mex-ico"); *id.* ¶ 28(a) (citing Anadarko's "fossil fuel . . . exploration and production" in "the Gulf of Mex-ico"); *id.* ¶ 30(a) (citing Repsol's "fossil fuel exploration and production activities in the United States, including in the Gulf of Mexico"); *id.* ¶¶ 142, 144–145 (discussing arctic offshore drilling equipment and patents which may be relevant to conduct near Alaskan OCS). Thus, Plaintiffs cannot contest that their alleged injuries "occurred because of the [Defendants'] 'operations' in exploring for and producing oil on the [OCS]." *See Deepwater Horizon*, 745 F.3d at 163.[20]

Plaintiffs' contention that the second prong requires two findings, that "the plaintiff 'would not have been injured but for the operation,'" *and* that "granting relief 'thus threatens to impair the total recovery of the federally-owned minerals' from the OCS," is mistaken. Mot. 35 (citing *Recar v. CNG Producing Co.*, 853 F.2d 367, 369 (5th Cir. 1988); *EP Operating Ltd. P'ship*, 26 F.3d at 570). That formulation is unsupported in case law. In fact, courts have held that OCSLA jurisdiction is proper where *either* the "but for test" *or* the "impaired recovery" test is satisfied. *Compare Deep-water Horizon*, 745 F.3d at 163 ("[T]his Court deems § 1349 to require only a 'but-for' connec-tion."), *and Tenn. Gas Pipeline v. Hous. Cas. Ins. Co.*, 87 F.3d 150, 155 (5th Cir. 1996) ("use of the but-for test implies a broad jurisdictional grant under § 1349"), *with EP Operating Ltd. P'ship*, 26 F.3d at 570 (applying "impaired recovery" test), *United Offshore Co. v. S. Deepwater Pipeline Co.*, 899 F.2d 405, 407 (5th Cir. 1990) (same), *and Amoco Prod. Co.*, 844 F.2d at 1210 (same). In any event, Plaintiffs' attack on nationwide extraction and production of fossil fuels easily satisfies both tests.

Given the "the expansive substantive reach of the OCSLA," the causal link between Defend-ants' operations on the OCS and Plaintiffs' alleged injuries satisfies the "broad" "jurisdictional grant of section 1349." *EP Operating Ltd. P'ship*, 26 F.3d at 569; *Texaco Expl. & Prod., Inc. v. AmClyde*

---

[20]  Having alleged that Defendants' worldwide production of fossil fuels caused their injuries, Plaintiffs cannot claim the substantial portion of that production occurring on the OCS did *not* cause their injuries. The "arises out of, or in connection with" test "implies a broad jurisdictional grant un-der § 1349," and by Plaintiffs' own causal theory, some portion of their alleged injuries would not have occurred absent Defendants' operations on the OCS. *Tenn. Gas Pipeline v. Hous. Cas. Ins. Co.*, 87 F.3d 150, 155 (5th Cir. 1996); *see also Ronquille v. Aminoil Inc.*, 2014 WL 4387337, at *2 (E.D. La. Sept. 4, 2014) (finding second prong satisfied because "*at least part* of the work that Plaintiff al-lege[d] caused his exposure to asbestos arose out of or in connection with Shell's OCS operations" (emphasis added)).

*Engineered Prod. Co.*, 448 F.3d 760, 768 (5th Cir. 2006) ("We have recognized that OCSLA's juris-dictional grant is broad."); *Deepwater Horizon*, 745 F.3d at 163–64 (finding federal jurisdiction un-der OCSLA in case where the oil and gas alleged to have caused harm "'would not have entered into the State of Louisiana's territorial waters 'but for' [Defendants' OCS] drilling and exploration opera-tion[s]'" (internal citation omitted)).

Indeed, Plaintiffs acknowledge that "any dispute that . . . threatens to impair the total recovery of the federally-owned minerals from the reservoir or reservoirs underlying the OCS . . . was intended by Congress to be within the grant of [OCSLA] jurisdiction." Mot. 35 (quoting *Amoco*, 844 F.2d at 1210). There is no question that Plaintiffs' claims threaten to do just that. Plaintiffs seek potentially billions of dollars in damages and disgorgement of profits, together with equitable relief to abate the alleged nuisances. *See, e.g.*, Compl. ¶¶ 175, 197; *id.*, Prayer for Relief. Such relief—which could force Defendants to reduce emissions to some "acceptable" or "reasonable" cap imposed by a court—would not only discourage substantial OCS production, but would likely impact the future viability of the federal OCS leasing program, potentially costing the federal government hundreds of millions of dollars. *See San Diego Bldg. Trades Council v. Garmon*, 359 U.S. 236, 247 (1959) ("[R]egulation can be as effectively exerted through an award of damages as through some form of preventive re-lief."); *Cipollone v. Liggett Grp., Inc.*, 505 U.S. 504, 521 (1992) (same). The requested relief would thus substantially interfere with OCSLA's congressionally-mandated goal of obtaining the largest "total recovery of the federally-owned minerals" underlying the OCS. *Amoco*, 844 F.2d at 1210; *see also* 43 U.S.C. §§ 1802(1), (2). Accordingly, this action falls squarely within the "legal disputes . . . relating to resource development on the [OCS]" that Congress intended to be heard in the federal courts. *Laredo Offshore*, 754 F.2d at 1228; *cf.* Compl., Prayer for Relief.

Moreover, granting removal of Plaintiffs' claims would not expand OCSLA jurisdiction to "any case involving facts traceable to deep sea oil drilling," such as Plaintiffs' hypothesized personal injury action against the driver of a tanker truck carrying gasoline extracted from the OCS. Mot. 33–34. Unlike Plaintiffs' scenario, the claims here arise directly from Defendants' extraction activities—a substantial portion of which took place on the OCS. And although Plaintiffs now contend that their

claims "stem from the nature of the products themselves, and Defendants' knowledge of their danger-ous effects, not from the 'operations' used to extract them in raw form," the Complaints belie that ar-gument. *Id.* 36.  Indeed, the Complaints tie Defendants' alleged liability directly to their fossil-fuel production.  *See* Compl. ¶ 7 ("Defendants are directly responsible for 227.6 gigatons of $CO_2$ emis-sions between 1965 and 2015, representing 20.3% of total emissions of that potent greenhouse gas during that period.  Accordingly, Defendants are directly responsible for a substantial portion of com-mitted sea level rise … because of the consumption of their fossil fuel products.").  Thus, as in *Deepwater Horizon* and the other cases Defendants' cited, the alleged injuries here arose out of, or in con-nection with, "physical activity actually occurring on the OCS related to oil and natural gas extrac-tion." Mot. 37.

### 2.   The Actions Are Removable Because Plaintiffs' Claims Arise on Federal Enclaves

"Federal courts have federal question jurisdiction over tort claims that arise on 'federal en-claves.'"  *Durham*, 445 F.3d at 1250; *see also Klausner v. Lucas Film Entm't Co.*, 2010 WL 1038228, at *4 (N.D. Cal. Mar. 19, 2010) (identifying where the "alleged unlawful acts took place" and holding that federal enclave doctrine applied).

Plaintiffs do not challenge the federal enclave status of the property at issue in these cases.[21] Nor could they:  Some Defendants maintained production operations on federal enclaves and sold fossil fuels across the country, including on military bases and other federal enclaves.  For example, Standard Oil Co. (Chevron's predecessor) operated Elk Hills Naval Petroleum Reserve (the "Re-serve"), a federal enclave, for most of the twentieth century.  *See* NOR, Ex. D; Thomson Decl., Exs. 16–18 (Executive Order and California statutes relating to federal jurisdiction); *see also infra* Section III.D.3; *Azhocar v. Coastal Marine Servs., Inc.*, 2013 WL 2177784, at *1 (S.D. Cal. May 20, 2013) (federal enclaves include military bases, federal facilities, and some national forests and parks).  Moreover, as further detailed below, CITGO distributed gasoline and diesel under its contracts with the Navy Exchange Service Command ("NEXCOM") to multiple Naval installations, *see* Walton

---

[21]  Plaintiffs conceded the factual assertions in the Notice of Removal, for purposes of this Motion, by failing to challenge them.  *See Leite v. Crane*, 749 F.3d 1117, 1121–22 (9th Cir. 2014).

Gibson, Dunn &
Crutcher LLP

Decl. ¶ 6 & Exs. A–G, that have been identified as federal enclaves by either a state or federal court or a state attorney general.[22]  Plaintiffs also allege that Defendants engaged in tortious conduct in the District of Columbia, a federal enclave, such as lobbying activities and other purported misinformation campaigns.[23]  Compl. ¶¶ 127–129, 141.  These allegations also support federal jurisdiction here.  *See, e.g.*, *Collier v. District of Columbia*, 46 F. Supp. 3d 6, 20 n.8 (D.D.C. 2014).

Federal enclave jurisdiction will lie as long as "pertinent events" on which liability is based took place on a federal enclave.  *See Rosseter v. Indus. Light & Magic*, 2009 WL 210452, at *2 (N.D. Cal. Jan. 27, 2009); *see also Stiefel v. Bechtel Corp.*, 497 F. Supp. 2d 1138, 1148 (S.D. Cal. 2007); *Klausner*, 2010 WL 1038228, at *1, *4 (finding federal enclave jurisdiction for employment discrimination claim where "alleged unlawful acts" took place on the federal enclave even though plaintiffs' employment was based elsewhere).  Moreover, federal jurisdiction exists even if conduct occurs both inside and outside of a federal enclave if the "federal interest" in regulating the conduct at issue is high enough.  *Ballard v. Ameron Int'l Corp.*, 2016 WL 6216194, at *3 (N.D. Cal. Oct. 25, 2016).  Plaintiffs claim that only the place of injury determines federal enclave jurisdiction.  Mot. 42–44.  But this would lead to the absurd result that federal jurisdiction does not exist over claims where all of the relevant conduct occurred on a federal enclave, but the plaintiff happened to be outside the enclave at the time of injury.  Courts reject this interpretation, holding that the "fortuity" of the location

---

[22]  *See, e.g.*, (1) Naval Battalion Center Gulfport, Walton Decl. ¶ 6, Exs. F–G, *United States v. State Tax Comm'n of Miss.*, 412 U.S. 363, 371–73 (1973); (2) Naval Air Station Corpus Christi, Walton Decl. ¶ 6, Ex. D, *Humble Oil & Ref. Co. v. Calvert*, 464 S.W.2d 170, 172–73 (Tex. Civ. App. 1971); (3) Washington D.C. Navy Yard, Walton Decl. ¶ 6, Ex. C, *Jograj v. Enter. Servs., LLC*, 2017 WL 3841833, at *3 (D.D.C. Sept. 1, 2017); (4) Naval Air Station Key West, Walton Decl. ¶ 6, Exs. E–G, *see United States v. Gaskell*, 134 F.3d 1039, 1041–42 (11th Cir. 1998); (5) Naval Air Station at Belle Chasse, Walton Decl. ¶ 6, Ex. D, *United States v. Hollingsworth*, 783 F.3d 556, 558 (5th Cir. 2015); (6) Fleet Training Center Dam Neck, Walton Decl. ¶ 6, Ex. D, *United States v. Robertson*, 638 F. Supp. 1202, 1202–03 (E.D. Va. 1986); (7) Norfolk Naval Shipyard Portsmouth, Walton Decl. ¶ 6, Exs. A, B, D, *see Anderson v. Crown Cork & Seal*, 93 F. Supp. 2d 697, 700 n.2 (E.D. Va. 2000); (8) Naval Medical Center Bethesda, Walton Decl. ¶ 6, Exs. C, F, G, 61 Op. Att'y Gen. Md. 441, 445 (1976); (9) Naval Air Station Brunswick, Walton Decl. ¶ 6, Ex. F, 80 Op. Att'y Gen. Me. 15 (1980); (10) Naval Weapon Station Yorktown, Walton Decl. ¶ 6, Exs. A–B, *see* 1975–1976 Op. Atty. Gen. Va. 184 (1976); and (11) Naval Air Station Pensacola, Walton Decl. ¶ 6, Exs. E–G, 75 Op. Att'y Gen. Fla. 198 (1975).

[23]  Plaintiffs' claim that they allege no tortious conduct in the District of Columbia is false.  *See* Mot. 41.  Plaintiffs specifically allege that Defendants engaged in "efforts . . . to sow uncertainty and prevent regulation" in D.C., Compl. ¶ 129, and claim that this campaign "contributed substantially to the buildup of $CO_2$ in the environment that drives sea level rise," *id.* ¶ 6.

Gibson, Dunn & Crutcher LLP

DEFENDANTS' JOINT OPPOSITION TO MOTION TO REMAND
CASE NOS. 3:17-CV-4929-VC, 3:17-CV-4934-VC, 3:17-CV-4935-VC

of the plaintiff at the time of the alleged injury "does not mean" that the claim arose there for pur-poses of the doctrine.  *Taylor v. Lockheed Martin Corp.*, 78 Cal. App. 4th 472, 481 (2000).  Moreo-ver, "[d]etermining where a given claim 'arose' in the context of federal enclave jurisdiction depends upon the nature of the specific claim at issue."  *Cramer v. Logistics Co.*, 2015 WL 222347, at *2 (W.D. Tex. Jan. 14, 2015); *see also Sparling v. Doyle*, 2014 WL 2448926, at *3 (W.D. Tex. May 30, 2014).

Plaintiffs' reliance on *Totah v. Bies* is inapt and supports, rather than undermines, removal of Plaintiffs' claims.  There, the court held that the plaintiffs' defamation claim was subject to federal enclave jurisdiction because the publication—the principal conduct at issue in the case—took place on the Presidio.  2011 WL 1324471, at *2 (N.D. Cal. Apr. 6, 2011).  The court found that publication, the "last event necessary to render the tortfeasor liable" under defamation law, was sufficient to cre-ate federal enclave jurisdiction.  *See id.*

Federal jurisdiction is also proper here because Plaintiffs assert numerous injuries on federal enclaves.  For example, Plaintiffs broadly allege that "California's Pacific coast" will experience ex-treme weather and flooding events, including sea level rise "in the San Francisco Bay Area," and that they have suffered damage to their "beaches, parks, roads, civil infrastructure, [] essential public ser-vices, and communities."  Compl. ¶ 8.  Such broad allegations necessarily include the federal en-claves "within their boundaries," *see* Mot. 42, which, according to public records, include at least the following:  in Marin County, Fort Baker, Fort Barry, and Fort Cronkhite, *see* Thomson Decl. Exs. 19–21; in San Mateo County, Milagra Ridge and Pillar Point, *id.* Exs. 22 & 23 at 3; and in Imperial Beach, Naval Outlying Field (former Ream Field), *id.* Ex. 24; *see also id.* Ex. 25.

Indeed, the Vulnerability Assessments incorporated into Plaintiffs' Complaints, which purport to be their analyses of their "overall vulnerability to sea level rise" and "formally identif[y] actual risks to [Plaintiffs]," themselves identify alleged injuries to federal enclaves.[24]  Compl. ¶ 171.  Con-

---

[24]  These Vulnerability Assessments, because they are expressly incorporated into the Complaints and highlight the federal properties at issue here, can properly form a basis for removal.  *See STMicroelectronics, Inc. v. Harari*, 2008 WL 3929553, at *3 (N.D. Cal. Aug. 26, 2008) (documents in the case "may introduce a federal issue into the claim.").

1   trary to Plaintiffs' claims, these reports do not "expressly exclude federal property" from their anal-

2   yses.  Mot. 39.  Rather, while claiming that federal property is "not the focus" of the reports, the As-

3   sessments nevertheless incorporate alleged impacts to federal lands into their analysis.  *See, e.g.*, San

4   Mateo Sea Level Rise Vulnerability Assessment at 94, 221 (Apr. 2017) (noting marsh and bluffs

5   around Pillar Point vulnerable to flooding or erosion); Marin Shoreline Sea Level Rise Vulnerability

6   Assessment at 151, 158, 339, 341 (June 2017) (including Fort Baker among "[h]istoric sites [that]

7   may contribute to local sense of place and . . . help define community character and identity"); 2016

8   City of Imperial Beach Sea Level Rise Assessment at A-12 (Sept. 2016) ("noting that "[s]ignificant

9   stormwater back up still occurs at the Estuary and North of Naval Outlying Landing Field," and

10  "[n]uisance flooding occurs on the South Seacoast with a daily recurrence").

11        Plaintiffs' reliance on *State v. Monsanto Co.*, 2017 WL 3492132 (W.D. Wash. July 28, 2017),

12  is misplaced and cannot defeat federal jurisdiction.  First, *Monsanto* only speaks to injuries allegedly

13  suffered within Plaintiffs' boundaries, *see id.* at *5, and does not apply to the federal enclaves on

14  which Defendants maintained production activities or promoted the use of fossil fuels.  Second,

15  plaintiff disavowed damages on federal property, conceding that it "would not have standing" to seek

16  those damages.  *Id.*  But for the reasons articulated above, Plaintiffs have not done that here; not only

17  do Plaintiffs' allegations necessarily include federal enclaves, the Vulnerability Assessments include

18  federal property in the assessment of injuries and damages.  Nor have Plaintiffs "stipulated" that they

19  will not seek damages occurring on federal property, or made such a representation on the record.

20  Mot. 40.  Thus, federal jurisdiction is appropriate.

21        **3.    The Actions Are Removable Under the Federal Officer Statute**

22        These actions are also removable under the Federal Officer Removal Statute (28 U.S.C.

23  § 1442) because Plaintiffs base liability on activities undertaken at the direction of the federal govern-

24  ment.  Removal is proper of an action against "any officer (or any person acting under that officer) of

25  the United States or of any agency thereof . . . for or relating to any act under color of such office."

26  28 U.S.C. § 1442(a)(1).  Jurisdiction under the Federal Officer Removal Statute is "not interpret[ed]

27  . . . strictly," but is afforded a "generous interpretation."  *Durham*, 445 F.3d at 1252.  "[T]he right of

28  removal is absolute for conduct performed under color of federal office," and "the policy favoring

Gibson, Dunn &
Crutcher LLP

removal 'should not be frustrated by a narrow, grudging interpretation of § 1442(a)(1).'" *Arizona v. Manypenny*, 451 U.S. 232, 242 (1981) (quoting *Willingham v. Morgan*, 395 U.S. 402, 407 (1969)). Contrary to Plaintiffs' suggestions, Mot. 45, "the Ninth Circuit d[oes] not differentiate between federal agents and private parties acting at the direction of a federal agent." *Willis v. Buffalo Pumps, Inc.*, 2013 WL 1316715, at *2 (S.D. Cal. Mar. 29, 2013) (citing *Durham*, 445 F.3d at 1252–53).[25]

"A party seeking removal under section 1442 must demonstrate that (a) it is a 'person' within the meaning of the statute; (b) there is a causal nexus between its actions, taken pursuant to a federal officer's directions, and plaintiff's claims; and (c) it can assert a 'colorable federal defense.'" *Durham*, 445 F.3d at 1251 (citations omitted). Plaintiffs concede the first and third elements (*see* Mot. 45–52), and as described below, Defendants clearly satisfy the second.

There is a clear causal nexus between Plaintiffs' claims and Defendants' conduct "acting under" federal officers, a term that is liberally construed. *See Goncalves*, 865 F.3d at 1245. Defendants engaged in the extraction, production, and sale of fossil fuels, conduct that forms the core of Plaintiffs' allegations, under the supervision, direction, and control of federal officers. *See Leite v. Crane Co.*, 749 F.3d 1117, 1124 (9th Cir. 2014). Defendants thus "acted under" federal officers. *Goncalves*, 865 F.3d at 1248–49. Indeed, any one of the three specific examples below provides federal jurisdiction over these cases under the federal officer removal statute. *See Savoie v. Huntington Ingalls, Inc.*, 817 F.3d 457, 463 (5th Cir. 2016) ("[R]emoval of the entire case is appropriate as long as a single claim satisfies the federal officer removal statute.").

*First*, Chevron extracted oil from the Elk Hills Naval Petroleum Reserve (the "Reserve") under the direct supervision and control of the Navy, providing the government with oil it needed for national security in wartime. *See* NOR, Ex. D. This Unit Plan Contract ("UPC"), which President

---

[25] Plaintiffs cite two out-of-circuit district court cases to argue that "[section] 1442 must be 'read narrowly' when applied to private parties." Mot. 45 (citing *Mobley v. Cerro Flow Prod., Inc.*, 2010 WL 55906, at *3 (S.D. Ill. Jan. 5, 2010), and *Freiberg v. Swinerton & Walberg Prop. Servs., Inc.*, 245 F. Supp. 2d 1144, 1150, 1152 n.6 (D. Colo. 2002)). Not only is this contrary to Supreme Court and Ninth Circuit precedent, it is inconsistent with Seventh and Tenth Circuit law as well. *See Ruppel v. CBS Corp.*, 701 F.3d 1176, 1180 (7th Cir. 2012) (citations omitted) ("[T]he federal officer removal statute is not 'narrow' or 'limited,' . . . drawing no distinction between governmental and private parties."); *see also Greene v. Citigroup, Inc.*, 215 F.3d 1336 (Table), 2000 WL 647190, at *2 (10th Cir. 2000) (unpublished) (holding private corporation "clearly met" the ordinary federal officer factors); *accord Akin v. Ashland Chem. Co.*, 156 F.3d 1030, 1034–35 (10th Cir. 1998).

Franklin D. Roosevelt approved and which Standard Oil ("Standard") (a predecessor of Chevron) signed only under threat of eminent domain condemnation, obligated Standard to produce oil. The UPC stated that "the Reserve *shall* be developed and operated" to produce "not less than 15,000 barrels oil per day" until Standard had received its share of production, thereafter still producing enough oil to cover Standard's operating costs subject only to the Navy's discretion to change that amount. *Id.*, Ex. D §§ 4(b), 5(f) (emphasis added). The UPC's terms show the federal government's "full and absolute" power and "complete control" over fossil fuel exploration, production, and sales at the Reserve:

- The plan was designed to "[a]fford [the] Navy a means of acquiring *complete control over* the development of the entire Reserve *and the production of oil therefrom.*" *Id.*, Ex. D, Recitals § 6(d)(i) (emphases added).

- "[The] Navy shall, subject to the provisions hereof, *have the exclusive control over the exploration, prospecting development and operation of the Reserve . . . .*" *Id.*, Ex. D § 3(a) (emphasis added).

- "[The] Navy shall have *full and absolute power* to determine from time to time the rate of prospecting and development on, and the quantity and rate of production from, the Reserve, and may from time to time shut in wells on the Reserve if it so desires." *Id.*, Ex. D § 4(a) (emphasis added).

- "[A]ll exploration, prospecting, development, and producing operations on the Reserve" occurred "under the supervision and direction of an Operating Committee" tasked with "supervis[ing]" operations and "[r]equir[ing]" the use of sound oil field engineering practices designed to achieve the maximum economic recovery of oil from the Reserve." *Id.*, Ex. D § 3(b). In the event of disagreement, "such matter shall be referred to the Secretary of the Navy for determination; and his decision in each such instance shall be final and shall be binding upon Navy and Standard." *Id.*, Ex. D § 9(a); *accord United States v. Standard Oil Co. of Cal.*, 545 F.2d 624, 628 (9th Cir. 1976) (confirming this arrangement).

- The Navy retained ultimate and even "absolute" discretion to suspend production, decrease the minimum amount of production per day that Standard was entitled to receive, or increase the rate of production. NOR, Ex. D §§ 4(b), 5(d)(1).

The UPC demonstrates that Defendants' activities went far beyond simple compliance with the law or participation in a regulated industry. Indeed, Chevron's Elk Hills activity increased as directed by the federal government in response to the 1970s energy crisis. Specifically, in 1976 Congress enacted the Naval Petroleum Reserves Production Act, *see Chevron U.S.A., Inc. v. United States*, 110 Fed. Cl. 747, 754 (2013), which "directed" the Secretary of the Navy to produce oil from

Elk Hills "at the maximum efficient rate consistent with sound engineering practices for a period not to exceed six years after the date of enactment of such Act."  Pub. L. No. 94–258, 90 Stat. 303 (codified as amended at 10 U.S.C. § 7422(c)(1)(B)).[26]

*Second*, Defendants "acted under" federal officials as part of their role in extracting and selling oil from OCSLA leases or strategic petroleum reserve leases.  *See* NOR ¶¶ 59–60; *supra* Section III.D.1.  OCSLA "has an objective—the expeditious development of OCS resources."  *California v. Watt*, 668 F.2d 1290, 1316 (D.C. Cir. 1981).  In keeping with that purpose, the Secretary of the Interior is mandated to develop serial leasing schedules "which he determines will best meet national energy needs for the five-year period" following the schedule's approval.  43 U.S.C. § 1344(a).  Those leases thus provide that the lessee-Defendants "*shall*" drill for oil and gas pursuant to *government approved* exploration plans.  NOR, Ex. C § 9 (emphasis added).  DOI may cancel the leases for noncompliance with that term.  30 C.F.R. § 550.185; *see also* 30 C.F.R. § 250.180 (permitting DOI to grant a suspension of production for a lessee to avoid cancellation); Complaint for Declaratory & Injunctive Relief, *ExxonMobil Corp. v. Salazar*, 2011 WL 3612296 (W.D. La. Aug. 12, 2011) (suit brought by Defendant Exxon challenging DOI refusal to grant suspension); Settlement Agreement at 4, *ExxonMobil Corp. v. Salazar*, No. 11-1474 (W.D. La. Jan. 17, 2012), ECF No. 18 (granting suspension after Exxon agreed to a specific Activity Schedule set by DOI).  For example, if Chevron did not produce hydrocarbons in paying quantities, its federal leases would terminate automatically after the primary term.  In addition, DOI leases also identify to whom operator-Defendants *must* sell oil and gas (such as small or independent refiners); a condition precedent to these covenants is that natural resources are being extracted and sold in the first place.  NOR, Ex. C § 15.  The leases further require minimum royalty payments on the total value of oil and gas produced pursuant to the leases.  *Id.*, Ex. C. §§ 5–6.  The Strategic Petroleum Reserve, which the DOE is required to maintain as insurance against "the short-term consequences of interruptions in supplies of petroleum products," is sup-

---

[26]  Plaintiffs erroneously claim that Standard "could have complied with the contract by extracting, producing, and selling *no oil at all.*"  Mot. 50.  But this ignores the contract's plain language setting a minimum floor of production and Congress's revisions to the UPC, explained above, which ordered that the reserves be operated at maximum capacity for at least 6 six years, subject to extension.

ported by both monetary and "in-kind" royalties.  42 U.S.C. §§ 6231(a), 6234, 6240; *see also* Thomson Decl., Ex. 26.

    *Third*, pursuant to the detailed requirements of CITGO's fuel supply agreements with the U.S. Navy, between 1988 and 2012, CITGO advertised, supplied, and distributed gasoline and diesel fuel to NEXCOM.  Walton Decl. ¶¶ 5, 6(f)–(g), Ex. F § C.11 (CITGO-0424), Ex. G § C.9 (CITGO-0509); NOR ¶ 62.  The NEXCOM Agreements (1) set forth detailed "fuel specifications" that in addition to requiring compliance with specified American Society for Testing and Materials ("ASTM") standards among other requirements,[27] also required NEXCOM to "have a qualified independent source analyze the products" for compliance with those specifications[28]; (2) reserved to the Contracting Officer the right to inspect delivery, site, and CITGO's operations[29]; (3) designated the quantity of fuel to be delivered[30]; and (4) established detailed branding and advertising requirements, including reserving to the Navy the right to determine whether NEXCOM would market the supplied product under its own or CITGO's brand.[31]  Under these contracts CITGO provided the government with access to fuel that it needed for resale to active and former military personnel and their families.

    There is no question that Defendants assist the government in "produc[ing] an item that it needs," and "perform[ing] a job that," in Defendants' absence, "the Government itself would have had to perform."  *Watson v. Phillip Morris Co.*, 551 U.S. 142, 153–54 (2007).[32]  By aiding federal

---

[27] *See* Walton Decl. ¶¶ 6(a)–(g), Ex. A §§ 10-11 (CITGO-0012 to-0013), Ex. B § I.C.5 (CITGO-0043), Ex. C §§ I.C.4–7 (CITGO-00110 to-00112), Ex. D §§ C.6–10 (CITGO-0231, -0235 to -0236), Ex. E §§ C.1–4 (CITGO-0372 to -0374), Ex. F §§ C.1-4 (CITGO-0419 to -0422), Ex. G §§ C.1–4 (CITGO-0506 to -0508).

[28] *See* Walton Decl. ¶¶ 6(a)–(d), Ex. A § 10.I (CITGO-0013), Ex. B § I.C.5 (CITGO-0043), Ex. C § I.C.4(c) (CITGO-0110); Ex. D § C.6.a (CITGO-0231).

[29] *See* Walton Decl. ¶¶ 6(a), (e), (g), Ex. A § 19 (CITGO-0017 to -0018); Ex. E § F.3 (CITGO-00376 to -00378); Ex. G § D "Inspection and Acceptance" (CITGO-0509).

[30] *See* Walton Decl. ¶¶ 6(a)–(c), Ex. A (Attachment A, CITGO-0025 to -0027), Ex. B § B.2(a) (CITGO-0035), Ex. C, Part III § J (CITGO-0091, -0171); *id.* ¶ 6(d), Ex. D § A.1 (CITGO-0205), Attachment 1 (CITGO-0297), Attachment 4 (CITGO-0307 to -0314); *id.* ¶ 6(e), Ex. E § A.5 (CITGO-0366), Attachment 2 (CITGO-0359, -0389); *id.* ¶ 6(f), Ex. F (CITGO-0403), Attachment 1 (CITGO-0456 to -0460, -0463); *id.* ¶ 6(g), Ex. G (CITGO-0496), Attachment 1 (CITGO-0533 to -0536, -0539).

[31] *See* Walton Decl. ¶¶ 6(f)–(g), Ex. F § C.11 (CITGO-0424), Ex. G § C.9 (CITGO-0509).

[32] It is irrelevant that Defendants made "uncoerced decision[s]" to contract in a way that put them

officials in exploring for and extracting fossil fuels, Defendants assisted the government in achieving

its objectives of, among other things, promoting "expedited exploration and development of the

[OCS] in order to achieve national economic and energy policy goals [and] assure national security."

43 U.S.C. § 1802(1); *Nat. Res. Def. Council, Inc. v. Hodel*, 865 F.2d 288, 291–92 (D.C. Cir. 1988)

(same).  By contracting with the government to perform these vital services, Defendants saved the

government from expending resources to perform such tasks itself.  *See Watson*, 551 U.S. at 153–54.

Thus, by entering into federal reserve and OCSLA leases, the government delegated energy explora-

tion and production functions to Defendants such that lawsuits against Defendants pursuant to these

activities warrant removal.  *See, e.g.*, *Ruppel*, 701 F.3d at 1182 (holding removal was proper where

private company supplied the Navy with turbines built with asbestos).[33]  Moreover, Plaintiffs' own

authority recognizes that a private entity can "act under" the federal government when it sells "di-

rectly to the government, or to others at the direction of the government," which CITGO did here.

*Bailey v. Monsanto Co.*, 176 F. Supp. 3d 853, 870 (E.D. Mo. 2016).

Moreover, under Plaintiffs' own theory, Defendants' actions taken pursuant to the directive of

a federal officer are causally connected to Plaintiffs' claims, a "quite low" hurdle that requires De-

fendants to "show only that the challenged acts occurred *because of* what they were asked to do by

the Government."  *Goncalves*, 865 F.3d at 1245 (citations omitted) (emphasis in original).  Plaintiffs

sue for, among other things, Defendants' "extracting raw fossil fuel products, including crude oil,

coal, and natural gas from the Earth, and placing those fossil fuel products into the stream of com-

merce," Compl. ¶ 181(a); as demonstrated above, Defendants engaged in this conduct because they

---

under control of the federal government.  Mot. 47.  All who perform government work are compen-
sated in some way—whether a salary, commission, royalties or otherwise.  Under Plaintiffs' theory,
the machinists in *Leite* did not "act under" federal officers because they voluntarily chose to work on
the naval shipyard and were paid for doing so.  749 F.3d at 1124.  The Ninth Circuit held otherwise.
*Id.*

[33]  *See also, e.g.*, *Benson v. Russell's Cuthand Creek Ranch, Ltd.*, 183 F. Supp. 3d 795, 799, 802
(E.D. Tex. 2016) (federal government delegated authority to the non-profit to construct levee on pri-
vate land pursuant to government's easement); *Stephenson v. Nassif*, 160 F. Supp. 3d 884, 889 (E.D.
Va. 2015) (defendants engaged in monitoring that would otherwise be conducted by the government);
*Takacs v. Am. Eurocopter, L.L.C.*, 656 F. Supp. 2d 640, 645 (W.D. Tex. 2009) (performance of con-
tract with government assisted in fulfilling government's duties and provided "maintenance services
that [it] would be required to otherwise provide for itself").

were "asked to do [so] by the Government."[34]  *See Goncalves*, 865 F.3d at 1245.  These types of contractual obligations have routinely been found sufficient to support federal officer removal.  For example, in *Goncalves*, a private health insurer's contractual obligation to a federal agency to make "reasonable efforts" to pursue known subrogation claims satisfied the causal-connection prong.  865 F.3d at 1245.[35]  In *Leite*, the Ninth Circuit found a causal relationship between the plaintiffs' alleged harm—injury from exposure to asbestos used in and around equipment sold to the Navy—and the products provided to the Navy pursuant to a contract.  749 F.3d at 1124.  And in *Perez v. Consolidated Tribal Health Project, Inc.*, a causal nexus existed in a slip-and-fall case where a government agency agreement obligated the defendant to maintain and manage its facilities.  2013 WL 1191242, at *3 (N.D. Cal. Mar. 21, 2013).

Plaintiffs' cases do not help them.  *See* Mot. 52.  As Plaintiffs concede, in *Leite* the court found federal officer removal was *proper*.  749 F.3d at 1124.  And Plaintiffs' out-of-circuit decisions are easily distinguishable.  In fact, Plaintiffs cite *Meyers v. Chesterton*, 2015 WL 2452346, at *6 (E.D. La. May 20, 2015), without noting that decision was subsequently vacated as moot.  *Meyers v. CBS Corp.*, 2015 WL 13504685 (5th Cir. Oct. 28, 2015).  And in *In re MTBE Products Liability Litigation*, the defendants did not sufficiently allege facts supporting their claim that they had to use MTBE as a gasoline additive (as opposed to other possible additives like ethanol) to comply with amendments to the CAA.  488 F.3d 112, 126–30 (2d Cir. 2007).  By contrast, Defendants here present evidence of leases and contracts requiring them to engage in exactly the conduct Plaintiffs complain of:  extracting and selling fossil fuels.  Finally, the *de minimis* theory of causation in *Bailey*, 176 F. Supp. 3d at 870, under which the court found that PCB sales to the government totaling 1/100 of one percent of all market sales over a period of years insufficient to satisfy causation, has no analog in Ninth Circuit authority, and stands in tension with other federal officer removal rulings.[36]

---

[34]  *See* NOR, Exs. C § 9, D § 3(a)–(b).

[35]  *See also Savoie v. Huntington Ingalls, Inc.*, 817 F.3d 457, 465–66 (5th Cir. 2016) (finding a causal nexus to plaintiff's strict liability claim where defendant was compelled to use asbestos under its contract with the government and the government exercised control to ensure compliance).

[36]  Courts have held that *any* activity under a federal officer's direction gives rise to removal, even when the injury allegedly stems from a broader pattern of conduct, without purporting to condition removability on the federal portion crossing some arbitrary percentage of the total.  *See Reed v. Fina*

1   Finally, Plaintiffs' claim that this case presents a slippery slope—under which federal officer

2   removal will swell to encompass "any corporation that does any portion of its business with the fed-

3   eral government"—is unfounded.  Mot. 45.  On the contrary, this case is a quintessential example of

4   why Congress enacted the federal officer removal statute.  As the First Circuit recognized, "[s]tatutes

5   like section 1442(a)(1) represent a legislatively-spawned value judgment that a federal forum should

6   be available when particular litigation implicates a cognizable federal interest." *Camacho v. Autori-*

7   *dad de Telefonos de P.R.*, 868 F.2d 482, 487 (1st Cir. 1989); *see also Cuomo v. Crane Co.*, 771 F.3d

8   113, 115 (2d Cir. 2014) (citations omitted) ("[A] core purpose of the statute is to let the validity of the

9   federal defense be tried in federal court . . . .").  Here, Plaintiffs seek to use California tort law to

10  override federal policy choices on the production and use of energy, including by our military and for

11  purposes of national defense.  These issues, which have grave implications for federal policy, should

12  be adjudicated in a federal forum.[37]

13  **E.   The Actions Are Removable Under the Bankruptcy Removal Statute**

14  Plaintiffs have named as Defendants two entities that recently emerged from bankruptcy, have

15  participated in motion practice in those entities' bankruptcy proceedings as a result of this litigation,

16  and have alluded to the liability of more bankrupt energy companies by naming many John Doe de-

17  fendants.  Nonetheless, Plaintiffs deny that jurisdiction is proper under the bankruptcy removal stat-

18  ute, 28 U.S.C. § 1452(a), because (1) the suits are not "related to" any bankruptcy case, (2) they have

19  sued Defendants as an exercise of their governmental police powers, and (3) equitable factors compel

20  abdication of jurisdiction and remand of this internationally important case to local courts.  These ar-

21  guments are unavailing.

22  **1.   Plaintiffs' Lawsuits Are "Related to" Bankruptcy Proceedings**

23  The bankruptcy removal statute permits removal of "any claim or cause of action in a civil

24  action other than . . . a civil action by a governmental unit to enforce . . . police or regulatory power,

---

25  *Oil & Chem. Co.*, 995 F. Supp. 705, 712 (E.D. Tex. 1998); *Lalonde v. Delta Field Erection*, 1998

26  WL 34301466, at *4 (M.D. La. Aug. 6, 1998).

27  [37]  Plaintiffs do not dispute that Defendants have asserted colorable federal defenses.  Nor could
    they, as preemption provides such a defense here.  *Goncalves By & Through Goncalves v. Rady Chil-*

28  *dren's Hosp. San Diego*, 865 F.3d 1237, 1249 (9th Cir. 2017) (preemption is a colorable federal de-
    fense).  Plaintiffs' claims are preempted for several reasons, including that they conflict with numer-
    ous federal laws and policy objectives.

to the district court for the district where such civil action is pending, if such district court has juris-

diction . . . under section 1334 of this title." *Id.* Section 1334 provides that "the district courts shall

have original but not exclusive jurisdiction of all civil proceedings arising under title 11, or arising in

or related to cases under title 11" of the U.S. Code. *Id.* § 1334(b).

The Ninth Circuit has held that, with respect to pre-confirmation bankruptcies, "'related to'

jurisdiction is very broad, 'including nearly every matter directly or indirectly related to [a] bank-

ruptcy.'" *Sasson v. Sokoloff (In re Sasson)*, 424 F.3d 864, 868 (9th Cir. 2005) (citation omitted). Be-

fore confirmation of a bankruptcy plan, actions are properly removable as "related to" a bankruptcy

case if they "'could conceivably have any effect on the estate being administered in bankruptcy.'"

*PDG Los Arcos, LLC v. Adams*, 436 F. App'x 739, 742 (9th Cir. 2011) (quoting *In re Fietz*, 852 F.2d

455, 457 (9th Cir. 1988)). As Plaintiffs concede, Mot. 55, after a bankruptcy plan has been con-

firmed, "related to" jurisdiction exists where "there is a sufficiently close nexus . . . between the [case

to be removed] and the original bankruptcy proceeding," *In re Pegasus Gold Corp.*, 394 F.3d 1189,

1191 (9th Cir. 2005), such as where the case to be removed "'affects the interpretation, implementa-

tion, consummation, execution, or administration of the confirmed plan,'" *In re Wilshire Courtyard*,

729 F.3d 1279, 1289 (9th Cir. 2013) (quoting *In re Pegasus Gold Corp.*, 394 F.3d at 1194). The test

"requires particularized consideration of the facts and posture of [the] case" and "'retains a certain

flexibility.'" *Id.* (quoting *In re Pegasus Gold Corp.*, 394 F.3d at 1194).

### a.      These Cases Are "Related to" the Arch and Peabody Bankruptcies

Removal is proper because two of Defendants in this case—Peabody and Arch, Compl. ¶¶ 22,

24—emerged from Chapter 11 bankruptcy less than one year before Plaintiffs filed their Complaints,

and the assertion of the claims against Peabody and Arch here require interpretation of, and violate,

their confirmed bankruptcy plans. Indeed, the United States Bankruptcy Court for the Eastern Dis-

trict of Missouri (the "Bankruptcy Court"), which is overseeing both those bankruptcies, recently

ruled that Plaintiffs violated the Peabody plan of reorganization by asserting the claims against Pea-

body here, confirming that Plaintiffs' actions "relate to" those bankruptcies.

Arch and its subsidiaries filed for bankruptcy protection on January 11, 2016, and their plan

of reorganization (the "Arch Plan") was confirmed on September 15, 2016 (the "Arch Confirmation

Order").  *See In re Arch Coal, Inc.* ("*Arch*"), No. 16-40120 (Bankr. E.D. Mo. Sept. 15, 2016), ECF No. 1334.  Peabody and its subsidiaries likewise filed a petition for reorganization on April 13, 2016, and their plan of reorganization (the "Peabody Plan") was confirmed on March 17, 2017 (the "Peabody Confirmation Order").  *See In re Peabody Energy Corp.* ("*Peabody*"), No. 16-42529 (Bankr. E.D. Mo. Mar. 17, 2017), ECF No. 2763.

Both the Arch and Peabody Plans and Confirmation Orders include discharge and injunction provisions that enjoin and preclude parties from pursuing any claims that arose against Arch or Peabody prior to their "Effective Dates" (October 5, 2016 and April 3, 2017, respectively).  On August 28, 2017, Peabody filed a motion in its bankruptcy case to enjoin Plaintiffs from prosecuting their claims in this Court, arguing that the Peabody Plan and the Peabody Confirmation Order discharged and enjoined Plaintiffs' claims.  *Peabody*, ECF No. 3362.  On October 4, 2017, Arch filed a similar motion in its bankruptcy case to enjoin Plaintiffs from pursuing their claims in this Court.  *Arch*, ECF No. 1598.

On October 24, 2017, the Bankruptcy Court granted Peabody's motion, holding that all of Plaintiffs' claims "concern only pre-Effective Date (and pre-petition) conduct and harm" and were discharged when Peabody emerged from bankruptcy.  *In re Peabody Energy Corp.*, 2017 WL 4843724, at *5 (Bankr. E.D. Mo. Oct. 24, 2017).  The Bankruptcy Court thus enjoined Plaintiffs from prosecuting their claims against Peabody and ordered Plaintiffs to dismiss their claims in this case with prejudice.  *Id.* at *12.  On December 5, 2017, the Bankruptcy Court denied Plaintiffs' motion to stay the ruling pending appeal, holding that Plaintiffs did not have a strong likelihood of success on appeal.  *Peabody*, ECF Nos. 3614 (hearing); 3622 (order).  Given the Bankruptcy Court's ruling as to Plaintiffs' claims against Peabody, it is likely that the Bankruptcy Court would rule that Plaintiffs' claims also violate the Arch Plan and Confirmation Order.  Indeed, on November 21, 2017, Arch and Plaintiffs entered into a stipulation, approved by the Bankruptcy Court, withdrawing Arch's October 4 motion without prejudice and providing that any action in the Peabody bankruptcy proceedings that results in dismissal of any of Plaintiffs' claims against Peabody will also require dismissal of those claims against Arch.  *See Arch*, ECF No. 1615.  Because Plaintiffs' actions have necessitated interpretation of Peabody's and Arch's bankruptcy plans and confirmation orders, there is no question that

Plaintiffs' claims are "related to" and have a "close nexus" with Peabody's and Arch's bankruptcy cases. *See, e.g., In re Valley Health Sys.*, 584 F. App'x 477, 479 (9th Cir. 2014) ("a close nexus" exists where "a court must interpret the bankruptcy plan and confirmation order to determine whether [plaintiffs'] claims were discharged or [plaintiffs] are enjoined from bringing suit").

### b.     This Case Is Also "Related to" Pre-Confirmation Bankruptcies of Other Energy Companies

Even dismissing Peabody and Arch now would not deprive this Court of jurisdiction, given their presence at the time of removal.[38]  And even if Plaintiffs had not sued Peabody and Arch in the first place, these cases are nonetheless "related to" bankruptcy proceedings because the Complaints implicate untold additional bankrupt entities through their inclusion of "Defendants Does 1 through 100," whom Plaintiffs allege are responsible for the same tortious acts alleged against the named Defendants, namely the "production, promotion, marketing, and use of fossil fuel products."  Compl. ¶¶ 9, 36(a).  Many of these companies are now in bankruptcy without a confirmed plan, exposing their estates to liability under theories Plaintiffs assert.[39]  Even if Plaintiffs do not seek to add these companies as defendants, under California law, the named Defendants may pursue claims for equitable indemnity against these alleged joint tortfeasors' estates.[40]  *See, e.g., Am. Motorcycle Ass'n v. Super. Ct. of L.A. Cty.*, 20 Cal. 3d 578, 591 (1978); *Evangelatos v. Super. Ct. of L.A. Cty.*, 44 Cal. 3d 1188, 1197–98 (1988); *Allen v. Southland Plumbing, Inc.*, 201 Cal. App. 3d 60, 64 (1988) (noting that plaintiff had "no right to single out" a particular defendant "to bear all the loss").  Accordingly, these actions are also removable under the broader, pre-confirmation "related to" standard.  *See, e.g., In re Dow Corning Corp.*, 86 F.3d 482, 490 (6th Cir. 1996) (finding bankruptcy removal proper where the debtor was not a named defendant, but there existed "contingent claims for contribution

---

[38]  *See Gillette v. Peerless Ins. Co.*, 2013 WL 3983872, at *3 (C.D. Cal. July 31, 2013) ("A plaintiff may not wait until her case has been removed to federal court to amend her complaint in order to manipulate the basis upon which removal was granted.").

[39]  *See* Thomson Decl., Ex. 27 at 2 (observing that 134 North American oil and gas producers filed for bankruptcy protection since the beginning of 2015); *id.*, Ex. 28 at 2 (observing that 21 midstream companies filed for bankruptcy protection since the beginning of 2015); *id.*, Ex. 29 at 2 (observing that 155 oilfield services companies filed for bankruptcy protection since the beginning of 2015).

[40]  Defendants' ability to pursue such indemnity claims would, like Plaintiffs' underlying claims, be subject to any discharges provided under any confirmed bankruptcy plans.

Gibson, Dunn &
Crutcher LLP

and indemnification that will have a conceivable effect on the bankruptcy proceedings"); *In re Wash. Mut., Inc. Sec., Derivative & ERISA Litig.*, 2009 WL 3711614, at *1 (W.D. Wash. Nov. 2, 2009); *Parke v. Cardsystems Sols., Inc.*, 2006 WL 2917604, at *4 (N.D. Cal. Oct. 11, 2006) ("[R]ecent case law suggests that the possibility of indemnification or contribution by the debtor . . . constitutes a conceivable effect so as to trigger 'related to' jurisdiction under Section 1452.").[41]

### 2. Plaintiffs' Police Powers Argument Fails

Plaintiffs also assert that, even if their claims are "related to" a bankruptcy proceeding, the Court still lacks jurisdiction because this litigation is an exercise of Plaintiffs' "police powers."  Mot. 52–55.  That argument is both collaterally estopped and meritless.

### a. Plaintiffs Are Precluded from Claiming to Exercise Police Powers

Plaintiffs have already litigated and lost their "police powers" argument in the Bankruptcy Court.  Specifically, in enjoining Plaintiffs from bringing claims against Peabody, the Bankruptcy Court interpreted the term "police and regulatory power" in the Peabody Plan by looking to the similar pecuniary interest analysis applied under section 362(b)(4) of the Bankruptcy Code.  *Peabody*, ECF No. 3514 at 15 ("Bankruptcy Code § 362(b)(4) . . . guides my interpretation [of the Peabody Plan] here."); *see* 11 U.S.C. § 362(b)(4) (automatic stay does not apply to claims brought "to enforce [a] governmental unit's . . . police and regulatory power").  The Ninth Circuit has similarly looked to section 362(b)(4) and applied a pecuniary interest test in interpreting whether an action is an exercise of "police and regulatory power" within the meaning of the bankruptcy removal statute.  *City & Cty. of S.F. v. PG&E Corp.*, 433 F.3d 1115, 1123 (9th Cir. 2006).  Examining the "specific facts of this case," the Bankruptcy Court rejected Plaintiffs' characterization of their actions as exercises of "police and regulatory power," concluding that "[t]he clear purpose of the [Peabody] Causes of Action is for the Plaintiffs to obtain a pecuniary advantage."  *Peabody*, ECF No. 3514 at 15–16.  The Bank-

---

[41] Even setting aside the liability of Doe defendants, Plaintiffs' allegations against the Defendants would implicate other bankruptcy estates as well.  Plaintiffs purport to base liability on historical activities of some Defendants' predecessor companies, subsidiaries, and companies that Defendants may have acquired or with which they may have merged, many of which are now, or have been, in bankruptcy.  Compl. ¶¶ 21(e), 39(a), 84, 118.

1   ruptcy Court's resolution of this issue ends this argument under well-established principles of collat-

2   eral estoppel, which preclude a party from re-litigating an identical issue from a prior action where

3   the matter was a critical and necessary part of the court's decision.  *See Wabakken v. Cal. Dep't of*

4   *Corr. & Rehab.*, 801 F.3d 1143, 1148 (9th Cir. 2015).[42]

5               **b.      Plaintiffs' Police Powers Argument Is Unavailing, Even if Not Precluded**

6               Even if Plaintiffs had not litigated and lost this precise issue in the Bankruptcy Court, this

7   Court should reject their argument that this action is primarily an exercise of their police powers.  In

8   contrast to the broad bankruptcy removal jurisdiction, the exemption for government exercises of po-

9   lice power "is intended to be given a narrow construction," and does not apply where, as here, an ac-

10  tion "primarily seeks to protect the government's pecuniary interest."  *See PG&E Corp.*, 433 F.3d at

11  1124 & n.9.  As the Bankruptcy Court found, Plaintiffs seek to assert their pecuniary interest in De-

12  fendants' property, and their claims are thus comfortably within the bounds of "related to" jurisdic-

13  tion.  The Complaints show that Plaintiffs (and their private, for-profit attorneys) *primarily* seek "bil-

14  lions of dollars" in compensatory damages for costs Plaintiffs say they will incur to address sea level

15  rise, plus untold "punitive and exemplary damages," including "all profits Defendants obtained" from

16  fossil fuel-related business conduct since 1965.  Compl. ¶¶ 235, 247.  That is, the Complaints primar-

17  ily serve the counties' and city's pecuniary interest of filling their coffers at Defendants' expense to

18  fund improvements to their own property and protect against speculative future expenditures.  *See,*

19  *e.g.*, Compl. ¶¶ 186, 196(e), 235(e).  Plaintiffs' briefing in the Bankruptcy Court made clear that the

20  purpose of this litigation is to force "the Defendants, as opposed to the Governmental Plaintiffs and

21  their residents and taxpayers, [to] bear the costs and burdens" of climate change.  *Peabody*, ECF No.

22  3469 at 3.  Thus, even if Plaintiffs were not estopped from making a police-powers argument, that

23  argument is meritless.[43]

---

[42]  If an appeal is filed, the Bankruptcy Court's decision "retains its collateral estoppel effect, if any, while pending appeal."  *Collins v. D.R. Horton, Inc.*, 505 F.3d 874, 882 (9th Cir. 2007).

[43]  Application of the "public purpose" test, which asks "whether the government seeks to 'effectu-ate public policy' or to adjudicate 'private rights,'" also confirms that Plaintiffs' actions are not exer-cises of police or regulatory power.  *See PG&E Corp.*, 433 F.3d at 1125.  The Complaints unambigu-ously confirm that the primary purpose of Plaintiffs' suits is to adjudicate alleged private rights.  The

### 3.      The Court Should Decline to Relinquish Jurisdiction on Equitable Grounds

Although 28 U.S.C. § 1452 grants federal courts discretion to remand bankruptcy-related cases on equitable grounds, "[i]n the main, federal courts are obliged to decide cases within the scope of federal jurisdiction." *Sprint Commc'ns, Inc. v. Jacobs*, 134 S. Ct. 584, 588 (2013); *see also id.* at 591 ("[A] federal court's 'obligation' to hear and decide a case is 'virtually unflagging.'" (citation omitted)).  Plaintiffs principally identify three "equitable" factors supposedly justifying remand: (1) this litigation will not "affect the administration" of the bankruptcy plans of Peabody and Arch; (2) the claims asserted here are under state law; and (3) "comity" supports remand.  Mot. 57–58. None of these factors supports remand.

*First*, the relief Plaintiffs seek would impact the distributions provided to creditors under, and the administration of, Peabody and Arch's bankruptcy plans.

*Second*, Plaintiffs emphasize that their claims arise under California law and that "the case could not otherwise have originated in federal court." *Id.* at 58.  For the reasons described at length above, however, this case "arises under" federal law and is removable under a host of other statutes. It is therefore incorrect to say that this case could not have originated in federal court absent bankruptcy removal jurisdiction.  Moreover, it is irrelevant that Plaintiffs cloak their claims in state-law labels.  In any event, federal courts are competent to apply state law, and regularly do so.

*Third*, Plaintiffs assert that "comity" militates in favor of remand, because this Court should not "usurp the traditional precincts of the state court[s]." *Id.*  But it is not the "traditional precinct[]" of the state court[s]" to make interstate and worldwide energy policy through tort law.  Indeed, the U.S. Constitution (and federal law) commits that authority to the federal government.  No legitimate comity interest would be served by remanding this case of national and international concern.

///

///

///

///

---

Complaints state that seven of the eight causes of action alleged are brought on Plaintiffs' own be-halves, not on behalf of the broader public.  In connection with these claims, Plaintiffs seek "billions of dollars" for themselves, not the broader public.

Gibson, Dunn & Crutcher LLP

## IV.   CONCLUSION

For the foregoing reasons, and those set forth in Defendants' Notice of Removal, the Court should deny Plaintiffs' motion to remand.

December 22, 2017

Respectfully submitted,

Herbert J. Stern (*pro hac vice*)
Joel M. Silverstein (*pro hac vice*)
STERN & KILCULLEN, LLC
325 Columbia Turnpike, Suite 110
Florham Park, NJ 07932-0992
Telephone: (973) 535-1900
Facsimile: (973) 535-9664
E-mail:  hstern@sgklaw.com
E-mail:  jsilverstein@sgklaw.com


By: */s/ Bryan M. Killian*

Bryan M. Killian (*pro hac vice*)
MORGAN, LEWIS & BOCKIUS LLP
1111 Pennsylvania Ave NW
Washington, DC 20004
Telephone: (202) 373-6191
E-mail:  bryan.killian@morganlewis.com

James J. Dragna (SBN 91492)
Yardena R. Zwang-Weissman (SBN 247111)
MORGAN, LEWIS & BOCKIUS LLP
300 South Grand Ave., 22nd Floor
Los Angeles, CA 90071-3132
Telephone:  (213) 680-6436
E-Mail:  jim.dragna@morganlewis.com
E-mail:  yardena.zwang-weissman@morganlewis.com

*Attorneys for Defendant*
*ANADARKO PETROLEUM CORPORATION*

By: **\*\****/s/ Theodore J. Boutrous*

Theodore J. Boutrous, Jr. (SBN 132099)
William E. Thomson (SBN 187912)
GIBSON, DUNN & CRUTCHER LLP
333 South Grand Avenue
Los Angeles, CA 90071
Telephone: (213) 229-7000
Facsimile: (213) 229-7520
E-mail:  tboutrous@gibsondunn.com
E-mail:  wthomson@gibsondunn.com

Ethan D. Dettmer (SBN 196046)
Joshua S. Lipshutz (SBN 242557)
GIBSON, DUNN & CRUTCHER LLP
555 Mission Street, Suite 3000
San Francisco, CA 94105
Telephone:  (415) 393-8200
Facsimile:  (415) 393-8306
E-mail:  edettmer@gibsondunn.com
E-mail:  jlipshutz@gibsondunn.com

Andrea E. Neuman (SBN 149733)
Anne Champion (*pro hac vice*)
GIBSON, DUNN & CRUTCHER LLP
200 Park Avenue
New York, NY 10166-0193
Telephone: (212) 351-4000
Facsimile: (212) 351-5281
E-mail:  aneuman@gibsondunn.com
E-mail:  achampion@gibsondunn.com

*Attorneys for Defendants CHEVRON CORP.*
*and CHEVRON U.S.A., INC.*

\*\* Pursuant to Civ. L.R. 5-1(i)(3), the electronic signatory has obtained approval from all other signatories

Gibson, Dunn &
Crutcher LLP

By: */s/ Thomas F. Koegel*                     By: */s/ Patrick W. Mizell*

Thomas F. Koegel, SBN 125852
CROWELL & MORING LLP
Three Embarcadero Center, 26th Floor
San Francisco, CA 94111
Telephone: (415) 986-2800
Facsimile: (415) 986-2827
E-mail: tkoegel@crowell.com

Kathleen Taylor Sooy (*pro hac vice*)
Tracy A. Roman (*pro hac vice*)
CROWELL & MORING LLP
1001 Pennsylvania Avenue, NW
Washington, DC 20004
Telephone: (202) 624-2500
Facsimile: (202) 628-5116
E-mail: ksooy@crowell.com
E-mail: troman@crowell.com

*Attorneys for Defendant*
*ARCH COAL, INC.*

Mortimer Hartwell (SBN 154556)
VINSON & ELKINS LLP
555 Mission Street Suite 2000
San Francisco, CA 94105
Telephone: (415) 979-6930
E-mail: mhartwell@velaw.com

Patrick W. Mizell (*pro hac vice*)
Deborah C. Milner (*pro hac vice*)
VINSON & ELKINS LLP
1001 Fannin Suite 2300
Houston, TX 77002
Telephone: (713) 758-2932
E-mail: pmizell@velaw.com
E-mail: cmilner@velaw.com

*Attorneys for Defendant*
*APACHE CORPORATION*

By: /s/ Jonathan W. Hughes

Jonathan W. Hughes (SBN 186829)
ARNOLD & PORTER KAYE SCHOLER
LLP
Three Embarcadero Center, 10th Floor
San Francisco, California  94111-4024
Telephone: (415) 471-3100
Facsimile: (415) 471-3400
E-mail:  jonathan.hughes@apks.com

Matthew T. Heartney (SBN 123516)
John D. Lombardo (SBN 187142)
ARNOLD & PORTER KAYE SCHOLER
LLP
777 South Figueroa Street, 44th Floor
Los Angeles, California  90017-5844
Telephone: (213) 243-4000
Facsimile: (213) 243-4199
E-mail:  matthew.heartney@apks.com
E-mail:  john.lombardo@apks.com

Philip H. Curtis (*pro hac vice*)
Nancy Milburn (*pro hac vice*)
ARNOLD & PORTER KAYE SCHOLER
LLP
250 West 55th Street
New York, NY 10019-9710
Telephone: (212) 836-8383
Facsimile: (212) 715-1399
E-mail:  philip.curtis@apks.com
E-mail:  nancy.milburn@apks.com

*Attorneys for Defendants BP P.L.C. and
BP AMERICA, INC.*

By: /s/ William M. Sloan

William M. Sloan (CA SBN 203583)
Jessica L. Grant (CA SBN 178138)
VENABLE LLP
505 Montgomery St, Suite 1400
San Francisco, CA 94111
Telephone: (415) 653-3750
Facsimile: (415) 653-3755
E-mail: WMSloan@venable.com
Email:  JGrant@venable.com

*Attorneys for Defendant
PEABODY ENERGY CORPORATION*

By: */s/ Megan R. Nishikawa*        

Megan R. Nishikawa (SBN 271670)
King & Spalding LLP
101 Second Street, Suite 2300
San Francisco, CA 94105
Telephone:  (415) 318-1200
Facsimile:  (415) 318-1300
Email:  mnishikawa@kslaw.com

Tracie J. Renfroe (*pro hac vice*)
Carol M. Wood (*pro hac vice*)
King & Spalding LLP
1100 Louisiana Street, Suite 4000
Houston, Texas 77002
Telephone: (713) 751-3200
Facsimile: (713) 751-3290
E-mail:  trenfroe@kslaw.com
Email: cwood@kslaw.com

Justin A. Torres (*pro hac vice*)
King & Spalding LLP
1700 Pennsylvania Avenue, NW
Suite 200
Washington, DC 20006-4707
Telephone:  (202) 737 0500
Facsimile:  (202) 626 3737
Email: jtorres@kslaw.com

*Attorneys for Defendants*
*CONOCOPHILLIPS and CONOCOPHIL-*
*LIPS COMPANY*

By: */s/ Andrew A. Kassof*        

Mark McKane, P.C. (SBN 230552)
KIRKLAND & ELLIS LLP
555 California Street
San Francisco, California  94104
Telephone: (415) 439-1400
Facsimile: (415) 439-1500
E-mail: mark.mckane@kirkland.com

Andrew A. Kassof, P.C. (*pro hac vice*)
Brenton Rogers (*pro hac vice*)
KIRKLAND & ELLIS LLP
300 North LaSalle
Chicago, Illinois 60654
Telephone: (312) 862-2000
Facsimile: (312) 862-2200
E-mail: andrew.kassof@kirkland.com
E-mail: brenton.rogers@kirkland.com

*Attorneys for Defendants*
*RIO TINTO ENERGY AMERICA INC., RIO*
*TINTO MINERALS, INC., and RIO TINTO*
*SERVICES INC.*

DEFENDANTS' JOINT OPPOSITION TO MOTION TO REMAND
CASE NOS. 3:17-CV-4929-VC, 3:17-CV-4934-VC, 3:17-CV-4935-VC

1   By: /s/ Gregory Evans

2   Gregory Evans (SBN 147623)
    MCGUIREWOODS LLP
3   Wells Fargo Center
    South Tower
4   355 S. Grand Avenue, Suite 4200
    Los Angeles, CA 90071-3103
5   Telephone: (213) 457-9844
    Facsimile: (213) 457-9888
6
7   E-mail: gevans@mcguirewoods.com

8   Steven R. Williams (*pro hac vice*)
    Brian D. Schmalzbach (*pro hac vice*)
9   MCGUIREWOODS LLP
    800 East Canal Street
10  Richmond, VA 23219-3916
    Telephone:  (804) 775-1141
11  Facsimile:  (804) 698-2208
12  E-mail:  srwilliams@mcguirewoods.com
    E-mail:  bschmalzbach@mcguirewoods.com
13
14  *Attorneys for Defendants*
    *DEVON ENERGY CORPORATION and*
15  *DEVON ENERGY PRODUCTION COM-*
    *PANY, L.P.*
16

By: /s/ Andrew McGaan

Christopher W. Keegan (SBN 232045)
KIRKLAND & ELLIS LLP
555 California Street
San Francisco, California  94104
Telephone: (415) 439-1400
Facsimile: (415) 439-1500
E-mail: chris.keegan@kirkland.com

Andrew R. McGaan, P.C. (*pro hac vice*)
KIRKLAND & ELLIS LLP
300 North LaSalle
Chicago, Illinois 60654
Telephone: (312) 862-2000
Facsimile: (312) 862-2200
E-mail: andrew.mcgaan@kirkland.com

Anna G. Rotman, P.C. (*pro hac vice*)
KIRKLAND & ELLIS LLP
609 Main Street
Houston, Texas 77002
Telephone: (713) 836-3600
Facsimile: (713) 836-3601
E-mail: anna.rotman@kirkland.com

Bryan D. Rohm (*pro hac vice*)
TOTAL E&P USA, INC.
1201 Lousiana Street, Suite 1800
Houston, TX 77002
Telephone: (713) 647-3420
E-mail: bryan.rohm@total.com

*Attorneys for Defendants*
*TOTAL E&P USA INC. and TOTAL SPE-*
*CIALTIES USA INC.*

17

18

19

20

21

22

23

24

25

26

27

28

Gibson, Dunn &
Crutcher LLP

DEFENDANTS' JOINT OPPOSITION TO MOTION TO REMAND
CASE NOS. 3:17-CV-4929-VC, 3:17-CV-4934-VC, 3:17-CV-4935-VC

1

By: /s/ David E. Cranston

2

David E. Cranston (SBN 122558)
GREENBERG GLUSKER FIELDS
CLAMAN & MACHTINGER LLP
1900 Avenue of the Stars, 21st Floor, Los An-
geles, CA 90067
Telephone: (310) 785-6897
Facsimile: (310) 201-2361
E-mail: DCranston@greenbergglusker.com

3

4

5

6

7

8

Attorneys for Defendant
ENI OIL & GAS INC.

9

By: /s/ Michael F. Healy
Michael F. Healy (SBN 95098)
Michael L. Fox (SBN 173355)
SEDGWICK L.L.P.
333 Bush Street
30th Floor
San Francisco, CA 94104-2834
Telephone: (415) 781-7900
Facsimile: (415) 781-2635
E-mail: michael.healy@sedgwicklaw.com
E-mail: michael.fox@sedgwicklaw.com

10

11

12

13

14

15

16

Attorneys for Defendant
ENCANA CORPORATION

17

18

19

20

21

22

23

24

25

26

27

28

By: /s/ Peter Duchesneau

Craig A. Moyer (SBN 094187)
Peter Duchesneau (SBN 168917)
MANATT, PHELPS & PHILLIPS, LLP
11355 West Olympic Boulevard
Los Angeles, CA  90064-1614
Telephone:  (310) 312-4000
Facsimile:  (310) 312-4224
E-mail:  cmoyer@manatt.com
E-mail:  pduchesneau@manatt.com

Stephanie A. Roeser (SBN 306343)
MANATT, PHELPS & PHILLIPS, LLP
One Embarcadero Center, 30th Floor
San Francisco, CA 94111
Telephone:  (415) 291-7400
Facsimile:  (415) 291-7474
E-mail:  sroeser@manatt.com

Attorneys for Defendant
CITGO PETROLEUM CORPORATION

By: */s/ J. Scott Janoe*

Christopher J. Carr (SBN 184076)
Jonathan A. Shapiro (SBN 257199)
BAKER BOTTS L.L.P.
101 California Street
36th Floor, Suite 3600
San Francisco, California 94111
Telephone: (415) 291-6200
Facsimile: (415) 291-6300
Email: chris.carr@bakerbotts.com
Email: jonathan.shapiro@bakerbotts.com

Scott Janoe (*pro hac vice*)
BAKER BOTTS L.L.P.
910 Louisiana Street
Houston, Texas 77002
Telephone: (713) 229-1553
Facsimile:  (713) 229 7953
Email: scott.janoe@bakerbotts.com

Evan Young (*pro hac vice*)
BAKER BOTTS L.L.P.
98 San Jacinto Boulevard
Austin, Texas 78701
Telephone: (512) 322-2506
Facsimile: (512) 322-8306
Email: evan.young@bakerbotts.com

Megan Berge (*pro hac vice*)
BAKER BOTTS L.L.P.
1299 Pennsylvania Ave, NW
Washington, D.C. 20004
Telephone: (202) 639-7700
Facsimile: (202) 639-1171
Email: megan.berge@bakerbotts.com

*Attorneys for Defendant*
*HESS CORPORATION*

By: */s/ Megan R. Nishikawa*

Megan R. Nishikawa (SBN 271670)
King & Spalding LLP
101 Second Street, Suite 2300
San Francisco, CA 94105
Telephone: (415) 318-1200
Facsimile: (415) 318-1300
Email:  mnishikawa@kslaw.com

Tracie J. Renfroe (*pro hac vice*)
Carol M. Wood (*pro hac vice*)
King & Spalding LLP
1100 Louisiana Street, Suite 4000
Houston, Texas 77002
Telephone: (713) 751-3200
Facsimile: (713) 751-3290
E-mail:  trenfroe@kslaw.com
Email: cwood@kslaw.com

Justin A. Torres (*pro hac vice*)
King & Spalding LLP
1700 Pennsylvania Avenue, NW
Suite 200
Washington, DC 20006-4707
Telephone: (202) 737 0500
Facsimile: (202) 626 3737
Email: jtorres@kslaw.com

*Attorneys for Defendant*
*PHILLIPS 66*

DEFENDANTS' JOINT OPPOSITION TO MOTION TO REMAND
CASE NOS. 3:17-cv-4929-VC, 3:17-cv-4934-VC, 3:17-cv-4935-VC

By: */s/ J. Scott Janoe*

Christopher J. Carr (SBN 184076)
Jonathan A. Shapiro (SBN 257199)
BAKER BOTTS L.L.P.
101 California Street
36th Floor, Suite 3600
San Francisco, California 94111
Telephone: (415) 291-6200
Facsimile: (415) 291-6300
Email: chris.carr@bakerbotts.com
Email: jonathan.shapiro@bakerbotts.com

Scott Janoe (*pro hac vice*)
BAKER BOTTS L.L.P.
910 Louisiana Street
Houston, Texas 77002
Telephone: (713) 229-1553
Facsimile: (713) 229 7953
Email: scott.janoe@bakerbotts.com

Evan Young (*pro hac vice*)
BAKER BOTTS L.L.P.
98 San Jacinto Boulevard
Austin, Texas 78701
Telephone: (512) 322-2506
Facsimile: (512) 322-8306
Email: evan.young@bakerbotts.com

Megan Berge (*pro hac vice*)
BAKER BOTTS L.L.P.
1299 Pennsylvania Ave, NW
Washington, D.C. 20004
Telephone: (202) 639-7700
Facsimile: (202) 639-1171
Email: megan.berge@bakerbotts.com

*Attorneys for Defendants*
*MARATHON OIL COMPANY and MARA-*
*THON OIL CORPORATION*

By: */s/ Dawn Sestito*

M. Randall Oppenheimer (SBN 77649)
Dawn Sestito (SBN 214011)
O'MELVENY & MYERS LLP
400 South Hope Street
Los Angeles, California  90071-2899
Telephone:  (213) 430-6000
Facsimile:  (213) 430-6407
E-Mail:  roppenheimer@omm.com
E-Mail:  dsestito@omm.com

Theodore V. Wells, Jr. (*pro hac vice*)
Daniel J. Toal (*pro hac vice*)
Jaren E. Janghorbani (*pro hac vice*)
PAUL, WEISS, RIFKIND, WHARTON &
GARRISON LLP
1285 Avenue of the Americas
New York, NY 10019-6064
Telephone: (212) 373-3000
Facsimile: (212) 757-3990
E-Mail:  twells@paulweiss.com
E-Mail:  jjanghorbani@paulweiss.com

*Attorneys for Defendant*
*EXXON MOBIL CORPORATION*

DEFENDANTS' JOINT OPPOSITION TO MOTION TO REMAND
CASE NOS. 3:17-CV-4929-VC, 3:17-CV-4934-VC, 3:17-CV-4935-VC

1    By: */s/ Marc A. Fuller*                    By: */s/ Shannon S. Broome*

2    Marc A. Fuller (SBN 225462)                 Shannon S. Broome (SBN 150119)
3    Matthew R. Stammel (*pro hac vice*)         Ann Marie Mortimer (SBN 169077)
     VINSON & ELKINS L.L.P.                       HUNTON & WILLIAMS LLP
4    2001 Ross Avenue, Suite 3700                 50 California Street, Suite 1700
     Dallas, TX  75201-2975                       San Francisco, CA 94111
5    Telephone: (214) 220-7881                    Telephone: (415) 975-3700
     Facsimile: (214) 999-7881                    Facsimile: (415) 975-3701
6    E-mail: mfuller@velaw.com                    E-mail: sbroome@hunton.com
7    E-mail: mstammel@velaw.com                   E-mail: amortimer@hunton.com

8    Stephen C. Lewis (SBN 66590)                 Shawn Patrick Regan (*pro hac vice*)
     R. Morgan Gilhuly (SBN 133659)               HUNTON & WILLIAMS LLP
9    BARG COFFIN LEWIS & TRAPP, LLP               200 Park Avenue
     350 California Street, 22nd Floor            New York, NY   10166-0136
10   San Francisco, California 94104-1435         Telephone: (212) 309-1000
     Telephone: (415) 228-5400                    Facsimile: (212) 309-1100
11   Facsimile: (415) 228-5450                    E-mail: sregan@hunton.com
     E-mail: slewis@bargcoffin.com
12   E-mail: mgilhuly@bargcoffin.com

13                                                *Attorneys for Defendant*
     *Attorneys for Defendants*                   *MARATHON PETROLEUM CORPORATION*
14   *OCCIDENTAL PETROLEUM CORP. and*
     *OCCIDENTAL CHEMICAL CORP.*

15

16

17

18

19

20

21

22

23

24

25

26

27

28

Gibson, Dunn &
Crutcher LLP

By: /s/ Daniel P. Collins

Daniel P. Collins (SBN 139164)
MUNGER, TOLLES & OLSON LLP
350 South Grand Avenue
Fiftieth Floor
Los Angeles, California 90071-3426
Telephone: (213) 683-9100
Facsimile: (213) 687-3702
E-mail: daniel.collins@mto.com

Jerome C. Roth (SBN 159483)
Elizabeth A. Kim (SBN 295277)
MUNGER, TOLLES & OLSON LLP
560 Mission Street
Twenty-Seventh Floor
San Francisco, California 94105-2907
Telephone: (415) 512-4000
Facsimile: (415) 512-4077
E-mail: jerome.roth@mto.com
E-mail: elizabeth.kim@mto.com

David C. Frederick (pro hac vice)
Brendan J. Crimmins (pro hac vice)
KELLOGG, HANSEN, TODD, FIGEL &
FREDERICK, P.L.L.C.
1615 M Street, N.W., Suite 400
Washington, D.C. 20036
Telephone: (202) 326-7900
Facsimile: (202) 326-7999
E-mail: dfrederick@kelloghansen.com
E-mail: bcrimmins@kelloghansen.com

*Attorneys for Defendants ROYAL DUTCH
SHELL PLC and SHELL OIL PRODUCTS
COMPANY LLC*

By: /s/ J. Scott Janoe

Christopher J. Carr (SBN 184076)
Jonathan A. Shapiro (SBN 257199)
BAKER BOTTS L.L.P.
101 California Street
36th Floor, Suite 3600
San Francisco, California 94111
Telephone: (415) 291-6200
Facsimile: (415) 291-6300
Email: chris.carr@bakerbotts.com
Email: jonathan.shapiro@bakerbotts.com

Scott Janoe (*pro hac vice*)
BAKER BOTTS L.L.P.
910 Louisiana Street
Houston, Texas 77002
Telephone: (713) 229-1553
Facsimile: (713) 229 7953
Email: scott.janoe@bakerbotts.com

Evan Young (*pro hac vice*)
BAKER BOTTS L.L.P.
98 San Jacinto Boulevard
Austin, Texas 78701
Telephone: (512) 322-2506
Facsimile: (512) 322-8306
Email: evan.young@bakerbotts.com

Megan Berge (*pro hac vice*)
BAKER BOTTS L.L.P.
1299 Pennsylvania Ave, NW
Washington, D.C. 20004
Telephone: (202) 639-7700
Facsimile: (202) 639-1171
Email: megan.berge@bakerbotts.com

*Attorneys for Defendants
REPSOL ENERGY NORTH AMERICA
CORP. and REPSOL TRADING USA CORP.*

Gibson, Dunn &
Crutcher LLP

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

**Appendix:  San Mateo / Marin County / City of Imperial Beach Complaint Paragraph Comparison**

| San Mateo County Paragraph | Corresponding Marin County Paragraph | Corresponding City of Imperial Beach Paragraph |
|:---:|:---:|:---:|
| 1 | 1 | 1 |
| 2 | 2 | 2 |
| 3 | 3 | 3 |
| 4 | 4 | 4 |
| 5 | 5 | 5 |
| 6 | 6 | 6 |
| 7 | 7 | 7 |
| 8 | 8 | 8 |
| 9 | 9 | 9 |
| 10 | 10 | 10 |
| 11 | 11 | 11 |
| 12 | 12 | 12 |
| 13 | 13 | 13 |
| 14 | 14 | 14 |
| 15 | 15 | 15 |
| 16 | 16 | 16 |
| 17 | 17 | 17 |
| 18 | 18 | 18 |
| 19 | 19 | 19 |
| 20 | 20 | 20 |
| 21 | 21 | 21 |
| 22 | 22 | 22 |
| 23 | 23 | 23 |
| 24 | 24 | 24 |
| 25 | 25 | 25 |
| 26 | 26 | 26 |
| 27 | 27 | 27 |
| 28 | 28 | 28 |
| 29 | 29 | 29 |
| 30 | 30 | 30 |
| 31 | 31 | 31 |
| 32 | 32 | 32 |
| 33 | 33 | 33 |
| 34 | 34 | 34 |
| 35 | 35 | 35 |
| 36 | 36 | 36 |
| 37 | 37 | 37 |
| 38 | 38 | 38 |
| 39 | 39 | 39 |
| 40 | 40 | 40 |
| 41 | 41 | 41 |
| 42 | 42 | 42 |
| 43 | 43 | 43 |
| 44 | 44 | 44 |
| 45 | 45 | 45 |
| 46 | 46 | 46 |
| 47 | 47 | 47 |

Gibson, Dunn & Crutcher LLP

| San Mateo County Paragraph | Corresponding Marin County Paragraph | Corresponding City of Imperial Beach Paragraph |
|:---:|:---:|:---:|
| 48 | 48 | 48 |
| 49 | 49 | 49 |
| 50 | 50 | 50 |
| 51 | 51 | 51 |
| 52 | 52 | 52 |
| 53 | 53 | 53 |
| 54 | 54 | 54 |
| 55 | 55 | 55 |
| 56 | 56 | 56 |
| 57 | 57 | 57 |
| 58 | 58 | 58 |
| 59 | 59 | 59 |
| 60 | 60 | 60 |
| 61 | 61 | 61 |
| 62 | 62 | 62 |
| 63 | 63 | 63 |
| 64 | 64 | 64 |
| 65 | 65 | 65 |
| 66 | 66 | 66 |
| 67 | 67 | 67 |
| 68 | 68 | 68 |
| 69 | 69 | 69 |
| 70 | 70 | 70 |
| 71 | 71 | 71 |
| 72 | 72 | 72 |
| 73 | 73 | 73 |
| 74 | 74 | 74 |
| 75 | 75 | 75 |
| 76 | 76 | 76 |
| 77 | 77 | 77 |
| 78 | 78 | 78 |
| 79 | 79 | 79 |
| 80 | 80 | 80 |
| 81 | 81 | 81 |
| 82 | 82 | 82 |
| 83 | 83 | 83 |
| 84 | 84 | 84 |
| 85 | 85 | 85 |
| 86 | 86 | 86 |
| 87 | 87 | 87 |
| 88 | 88 | 88 |
| 89 | 89 | 89 |
| 90 | 90 | 90 |
| 91 | 91 | 91 |
| 92 | 92 | 92 |
| 93 | 93 | 93 |
| 94 | 94 | 94 |
| 95 | 95 | 95 |
| 96 | 96 | 96 |
| 97 | 97 | 97 |

Gibson, Dunn &
Crutcher LLP

APPENDIX TO DEFENDANTS' JOINT OPPOSITION TO MOTION TO REMAND
CASE NOS. 3:17-CV-4929-VC, 3:17-CV-4934-VC, 3:17-CV-4935-VC

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

| San Mateo County Paragraph | Corresponding Marin County Paragraph | Corresponding City of Imperial Beach Paragraph |
|---|---|---|
| 98 | 98 | 98 |
| 99 | 99 | 99 |
| 100 | 100 | 100 |
| 101 | 101 | 101 |
| 102 | 102 | 102 |
| 103 | 103 | 103 |
| 104 | 104 | 104 |
| 105 | 105 | 105 |
| 106 | 106 | 106 |
| 107 | 107 | 107 |
| 108 | 108 | 108 |
| 109 | 109 | 109 |
| 110 | 110 | 110 |
| 111 | 111 | 111 |
| 112 | 112 | 112 |
| 113 | 113 | 113 |
| 114 | 114 | 114 |
| 115 | 115 | 115 |
| 116 | 116 | 116 |
| 117 | 117 | 117 |
| 118 | 118 | 118 |
| 119 | 119 | 119 |
| 120 | 120 | 120 |
| 121 | 121 | 121 |
| 122 | 122 | 122 |
| 123 | 123 | 123 |
| 124 | 124 | 124 |
| 125 | 125 | 125 |
| 126 | 126 | 126 |
| 127 | 127 | 127 |
| 128 | 128 | 128 |
| 129 | 129 | 129 |
| 130 | 130 | 130 |
| 131 | 131 | 131 |
| 132 | 132 | 132 |
| 133 | 133 | 133 |
| 134 | 134 | 134 |
| 135 | 135 | 135 |
| 136 | 136 | 136 |
| 137 | 137 | 137 |
| 138 | 138 | 138 |
| 139 | 139 | 139 |
| 140 | 140 | 140 |
| 141 | 141 | 141 |
| 142 | 142 | 142 |
| 143 | 143 | 143 |
| 144 | 144 | 144 |
| 145 | 145 | 145 |
| 146 | 146 | 146 |
| 147 | 147 | 147 |

| San Mateo County Paragraph | Corresponding Marin County Paragraph | Corresponding City of Imperial Beach Paragraph |
|---|---|---|
| 148 | 148 | 148 |
| 149 | 149 | 149 |
| 150 | 150 | 150 |
| 151 | 151 | 151 |
| 152 | 152 | 152 |
| 153 | 153 | 153 |
| 154 | 154 | 154 |
| 155 | 155 | 155 |
| 156 | 156 | 156 |
| 157 | 157 | 157 |
| 158 | 158 | 158 |
| 159 | 159 | 159 |
| 160 | 160 | 160 |
| 161 | 161 | 161 |
| 162 | 162 | 162 |
| 163 | 163 | 163 |
| 164 | 164 | 164 |
| 165 | 165 | 165 |
| 166 | 166 | 166 |
| 167 |  | 167 |
| 168 | 167 | 168 |
| 169 | 169 |  |
| 170 | 170 |  |
| 171 | 168 | 169 |
| 172 |  |  |
| 173 |  |  |
| 174 |  |  |
| 175 | 176 | 172 |
| 176 | 177 | 173 |
| 177 | 178 | 174 |
| 178 | 179 | 175 |
| 179 | 180 | 176 |
| 180 | 181 | 177 |
| 181 | 182 | 178 |
| 182 | 183 | 179 |
| 183 | 184 | 180 |
| 184 | 185 | 181 |
| 185 | 186 | 182 |
| 186 | 187 | 183 |
| 187 | 188 | 184 |
| 188 | 189 | 185 |
| 189 | 190 | 186 |
| 190 | 191 | 187 |
| 191 | 192 | 188 |
| 192 | 193 | 189 |
| 193 | 194 | 190 |
| 194 | 195 | 191 |
| 195 | 196 | 192 |
| 196 | 197 | 193 |
| 197 | 198 | 194 |

Gibson, Dunn & Crutcher LLP

APPENDIX TO DEFENDANTS' JOINT OPPOSITION TO MOTION TO REMAND
CASE NOS. 3:17-CV-4929-VC, 3:17-CV-4934-VC, 3:17-CV-4935-VC

| San Mateo County Paragraph | Corresponding Marin County Paragraph | Corresponding City of Imperial Beach Paragraph |
|:---:|:---:|:---:|
| 198 | 199 | 195 |
| 199 | 200 | 196 |
| 200 | 201 | 197 |
| 201 | 202 | 198 |
| 202 | 203 | 199 |
| 203 | 204 | 200 |
| 204 | 205 | 201 |
| 205 | 206 | 202 |
| 206 | 207 | 203 |
| 207 | 208 | 204 |
| 208 | 209 | 205 |
| 209 | 210 | 206 |
| 210 | 211 | 207 |
| 211 | 212 | 208 |
| 212 | 213 | 209 |
| 213 | 214 | 210 |
| 214 | 215 | 211 |
| 215 | 216 | 212 |
| 216 | 217 | 213 |
| 217 | 218 | 214 |
| 218 | 219 | 215 |
| 219 | 220 | 216 |
| 220 | 221 | 217 |
| 221 | 222 | 218 |
| 222 | 223 | 219 |
| 223 | 224 | 220 |
| 224 | 225 | 221 |
| 225 | 226 | 222 |
| 226 | 227 | 223 |
| 227 | 228 | 224 |
| 228 | 229 | 225 |
| 229 | 230 | 226 |
| 230 | 231 | 227 |
| 231 | 232 | 228 |
| 232 | 233 | 229 |
| 233 | 234 | 230 |
| 234 | 235 | 231 |
| 235 | 236 | 232 |
| 236 | 237 | 233 |
| 237 | 238 | 234 |
| 238 | 239 | 235 |
| 239 | 240 | 236 |
| 240 | 241 | 237 |
| 241 | 242 | 238 |
| 242 | 243 | 239 |
| 243 | 244 | 240 |
| 244 | 245 | 241 |
| 245 | 246 | 242 |
| 246 | 247 | 243 |
| 247 | 248 | 244 |

Gibson, Dunn &
Crutcher LLP

APPENDIX TO DEFENDANTS' JOINT OPPOSITION TO MOTION TO REMAND
CASE NOS. 3:17-CV-4929-VC, 3:17-CV-4934-VC, 3:17-CV-4935-VC

| San Mateo County Paragraph | Corresponding Marin County Paragraph | Corresponding City of Imperial Beach Paragraph |
|---|---|---|
| 248 | 249 | 245 |
| 249 | 250 | 246 |
| 250 | 251 | 247 |
| 251 | 252 | 248 |
| 252 | 253 | 249 |
| 253 | 254 | 250 |
| 254 | 255 | 251 |
| 255 | 256 | 252 |
| 256 | 257 | 253 |
| 257 | 258 | 254 |
| 258 | 259 | 255 |
| 259 | 260 | 256 |
| 260 | 261 | 257 |
| 261 | 262 | 258 |
| 262 | 263 | 259 |
| 263 | 264 | 260 |
| 264 | 265 | 261 |
| 265 | 266 | 262 |
| 266 | 267 | 263 |
| 267 | 268 | 264 |

Gibson, Dunn & Crutcher LLP

APPENDIX TO DEFENDANTS' JOINT OPPOSITION TO MOTION TO REMAND
CASE NOS. 3:17-CV-4929-VC, 3:17-CV-4934-VC, 3:17-CV-4935-VC