**FOR PUBLICATION**

# UNITED STATES COURT OF APPEALS
# FOR THE NINTH CIRCUIT

| | |
|---|---|
| COUNTY OF SAN MATEO, individually and on behalf of the People of the State of California, *Plaintiff-Appellee*, | No. 18-15499 |
| | D.C. No. 3:17-cv-04929-VC |
| v. | |
| CHEVRON CORPORATION; CHEVRON U.S.A. INC.; EXXONMOBIL CORPORATION; BP PLC; BP AMERICA, INC.; SHELL PLC; SHELL OIL PRODUCTS COMPANY LLC; CITGO PETROLEUM CORPORATION; CONOCOPHILLIPS; CONOCOPHILLIPS COMPANY; PHILLIPS 66 COMPANY; PEABODY ENERGY CORPORATION; TOTAL E&P USA, INC.; TOTAL SPECIALTIES USA, INC.; ARCH COAL INC.; ENI OIL & GAS, INC.; RIO TINTO ENERGY AMERICA, INC.; RIO TINTO MINERALS, INC.; RIO TINTO SERVICES, INC.; ANADARKO PETROLEUM CORPORATION; OCCIDENTAL PETROLEUM CORPORATION; OCCIDENTAL CHEMICAL CORPORATION; REPSOL ENERGY | |

NORTH AMERICA CORP.; REPSOL
TRADING USA CORP.;
MARATHON OIL COMPANY;
MARATHON OIL CORPORATION;
MARATHON PETROLEUM CORP.;
HESS CORP.; DEVON ENERGY
CORP.; DEVON ENERGY
PRODUCTION COMPANY, LP;
ENCANA CORPORATION; APACHE
CORP.,
                    *Defendants-Appellants.*

---

CITY OF IMPERIAL BEACH,
individually and on behalf of the
People of the State of California,
                    *Plaintiff-Appellee*,

          v.

CHEVRON CORPORATION;
CHEVRON U.S.A. INC.;
EXXONMOBIL CORPORATION; BP
PLC; BP AMERICA, INC.; SHELL
PLC; SHELL OIL PRODUCTS
COMPANY LLC; CITGO
PETROLEUM CORPORATION;
CONOCOPHILLIPS;
CONOCOPHILLIPS COMPANY;
PHILLIPS 66 COMPANY; PEABODY
ENERGY CORPORATION; TOTAL
E&P USA, INC.; TOTAL
SPECIALTIES USA, INC.; ARCH

No. 18-15502

D.C. No.
3:17-cv-04934-VC

COAL INC.; ENI OIL & GAS, INC.;
RIO TINTO ENERGY AMERICA,
INC.; RIO TINTO MINERALS, INC.;
RIO TINTO SERVICES, INC.;
ANADARKO PETROLEUM
CORPORATION; OCCIDENTAL
PETROLEUM CORPORATION;
OCCIDENTAL CHEMICAL
CORPORATION; REPSOL ENERGY
NORTH AMERICA CORP.; REPSOL
TRADING USA CORP.;
MARATHON OIL COMPANY;
MARATHON OIL CORPORATION;
MARATHON PETROLEUM CORP.;
HESS CORP.; DEVON ENERGY
CORP.; DEVON ENERGY
PRODUCTION COMPANY, LP;
ENCANA CORPORATION; APACHE
CORP.,
            *Defendants-Appellants.*

---

COUNTY OF MARIN, individually
and on behalf of the People of the
State of California,
            *Plaintiff-Appellee*,

            v.

CHEVRON CORPORATION;
CHEVRON U.S.A. INC.;
EXXONMOBIL CORPORATION; BP
PLC; BP AMERICA, INC.; SHELL

No. 18-15503

D.C. No.
3:17-cv-04935-VC

PLC; SHELL OIL PRODUCTS
COMPANY LLC; CITGO
PETROLEUM CORPORATION;
CONOCOPHILLIPS;
CONOCOPHILLIPS COMPANY;
PHILLIPS 66 COMPANY; PEABODY
ENERGY CORPORATION; TOTAL
E&P USA, INC.; TOTAL
SPECIALTIES USA, INC.; ARCH
COAL INC.; ENI OIL & GAS, INC.;
RIO TINTO ENERGY AMERICA,
INC.; RIO TINTO MINERALS, INC.;
RIO TINTO SERVICES, INC.;
ANADARKO PETROLEUM
CORPORATION; OCCIDENTAL
PETROLEUM CORPORATION;
OCCIDENTAL CHEMICAL
CORPORATION; REPSOL ENERGY
NORTH AMERICA CORP.; REPSOL
TRADING USA CORP.;
MARATHON OIL COMPANY;
MARATHON OIL CORPORATION;
MARATHON PETROLEUM CORP.;
HESS CORP.; DEVON ENERGY
CORP.; DEVON ENERGY
PRODUCTION COMPANY, LP;
ENCANA CORPORATION; APACHE
CORP.,
*Defendants-Appellants.*

| | |
|---|---|
| COUNTY OF SANTA CRUZ, individually and on behalf of The People of the State of California; CITY OF SANTA CRUZ, a municipal corporation, individually and on behalf of The People of the State of California; CITY OF RICHMOND, individually and on behalf of The People of the State of California, *Plaintiffs-Appellees*, v. CHEVRON CORPORATION; CHEVRON U.S.A. INC.; EXXONMOBIL CORPORATION; BP PLC; BP AMERICA, INC.; SHELL PLC; SHELL OIL PRODUCTS COMPANY LLC; CITGO PETROLEUM CORPORATION; CONOCOPHILLIPS; CONOCOPHILLIPS COMPANY; PHILLIPS 66 COMPANY; PEABODY ENERGY CORPORATION; TOTAL E&P USA, INC.; TOTAL SPECIALTIES USA, INC.; ARCH COAL INC.; ENI OIL & GAS, INC.; RIO TINTO ENERGY AMERICA, INC.; RIO TINTO MINERALS, INC.; RIO TINTO SERVICES, INC.; ANADARKO PETROLEUM CORPORATION; OCCIDENTAL | No. 18-16376  D.C. Nos. 3:18-cv-00450-VC 3:18-cv-00458-VC 3:18-cv-00732-VC   OPINION |

6          COUNTY OF SAN MATEO V. CHEVRON

PETROLEUM CORPORATION;
OCCIDENTAL CHEMICAL
CORPORATION; REPSOL ENERGY
NORTH AMERICA CORP.; REPSOL
TRADING USA CORP.;
MARATHON OIL COMPANY;
MARATHON OIL CORPORATION;
MARATHON PETROLEUM CORP.;
HESS CORP.; DEVON ENERGY
CORP.; DEVON ENERGY
PRODUCTION COMPANY, LP;
ENCANA CORPORATION; APACHE
CORP.,
                    *Defendants-Appellants.*

On Remand from the United States Supreme Court

Filed April 19, 2022

Before:  Sandra S. Ikuta, Morgan Christen, and
Kenneth K. Lee, Circuit Judges.

Opinion by Judge Ikuta

# SUMMARY[*]

### Removal Jurisdiction

On remand from the Supreme Court, the panel affirmed the district court's order remanding global-warming related complaints to state court after they were removed by the energy company defendants.

The complaints alleged that the energy companies' extraction of fossil fuels and other activities were a substantial factor in causing global warming and sea level rise. The County of San Mateo and other plaintiffs asserted causes of action for public and private nuisance, strict liability for failure to warn, strict liability for design defect, negligence, negligent failure to warn, and trespass.

In a prior opinion, the panel affirmed the district court's determination that no subject matter jurisdiction existed under the federal-officer removal statute, and the panel dismissed the rest of the appeal for lack of appellate jurisdiction. The Supreme Court granted the energy companies' petition for certiorari and remanded for further consideration in light of *BP p.l.c. v. Mayor & City Council of Baltimore*, 141 S. Ct. 1532 (2021), which interpreted 28 U.S.C. § 1447(d) as permitting appellate review of additional grounds for removal.

On remand, the panel concluded that *Baltimore* effectively abrogated the reasoning and holding of *Patel v.*

---

[*] This summary constitutes no part of the opinion of the court. It has been prepared by court staff for the convenience of the reader.

*Del Taco, Inc.*, 446 F.3d 996 (9th Cir. 2006), which held that the court of appeals lacked authority to review a remand order considering bases for subject matter jurisdiction other than federal officer jurisdiction. Accordingly, the panel considered all bases for removal raised by the defendants, rather than addressing only federal officer removal.

The panel held that the district court lacked federal-question jurisdiction under 28 U.S.C. § 1331 because, at the time of removal, the complaints asserted only state-law tort claims against the energy companies. The panel held that the plaintiffs' global-warming claims did not fall within the *Grable* exception to the well-pleaded complaint rule, under which federal jurisdiction over a state law claim will lie if a federal issue is necessarily raised, actually disputed, substantial, and capable of resolution in federal court without disrupting the federal-state balance approved by Congress. In addition, plaintiffs' state law claims did not fall under the "artful-pleading" doctrine, another exception to the well-pleaded complaint rule, because they were not completely preempted by the Clean Air Act. The panel rejected the energy companies' argument that the complaints arose under federal law for purposes of § 1331 because the tort claims at issue arose on a federal enclave.

The panel held that plaintiffs' claims were not removable under the Outer Continental Shelf Lands Act, which gives federal courts jurisdiction over actions "arising out of, or in connection with (A) any operation conducted on the outer Continental Shelf which involves exploration, development, or production of the minerals, of the subsoil and seabed of the outer Continental Shelf, or which involves rights to such minerals." Taking a different approach from other circuits, which interpreted the statute as requiring a "but-for"

connection between operations on the Outer Continental Shelf and a plaintiff's alleged injuries, the panel read the phrase "aris[e] out of, or in connection with" as granting federal courts jurisdiction over tort claims only when those claims arise from actions or injuries occurring on the Outer Continental Shelf.

The panel held that the district court did not have subject matter jurisdiction under the federal-officer removal statute, 28 U.S.C. § 1442(a)(1), because the energy companies were not "acting under" a federal officer's directions based on agreements with the government, including fuel supply agreements with the Navy Exchange Service Command, a unit agreement for petroleum reserves with the U.S. Navy, and lease agreements for the right to explore and produce oil and gas resources in the submerged lands of the Outer Continental Shelf.

The panel rejected the energy companies' argument that the district court had removal jurisdiction over the complaints under 28 U.S.C. § 1452(a) because they were related to bankruptcy cases involving Peabody Energy Corp., Arch Coal, and Texaco, Inc.

Finally, the panel held that the district court did not have admiralty jurisdiction because maritime claims brought in state court are not removable to federal court absent an independent jurisdictional basis, such as diversity jurisdiction.

## COUNSEL

Theodore J. Boutrous Jr. (argued), Andrea E. Neuman, William E. Thomson, and Joshua S. Lipshutz, Gibson Dunn & Crutcher LLP, Los Angeles, California; Herbert J. Stern and Joel M. Silverstein, Stern & Kilcullen LLC, Florham Park, New Jersey; Neal S. Manne, Johnny W. Carter, Erica Harris, and Steven Shepard, Susman Godfrey LLP, Houston, Texas; for Defendants-Appellants Chevron Corporation and Chevron U.S.A. Inc.

M. Randall Oppenheimer and Dawn Sestito, O'Melveny & Myers LLP, Los Angeles, California; Theodore V. Wells Jr., Daniel J. Toal, and Jaren Janghorbani, Paul Weis Rifkind Wharton & Garrison LLP, New York, New York; for Defendant-Appellant Exxon Mobil Corporation.

Jonathan W. Hughes, Arnold & Porter Kaye Scholer LLP, San Francisco, California; Matthew T. Heartney and John D. Lombardo, Arnold & Porter Kaye Scholer LLP, Los Angeles, California; Philip H. Curtis and Nancy Milburn, Arnold & Porter Kaye Scholer LLP, New York, New York; for Defendants-Appellants BP PLC and BP America Inc.

Daniel B. Levin, Munger Tolles & Olson LLP, Los Angeles, California; Jerome C. Roth and Elizabeth A. Kim, Munger Tolles & Olson LLP, San Francisco, California; David C. Frederick and Brendan J. Crimmins, Kellogg Hansen Todd Figel & Frederick PLLC, Washington, D.C.; for Defendants-Appellants Shell PLC and Shell Oil Products Company LLC.

Craig A. Moyer and Peter Duchesneau, Manatt Phelps & Phillips LLP, Los Angeles, California; Stephanie A. Roeser, Manatt Phelps & Phillips LLP, San Francisco, California;

Nathan P. Eimer, Lisa S. Meyer, Pamela R. Hanebutt, and Raphael Janove, Eimer Stahl LLP, Chicago, Illinois; for Defendant-Appellant CITGO Petroleum Corporation.

Sean C. Grimsley and Jameson R. Jones, Bartlit Beck LLP, Denver, Colorado; Megan R. Nishikawa and Nicholas A. Miller-Stratton, King & Spalding LLP, San Francisco, California; Traci J. Renfroe and Carol M. Wood, King & Spalding LLP, Houston, Texas; for Defendants-Appellants ConocoPhillips and ConocoPhillips Company.

Steven M. Bauer and Margaret A. Tough, Latham & Watkins LLP, San Francisco, California; for Defendant-Appellant Phillips 66 Company.

William M. Sloan and Jessica L. Grant, Venable LLP, San Francisco, California, for Defendant-Appellant Peabody Energy Corporation.

Christopher W. Keegan, Kirkland & Ellis LLP, San Francisco, California; Andrew R. McGaan, Kirkland & Ellis LLP, Chicago, Illinois; Anna G. Rotman, Kirkland & Ellis LLP, Houston, Texas; Bryan D. Rohm, Total E&P USA Inc., Houston, Texas; for Defendants-Appellants Total E&P USC Inc. and Total Specialties USA Inc.

Thomas F. Koegel, Crowell & Moring LLP, San Francisco, California; Kathleen Taylor Sooy and Tracy A. Roman, Crowell & Moring LLP, Washington, D.C.; for Defendant-Appellant Arch Coal Inc.

David E. Cranston, Greenberg Glusker Fields Claman & Machtinger LLP, Los Angeles, California, for Defendant-Appellant Eni Oil & Gas Inc.

Mark McKane, Kirkland & Ellis LLP, San Francisco, California; Andrew A. Kassoff and Brenton Rogers, Kirkland & Ellis LLP, Chicago, Illinois; for Defendants-Appellants Rio Tinto Energy America Inc., Rio Tinto Minerals Inc., and Rio Tinto Services Inc.

Bryan M. Killian, Morgan Lewis & Bockius LLP, Washington, D.C.; James J. Dragna and Yardena R. Zwang-Weissman, Morgan Lewis & Bockius LLP, Los Angeles, California; for Defendant-Appellant Anadarko Petroleum Corporation.

Marc A. Fuller and Matthew R. Stammel, Vinson & Elkins LLP, Dallas, Texas; Stephen C. Lewis and R. Morgan Gilhuly, Barg Coffin Lewis & Trapp LLP, San Francisco, California; for Defendants-Appellants Occidental Petroleum Corporation, and Occidental Chemical Corporation.

Christopher J. Carr and Jonathan A. Shapiro, Baker Botts LLP, San Francisco, California; Scott Janoe, Baker Botts LLP, Houston, Texas; Evan Young, Baker Botts LLP, Austin, Texas; Megan Berge, Baker Botts LLP, Washington, D.C. for Defendants-Appellants Repsol Energy North America Corp. Repsol Trading USA Corp., Marathon Oil Company, Marathon Oil Corporation, and Hess Corp.

Shannon S. Broome and Ann Marie Mortimer, Hunton Andrews Kurth LLP, San Francisco, California; Shawn Patrick Regan, Hunton Andrews Kurth LLP, New York, New York; for Defendant-Appellant Marathon Petroleum Corp.

Gregory Evans, McGuireWoods LLP, Los Angeles, California; Steven R. Williams, Joy C. Fuhr, and Brian D. Schmalzbach, McGuireWoods LLP, Richmond, Virginia; for

Defendants-Appellants Devon Energy Corp. and Devon Energy Production Company LP.

Michael F. Healy, Shook Hardy & Bacon LLP, San Francisco, California; Michael L. Fox, Duane Morris LLP, San Francisco, California; for Defendant-Appellant Encana Corporation.

Mortimer Hartwell, Vinson & Elkins LLP, San Francisco, California; Patrick W. Mizell and Deborah C. Milner, Vinson & Elkins LLP, Houston, Texas; for Defendant-Appellant Apache Corp.

Victor M. Sher (argued), Matthew K. Edling, Katie H. Jones, and Martin D. Quiñones, Sher Edling LLP, San Francisco, California; Kevin K. Russell, Sarah H. Harrington, and Charles H. Davis, Goldstein & Russell P.C., Bethseda, Maryland; for Plaintiffs-Appellees.

John C. Beiers, County Counsel; Paul A. Okada, and David A. Silberman, Chief Deputies; Margaret V. Tides and Matthew J. Sanders, Deputies; Office of the San Mateo County Counsel, Redwood City, California; for Plaintiff-Appellee County of San Mateo.

Jennifer Lyon, City Attorney; Steven E. Boehmer, Assistant City Attorney; Imperial Beach City Attorney, La Mesa, California; for Plaintiff-Appellee City of Imperial Beach.

Brian E. Washington, County Counsel; Brian C. Case and Brandon Halter, Deputy County Counsel; Office of the Marin County Counsel, San Rafael, California; for Plaintiff-Appellee County of Marin.

Dana McRae and Jordan Sheinbaum, Office of the Counsel Counsel, Santa Cruz, California, for Plaintiff-Appellee County of Santa Cruz.

Anthony P. Condotti, City Attorney, Office of the City Attorney, Santa Cruz, California, for Plaintiff-Appellee City of Santa Cruz.

Bruce Reed Goodmiller and Rachel H. Sommovilla, Office of the City Attorney, Richmond, California, for Plaintiff-Appellee City of Richmond.

Zachary D. Tripp and Lauren E. Morris, Weil Gotshal & Manges LLP, Washington, D.C.; Sarah M. Sternlieb, Weil Gotshal & Manges LLP, New York, New York; Peter D. Keisler, C. Frederick Beckner III, Ryan C. Morris, and Tobias S. Loss-Eaton, Sidley Austin LLP, Washington, D.C.; Steven P. Lehotsky, Michael B. Schon, and Jonathan D. Urick, U.S. Chamber Litigation Center, Washington, D.C.; for Amicus Curiae Chamber of Commerce of the United States of America.

Robert S. Peck, Center for Constitutional Litigation P.C., Washington, D.C.; Gerson H. Smoger, Smoger & Associates P.C., Dallas, Texas; for Amici Curiae Senator Sheldon Whitehouse.

Michael Burger, Morningside Heights Legal Services Inc., New York, New York, for Amici Curiae National League of Cities, U.S. Conference of Mayors, and International Municipal Lawyers Association.

Scott L. Nelson and Allison M. Zieve, Public Citizen Litigation Group, Washington, D.C., for Amicus Curiae Public Citizen Inc.

James R. Williams, County Counsel; Greta S. Hansen, Chief Assistant County Counsel; Laura S. Trice, Lead Deputy County Counsel; Tony LoPresti, Deputy County Counsel; Office of Santa Clara County Counsel, San Jose, California; for Amicus Curiae California State Association of Counties.

Daniel P. Mensher and Alison S. Gaffney, Keller Rohrback LLP, Seattle, Washington, for Amici Curiae Robert Brule, Center for Climate Integrity, Justin Farrell, Benjamin Franta, Stephan Lewandowsky, Naomi Oreskes, and Geoffrey Supran.

William A. Rossbach, Rossbach Law P.C., Missoula, Montana; Kenneth L. Adams, Adams Holcomb LLP, Washington, D.C.; for Amici Curiae Mario J. Molina, Michael Oppenheimer, Susanne C. Moser, Donald J. Wuebbles, Gary Griggs, Peter C. Frumhoff, and Kirstina Dahl.

Rob Bonta, Attorney General; Sally Magnani, Senior Assistant Attorney General; David A. Zonana, Supervising Deputy Assistant Attorney General; Erin Ganahl and Heather Leslie, Deputy Attorneys General; Attorney General's Office, California Department of Justice, Oakland, California; Letitia James, Attorney General, New York, New York; Brian E. Frosh, Attorney General, Baltimore, Maryland; Gurbir S. Grewal, Attorney General, Trenton, New Jersey; Ellen F. Rosenblum, Attorney General, Salem, Oregon; Peter F. Neronha, Attorney General, Providence, Rhode Island; Thomas J. Donovan Jr., Attorney General, Montpelier,

16          COUNTY OF SAN MATEO V. CHEVRON

Vermont; Robert W. Ferguson, Attorney General, Olympia, Washington; for Amici Curiae States of California, New York, Maryland, New Jersey, Oregon, Rhode Island, Vermont, and Washington.

Peter Huffman, Natural Resources Defense Council, Washington, D.C.; Ian Fein, Natural Resources Defense Council, San Francisco, California; for Amicus Curiae Natural Resources Defense Council Inc.

**OPINION**

IKUTA, Circuit Judge:

This appeal requires us to determine whether a district court erred in remanding the plaintiffs' global-warming related complaints to state court after they were removed by the energy company defendants.  On appeal, the defendants argue that the district court had removal jurisdiction over these complaints on multiple grounds, including federal question and federal enclave jurisdiction under 28 U.S.C. § 1331, federal officer removal jurisdiction under 28 U.S.C. § 1442(a)(1), bankruptcy jurisdiction under 28 U.S.C. § 1452(a) and 28 U.S.C. § 1334(b), and admiralty jurisdiction under 28 U.S.C. § 1333(1).  Because the district court did not err in concluding that it lacked subject matter jurisdiction under any of these asserted grounds, we affirm.

I

The County of San Mateo, the County of Marin, and the City of Imperial Beach filed three materially similar complaints in California state court against more than 30 energy companies in July 2017.[1]  The complaints allege that the Energy Companies' "extraction, refining, and/or formulation of fossil fuel products; their introduction of fossil fuel products into the stream of commerce; their wrongful promotion of their fossil fuel products and concealment of known hazards associated with use of those products; and their failure to pursue less hazardous alternatives available to them; is a substantial factor in causing the increase in global

---

[1] We refer to the plaintiffs collectively as the "Counties" and to the defendants collectively as the "Energy Companies."

mean temperature and consequent increase in global mean sea surface height."   Further, according to the complaints, the Counties "have already incurred, and will foreseeably continue to incur, injuries and damages because of sea level rise caused by [the Energy Companies'] conduct."  Such "sea level rise-related injuries and damages" include flooding that causes injury and damages to real property and its improvements, and prevents the "free passage on, use of, and normal enjoyment of that real property, or permanently [destroys] it."  For instance, the Counties allege that Surfer's Beach near the city of Half Moon Bay "has lost 140 feet of accessible beach since 1964 due to erosion, which has been exacerbated and substantially contributed to by sea level rise and increased extreme weather."  Other injuries caused by sea level rise, according to the Counties, include "infrastructural repair and reinforcement of roads and beach access."  Based on these allegations, the complaints assert causes of action for public and private nuisance, strict liability for failure to warn, strict liability for design defect, negligence, negligent failure to warn, and trespass.

The Energy Companies removed the three complaints to federal court, asserting multiple bases for subject matter jurisdiction: (1) the Counties' claims raise disputed and substantial federal issues, *see Grable & Sons Metal Prods., Inc. v. Darue Eng'g & Mfg.*, 545 U.S. 308 (2005); (2) the Counties' claims are "completely preempted" by federal law; (3) the Counties' claims arose on "federal enclaves"; (4) the Counties' claims arise out of operations on the outer Continental Shelf, *see* 43 U.S.C. § 1349(b); (5) the Counties' claims arise from actions that were taken by the Energy Companies pursuant to a federal officer's directions, *see* 28 U.S.C. § 1442(a); and (6) the Counties' claims are related to bankruptcy cases, *see* 28 U.S.C. §§ 1452(a), 1334(b).

Shortly after the complaints were filed, the County of Santa Cruz, the City of Santa Cruz, and the City of Richmond filed materially similar complaints in California state court. The Energy Companies removed these cases to federal court as well, asserting the same six bases for subject matter jurisdiction. Marathon Petroleum Corporation raised an additional ground for removal: the complaints raised issues concerning maritime activities, giving rise to admiralty jurisdiction. *See* 28 U.S.C. § 1333. These cases were assigned to the same district judge.

The Counties moved to remand each case to state court based on a lack of subject matter jurisdiction. In a reasoned opinion, the district court rejected all the grounds on which the Energy Companies relied for subject matter jurisdiction, but stayed its remand orders to give the Energy Companies an opportunity to appeal.

The Energy Companies appealed, and we affirmed the district court's determination that no subject matter jurisdiction existed under the federal-officer removal statute. *County of San Mateo v. Chevron Corp.*, 960 F.3d 586, 603 (9th Cir. 2020), *vacated*, 141 S. Ct. 2666 (2021) (mem.). We dismissed the rest of the appeal for lack of appellate jurisdiction. *Id.* Under 28 U.S.C. § 1447(d), "[1] [a]n order remanding a case to the State court from which it was removed is not reviewable on appeal or otherwise [(referred to as the "non-reviewability clause")], [2] except that an order remanding a case to the State court from which it was removed pursuant to section 1442 or 1443 of this title shall be reviewable by appeal or otherwise [(referred to as the

"exceptions clause")]."[2]   We concluded that we lacked authority to review the remand order under the non-reviewability clause because the district court's order remanded the complaints on subject matter jurisdiction grounds, and the non-reviewability clause applies when a district court bases its remand order on subject matter jurisdiction or nonjurisdictional defects. *San Mateo*, 960 F.3d at 594–95 (citing *Atl. Nat'l Tr. LLC v. Mt. Hawley Ins. Co.*, 621 F.3d 931, 934 (9th Cir. 2010)). We also concluded that we lacked authority to review the remand order under the exceptions clause because we were bound by our precedent, *see Patel v. Del Taco, Inc.*, 446 F.3d 996, 998 (9th Cir. 2006), which indicated we had the authority to review only the portion of the district court's remand order that addressed 28 U.S.C. § 1442(a), federal officer removal, but lacked jurisdiction to review the appeal from the portions of the remand order that considered the other bases for subject matter jurisdiction, *San Mateo*, 960 F.3d at 595–96. Therefore, we rejected the Energy Companies' argument that 28 U.S.C. § 1447(d) gave us the authority to conduct plenary review of the district court's remand order and did not address the other bases for removal. *Id.* at 603.

The Energy Companies sought review by the Supreme Court. While the Energy Companies' petition for certiorari was pending, the Supreme Court decided *BP p.l.c. v. Mayor & City Council of Baltimore*, 141 S. Ct. 1532 (2021). *Baltimore* interpreted § 1447(d) as permitting appellate review of all the defendants' grounds for removal under that section, and overruled the Fourth Circuit's interpretation of

---

[2] 28 U.S.C. § 1442 relates to removal of an action against an agency or an officer of the United States, or "any person acting under that officer," and 28 U.S.C. § 1443 relates to civil rights cases.

§ 1447(d) as limiting appellate review of a remand order to "the *part* of the district court's remand order" discussing § 1442 or 1443. *See Baltimore*, 141 S. Ct. at 1537. The Supreme Court then granted the petition for writ of certiorari in *San Mateo*, vacated judgment, and remanded for further consideration in light of *Baltimore*. *Chevron Corp. v. San Mateo County, California*, 141 S. Ct. 2666 (2021).

On remand, we conclude that *Baltimore* has effectively abrogated *Patel*'s reasoning and holding "in such a way that the cases are clearly irreconcilable." *Miller v. Gammie*, 335 F.3d 889, 900 (9th Cir. 2003) (en banc). Because *Baltimore* held that § 1447(d) gives us the authority to review the district court's entire remand order, 141 S. Ct. at 1538, we now consider all bases for removal raised by the defendants, rather than addressing only federal officer removal.

We have jurisdiction under 28 U.S.C. § 1291. We review questions of statutory construction and subject matter jurisdiction de novo. *Ritchey v. Upjohn Drug Co.*, 139 F.3d 1313, 1315 (9th Cir. 1998). The defendant has the burden of proving by a preponderance of the evidence that the requirements for removal jurisdiction have been met. *Leite v. Crane Co.*, 749 F.3d 1117, 1122 (9th Cir. 2014).

II

A

We start with the Energy Companies' argument that the district court erred in rejecting its claims that it had federal-question jurisdiction under 28 U.S.C. § 1331, which provides that "district courts shall have original jurisdiction of all civil

actions arising under the Constitution, laws, or treaties of the United States."  28 U.S.C. §1331.

At the time of removal, the Counties' complaints asserted only state-law claims against the Energy Companies.  Under the well-pleaded complaint rule, the plaintiff is "the 'master of the claim'" and can generally avoid federal jurisdiction if a federal question does not appear on the face of the complaint.  *City of Oakland v. BP PLC*, 969 F.3d 895, 904 (9th Cir. 2020) (quoting *Caterpillar Inc. v. Williams*, 482 U.S. 386, 392 (1987)).  The Energy Companies argue that the Counties' global-warming claims arise under federal common law and are removable under two exceptions to the well-pleaded complaint rule: (1) the exception articulated in *Grable*; and (2) the doctrine of complete preemption.  We consider each in turn.

1

*Grable* affirmed a long line of Supreme Court cases that recognized an exception to the well-pleaded complaint rule when "federal law is a necessary element of the [plaintiff's] claim for relief."  *Oakland*, 969 F.3d at 904 (cleaned up). "Only a few cases" have ever fallen into this narrow category. *Id.*  Under this exception, "federal jurisdiction over a state law claim will lie if a federal issue is: (1) necessarily raised, (2) actually disputed, (3) substantial, and (4) capable of resolution in federal court without disrupting the federal-state balance approved by Congress."  *Gunn v. Minton*, 568 U.S. 251, 258 (2013).  If those requirements are met, federal jurisdiction exists "because there is a 'serious federal interest in claiming the advantages thought to be inherent in a federal forum,' which can be vindicated without disrupting Congress's intended division of labor between state and

federal courts." *Id.* (quoting *Grable*, 545 U.S. at 313–14). The inquiry under *Grable* often focuses on the third requirement, which asks whether the case "turn[s] on substantial questions of federal law." *Oakland*, 969 F.3d at 905 (quoting *Grable*, 545 U.S. at 312).

In *Oakland*, we considered a similar issue. In that case, two cities sued various energy companies in state court, raising a state-law claim for public nuisance based on "production and promotion of massive quantities of fossil fuels" which "caused or contributed to 'global warming-induced sea level rise,'" and in turn led to injuries to the cities' wastewater treatment systems and stormwater infrastructure, as well as other injuries. *Id.* at 901–02. The energy companies argued that we had federal jurisdiction over the state complaint under the exception to the well-pleaded complaint rule for substantial federal questions. *Id.* at 902.

We rejected this argument, holding that even assuming that the complaint "could give rise to a cognizable claim for public nuisance under federal common law," the state law claim in that case did not raise a substantial federal question because "the claim neither requires an interpretation of a federal statute . . . nor challenges a federal statute's constitutionality," nor identifies "a legal issue necessarily raised by the claim that, if decided, will be controlling in numerous other cases." *Id.* at 906 (cleaned up). Further, as we explained:

> [I]t is not clear that the claim requires an interpretation or application of federal law at all, because the Supreme Court has not yet determined that there is a federal common law

> of public nuisance relating to interstate
> pollution, and we have held that federal
> public-nuisance claims aimed at imposing
> liability on energy producers for acting in
> concert to create, contribute to, and maintain
> global warming and conspiring to mislead the
> public about the science of global warming,
> are displaced by the Clean Air Act.

*Id.* (cleaned up).

We also rejected the energy companies' argument that because the complaint "implicates a variety of 'federal interests,'" including energy policy, national security, and foreign policy, the complaint necessarily raised a substantial federal question. *Id.* at 906–07. Although we acknowledged that the "question whether the Energy Companies can be held liable for public nuisance based on production and promotion of the use of fossil fuels and be required to spend billions of dollars on abatement is no doubt an important policy question," we concluded it "does not raise a substantial question of federal law for the purpose of determining whether there is jurisdiction under § 1331." *Id.* at 907. Finally, we noted that a court's evaluation of the cities' public nuisance claim would require a fact-intensive and situation specific analysis, which "is not the type of claim for which federal-question jurisdiction lies" under *Grable. Id.* Therefore, we concluded that because the plaintiffs' claim did not raise a substantial federal issue, it did not fit within the exception to the well-pleaded complaint rule articulated in *Grable*. *Id.*

The same analysis applies here.  Although in *Oakland* the plaintiffs raised a single public nuisance claim, while here the

Counties allege multiple state tort theories, including public nuisance, failure to warn, design defect, private nuisance, negligence, and trespass, the substance of their claims is the same as in *Oakland*:  tortious conduct by the Energy Companies in the course of producing, selling, and promoting the use of fossil fuels contributed to global warming and sea-level rise, which led to property damage and other injuries to the Counties.  Therefore, even if we assume that the Counties' complaints "could give rise to a cognizable claim" under federal common law, *id.* at 906, the global-warming-related tort claims do not "require resolution of a substantial question of federal law" because they do not require any interpretation of a federal statutory or constitutional issue, and are "displaced by the Clean Air Act." *Id.*  And as in *Oakland*, even if the complaints raise federal policy issues that are national and international in scope, implicate foreign affairs and negotiations with other nations, and require uniform standards, they do not "raise a substantial question of federal law for the purpose of determining whether there is jurisdiction under § 1331." *Id.* at 907.  Finally, as in *Oakland*, the Counties' tort claims require a fact-intensive and situation-specific analysis, which "is not the type of claim for which federal-question jurisdiction lies." *Id.*

Therefore, the exception to the well-pleaded complaint rule for substantial federal questions under *Grable* does not apply to the Counties' claims.

### 2

Second, the Energy Companies argue that the Counties' state law claims fall under the "artful-pleading doctrine," another exception to the well-pleaded complaint rule. *Oakland*, 969 F.3d at 905.  Under this doctrine, a federal

statute's preemptive force is "so 'extraordinary' that it 'converts an ordinary state common-law complaint into one stating a federal claim for purposes of the well-pleaded complaint rule.'" *Caterpillar*, 482 U.S. at 393 (quoting *Metro. Life Ins. Co. v. Taylor*, 481 U.S. 58, 65 (1987)). Once a federal statute completely preempts an area of state law, then "any claim purportedly based on that pre-empted state law is considered, from its inception, a federal claim, and therefore arises under federal law." *Id.* (citation omitted). We have held that complete preemption applies when Congress "(1) intended to displace a state-law cause of action, and (2) provided a substitute cause of action." *Oakland*, 969 F.3d at 906 (citations omitted). The Supreme Court has recognized only three statutes for which complete preemption applies: (1) § 301 of the Labor Management Relations Act, (2) § 502(a) of the Employee Retirement Income Security Act of 1974, and (3) §§ 85 and 86 of the National Bank Act. *See id.* at 905–906 (citations omitted).

The Energy Companies assert that the Counties' state-law claims are "completely preempted by the Clean Air Act and/or other federal statutes and the United States Constitution." We rejected this precise argument in *Oakland*, observing that "[t]he Clean Air Act is not one of the three statutes that the Supreme Court has determined has extraordinary preemptive force" and concluding that it does not "meet either of the two requirements for complete preemption." *Id.* at 907. The Energy Companies do not identify any other federal statute that completely preempts the state-law claims here. Therefore, the complete preemption exception to the well-pleaded complaint rule does not apply.

### 3

We next turn to the Energy Companies' argument that the Counties' complaints arise under federal law for purposes of § 1331 because the tort claims at issue arose on a federal enclave.

The removal of a claim brought in state court under the federal enclave doctrine is premised on the following legal framework.  First, a state law claim brought in state court is removable under § 1331 when "federal law is a necessary element of the [plaintiff's] claim for relief."  *Oakland*, 969 F.3d at 904 (cleaned up).  The Constitution establishes the principle that federal law applies in federal enclaves:

> Congress shall have Power . . . [t]o exercise exclusive Legislation in all Cases whatsoever, over such District[s] . . . as may, by Cession of particular States, and the Acceptance of Congress, become the Seat of the Government of the United States, and to exercise like Authority over all Places purchased by the Consent of the Legislature of the State in which the Same shall be, for the Erection of Forts, Magazines, Arsenals, dock-Yards, and other needful Buildings.

U.S. Const. art. I, § 8, cl. 17.

As this clause has been interpreted, when the federal government purchases state land with the consent of the state legislature, "any law existing [on that land] must derive its authority and force from the United States and is for that reason federal law." *Mater v. Holley*, 200 F.2d 123, 124 (5th

Cir. 1952).[3]  Accordingly, unless an exception applies, any conduct on a federal enclave is governed by federal law. *Id.*[4] Because federal law governs disputes arising from such conduct, federal courts have the "power to adjudicate controversies arising" on federal enclaves. *Id.* If federal law applies to a legal controversy arising on federal enclaves, then such a controversy necessarily "arises under the laws of the United States, within the meaning of 28 U.S.C. § 1331." *Id.* at 125. In sum, because conduct on a federal enclave is generally subject to federal law, a claim based on injuries stemming from such conduct arises under federal law, and a court has jurisdiction over such a claim under § 1331.[5]

We have referenced this framework for federal enclave jurisdiction in several cases. In *Willis v. Craig*, a civilian employee who was injured while working at a federal naval center brought a negligence action in federal court. *See* 555 F.2d 724, 725 (9th Cir. 1977) (per curiam). We held that federal jurisdiction was proper if the employee's accident occurred on property that qualified as a federal enclave. *Id.*

---

[3] We have said that *Mater* contains "[t]he best reasoning on [federal enclave jurisdiction]." *Willis v. Craig*, 555 F.2d 724, 726 n.4 (9th Cir. 1977) (per curiam).

[4] The state law that previously governed the territory "remain[s] operative as federal law" so long as it is consistent with federal law. *Mater*, 200 F.2d at 124. State law directly applies in federal enclaves only under one of three narrow exceptions, none of which is relevant here. *See Paul v. United States*, 371 U.S. 245, 268–69 (1963); *Goodyear Atomic Corp. v. Miller*, 486 U.S. 174, 180 (1988).

[5] Where such an action is transitory and a state court has personal jurisdiction over the defendant, the state court may also hear the action. *Mater*, 200 F.2d at 123 (citing *Ohio River Cont. Co. v. Gordon*, 244 U.S. 68 (1917)).

at 726.  In *Durham v. Lockheed Martin Corp.*, we noted in passing that federal courts would have federal question jurisdiction over an employee's claim arising from exposure to asbestos during his work on federal enclaves.  445 F.3d 1247, 1250 (9th Cir. 2006); *see also Alvares v. Erickson*, 514 F.2d 156, 160 (9th Cir. 1975) (noting in passing that in federal enclave cases, the jurisdiction of a federal court depends on "the locus in which the claim arose").

In this case, the Counties have not alleged that their claims are based on torts taking place on a federal enclave.  Rather, their complaint raises state-law claims arising from injuries to real property and infrastructure within their local jurisdictions.  For instance, San Mateo's alleged injuries flow from its claim of trespass to land, i.e., that the Energy Companies' petroleum activities ultimately led to a sea-level rise that caused water to enter San Mateo property in violation of trespass law and caused various damages and nuisances there, including the destruction of real property and infrastructure within its borders.[6]

---

[6] The other claims raised by the Counties are analogous.  For its trespass claim, San Mateo claims that the Energy Companies caused "ocean waters to enter" city property, without the  city's consent, "permanently submerging real property owned by [San Mateo], causing flooding which have [sic] invaded and threatens to invade real property owned by [San Mateo] and rendered it unusable, and causing storm surges which have invaded and threatened to invade real Property owned by [San Mateo] and rendered it unusable."  For its nuisance claims, San Mateo alleges that the condition of flooding and storms is "harmful and dangerous to human health," "indecent and offensive to the senses of the ordinary person," "obstruct[s] and threaten[s] to obstruct the free use of the People's property," and "obstruct[s] and threaten[s] to obstruct the . . . use of [various areas] within San Mateo County."  San Mateo specifies that "the ultimate nature of the harm is the destruction of real and personal

Therefore, we turn to the question whether the Counties' tort claims arose from actions and injuries that occurred on federal enclaves and thus were governed by federal law. The Energy Companies argue that "pertinent" or "substantial" events giving rise to the complaints took place on federal enclaves. Specifically, they contend that Standard Oil Co. (Chevron's predecessor) operated Elk Hills Naval Petroleum Reserve, a federal enclave, for many decades, and CITGO distributed gasoline and diesel under its contracts with the government to multiple naval installations that are federal enclaves. Relying on several district court opinions, the Energy Companies contend that because federal law applied to these activities on federal enclaves, federal law applies to the Counties' claims, which are therefore removable under § 1331.

We disagree. Unlike in *Willis*, where the accident that resulted in the plaintiff's injury occurred on a federal enclave, or in *Durham*, where the exposure that resulted in the plaintiff's injury occurred on a federal enclave, the Energy Companies allege only that some of the defendants engaged

---

property," and that "the interference borne is the loss of property and infrastructure within San Mateo County."

For its failure to warn claim, San Mateo alleges that the Energy Companies "failed to adequately warn customers, consumers, elected officials and regulators of known and foreseeable risk of climate change and the consequences that inevitably flow from the normal, intended use and foreseeable misuse of [their] fossil fuel products," which caused "damage to publicly owned infrastructure and real property, and the creation and maintenance of a nuisance that interferes with the rights of the County, its residents, and of the People." Finally, for its design defect claim, San Mateo alleges that the Energy Companies' "fossil fuel products are defective because the risks they pose to consumers and to the public, including and especially to [San Mateo] outweigh their benefits."

in some conduct on federal enclaves that may have contributed to global warming, which allegedly caused the rising sea levels that resulted in the injuries that are the basis for the Counties' claims. The Energy Companies do not allege how much of that conduct occurred on federal enclaves. The connection between conduct on federal enclaves and the Counties' alleged injuries is too attenuated and remote to establish that the Counties' cause of action is governed by the federal law applicable to any federal enclave. As a result, the Energy Companies have failed to establish that a federal issue is "necessarily raised" by the complaints. *Gunn*, 568 U.S. at 258.[7] We therefore reject this basis for removal jurisdiction.

## B

The Energy Companies next argue that the Counties' claims were removable under the Outer Continental Shelf Lands Act (OCSLA). OCSLA gives federal courts jurisdiction over actions "arising out of, or in connection with (A) any operation conducted on the outer Continental Shelf which involves exploration, development, or production of the minerals, of the subsoil and seabed of the outer

---

[7] We reject the Energy Companies' passing argument that federal enclave jurisdiction extends to complaints implicating "powerful federal interests." The constitutional basis for federal enclave jurisdiction is Congress's power to exercise exclusive legislation over federal enclaves, U.S. Const. art I, § 8, cl. 17, and we have no authority to extend federal enclave jurisdiction beyond such limitations.

Continental Shelf, or which involves rights to such minerals."[8]

According to the Energy Companies, the Counties' tort claims fall within this jurisdictional grant. The Energy Companies reason as follows: The Counties allege that their injuries were caused in part by the Energy Companies' cumulative fossil-fuel extraction; and a portion of this extraction took place on the outer Continental Shelf (OCS) because some of the Energy Companies have conducted (and continue to conduct) petroleum exploration, development, and production on the outer Continental Shelf.[9] Therefore, the Energy Companies argue, the Counties' claims "aris[e]

---

[8] 43 U.S.C. § 1349(b)(1) provides in full:

> Except as provided in subsection (c) of this section [regarding the federal government's leasing program on the outer Continental Shelf], the district courts of the United States shall have jurisdiction of cases and controversies arising out of, or in connection with (A) any operation conducted on the outer Continental Shelf which involves exploration, development, or production of the minerals, of the subsoil and seabed of the outer Continental Shelf, or which involves rights to such minerals, or (B) the cancellation, suspension, or termination of a lease or permit under this subchapter. Proceedings with respect to any such case or controversy may be instituted in the judicial district in which any defendant resides or may be found, or in the judicial district of the State nearest the place the cause of action arose.

[9] The outer Continental Shelf is defined as "all submerged lands lying seaward and outside of the area of lands beneath navigable waters . . . and of which the subsoil and seabed appertain to the United States and are subject to its jurisdiction and control." 43 U.S.C. § 1331(a).

out of, or in connection with" the Energy Companies' operations on the outer Continental Shelf.

In evaluating the Energy Companies' argument, we begin with the text of the jurisdictional statute, 43 U.S.C. § 1349(b)(1). The terms "aris[e] out of, or in connection with" are not defined in the statute. Nor are the dictionary definitions helpful. According to the dictionary definitions around the time OCSLA was enacted, "arise" in this context means to "spring up; originate," and "connection" means "[r]elationship by causality, mutual dependence, logical sequence, or the like." Webster's New Int'l Dictionary of the English Language (2d ed. 1952). As these definitions indicate, both terms are broad and indeterminate, and do not incorporate any principle that would limit federal jurisdiction. When interpreting phrases such as these, which lack a definite or fixed ending point, we must identify "a limiting principle consistent with the structure of the statute and its other provisions." *Maracich v. Spears*, 570 U.S. 48, 60 (2013) (interpreting the phrase "in connection with"); *see also Cal. Div. of Lab. Standards Enf't v. Dillingham Constr., N.A., Inc.*, 519 U.S. 316, 335 (1997) (Scalia, J., concurring) ("But applying the 'relate to' provision according to its terms was a project doomed to failure, since, as many a curbstone philosopher has observed, everything is related to everything else."). Thus, in interpreting terms such as "relates to," "in connection with," or "in reference to," a court must "go beyond the unhelpful text and the frustrating difficulty of defining its key term, and look instead to the objectives" of the statute as a guide to its scope. *N.Y. State Conf. of Blue Cross & Blue Shield Plans v. Travelers Ins. Co.*, 514 U.S. 645, 656 (1995). The Supreme Court has approved this approach to interpreting OCSLA, acknowledging that terms which have "indeterminacy in isolation" should be

"interpreted in light of the entire statute." *Parker Drilling Mgmt. Servs., Ltd. v. Newton*, 139 S. Ct. 1881, 1888 (2019).

Applying this interpretive approach, we turn to the structure and purpose of OCSLA as a whole. The Supreme Court has explained that "the purpose of OCSLA was 'to assert the exclusive jurisdiction and control of the Federal Government of the United States over the seabed and subsoil of the outer Continental Shelf, and to provide for the development of its vast mineral resources.'" *Gulf Offshore Co. v. Mobil Oil Corp.*, 453 U.S. 473, 479 n.7 (1981) (citation omitted). According to the Supreme Court's historical review of OCSLA, Congress was concerned about the extensive activity taking place on the outer Continental Shelf, and the need to identify with clarity the body of law that would govern such activities. *See Rodrigue v. Aetna Cas. & Sur. Co.*, 395 U.S. 352, 358 (1969). Congress recognized that "the full development of the estimated values in the shelf area [would] require the efforts and the physical presence of thousands of workers on fixed structures in the shelf area," and that "[i]ndustrial accidents, accidental death, peace, and order present problems requiring a body of law for their solution." *Id.* (cleaned up). After debating whether federal or state law should be applicable to the platforms and artificial islands created in the outer Continental Shelf (and to the workers present there), *see id.* at 363–64, Congress determined that federal law should "be applicable in the area, but that where there is a void, the State law may be applicable," *id.* at 358 (citation omitted).

To implement this determination, Congress expressly adopted "the federal enclave model" for OCSLA. *Parker Drilling*, 139 S. Ct. at 1890. It did so by enacting 43 U.S.C. § 1333, which provides that "[t]he Constitution and laws and

civil and political jurisdiction of the United States are extended, *to the same extent as if the outer Continental Shelf were an area of exclusive Federal jurisdiction located within a State*" to all areas of the outer Continental Shelf where operations could occur, including the "subsoil and seabed" of the outer Continental Shelf, any artificial islands, installations attached to the seabed "erected thereon for the purpose of exploring for, developing, or producing resources," or any other installations or devices needed to transport the resources. 43 U.S.C. § 1333(a)(1)(A) (emphasis added). This language ensured that drilling rigs and equipment on the outer Continental Shelf were treated "as though they were federal enclaves in an upland State." *Rodrigue*, 395 U.S. at 355.

The "textual connection between the OCSLA and the federal enclave model" as set out in § 1333 "suggests that, like the generally applicable enclave rule, the OCSLA sought to make all OCS law federal yet also 'provide a sufficiently detailed legal framework to govern life' on the OCS." *Parker Drilling*, 139 S. Ct. at 1890 (citation omitted). Because § 1333 adopted the federal enclave model's legal framework for the outer Continental Shelf, we read § 1349(b) as according federal courts the same jurisdiction over actions and injuries on the outer Continental Shelf as they would have in other federal enclaves.[10] As explained above, *supra* at Section II(A)(3), federal courts have federal enclave jurisdiction over tort claims regarding actions and injuries

---

[10] We presume that Congress was familiar with the scope of federal jurisdiction over federal enclaves when enacting OCSLA. *See Goodyear Atomic Corp. v. Miller*, 486 U.S. 174, 184–85 (1988) ("We generally presume that Congress is knowledgeable about existing law pertinent to the legislation it enacts.").

that occur on federal enclaves. Therefore, we read the phrase "aris[e] out of, or in connection with" in § 1349(b)(1) as granting federal courts jurisdiction over tort claims only when those claims arise from actions or injuries occurring on the outer Continental Shelf.

Reading the phrase "aris[e] out of, or in connection with" in § 1349(b)(1) as consistent with federal enclave jurisdiction provides "a limiting principle consistent with the structure of the statute and its other provisions," *Maracich*, 570 U.S. at 60, including OCSLA's purpose of addressing "industrial accidents, accidental death, peace, and order," given "the physical presence of thousands of workers on fixed structures in the shelf area," *Rodrigue*, 395 U.S. at 358 (cleaned up). Our interpretation of § 1349(b)(1) is also consistent with the Supreme Court's references to the scope of federal court jurisdiction under OCSLA. As the Supreme Court has explained, "a personal injury action *involving events occurring on the Shelf* is governed by federal law, the content of which is borrowed from the law of the adjacent State, here Louisiana." *Gulf Offshore Co.*, 453 U.S. at 481 (emphasis added); *see also id.* (describing OCSLA's legal framework by analogizing to a statute providing federal enclave jurisdiction over "personal injury and wrongful-death actions *involving events occurring within a national park or other place subject to the exclusive jurisdiction of the United States*, within the exterior boundaries of any State" (emphasis added) (internal quotation marks omitted)).

Three of our sister circuits have "deem[ed] § 1349 to require only a 'but-for' connection" between operations on the outer Continental Shelf and a plaintiff's alleged injuries. *See In re Deepwater Horizon*, 745 F.3d 157, 163–64 (5th Cir. 2014) (citation omitted) (collecting cases); *see also Bd. of*

*Cnty. Comm'rs of Boulder Cnty. v. Suncor Energy (U.S.A.) Inc.*, 25 F.4th 1238, 1273 (10th Cir. 2022) (adopting the Fifth Circuit's approach); *Mayor & City Council of Baltimore v. BP P.L.C.*, 2022 WL 1039685, at *21 (4th Cir. Apr. 7, 2022) (following the Fifth and Tenth Circuits in concluding that "invoking jurisdiction under § 1349(b)(1) requires a but-for connection between a claimant's cause of action and operations on the OCS"). The Energy Companies argue that this analysis is contrary to *Ford Motor Co. v. Montana Eighth Judicial District Court*, which held that the "requirement of a 'connection' between a plaintiff's suit and a defendant's activities" in order for a court to assert specific personal jurisdiction over a defendant is not synonymous with but-for causation. 141 S. Ct. 1017, 1019 (2021) (citation omitted). While we are skeptical that *Ford Motor Co.*'s interpretation of judicial rules delineating the scope of a court's specific personal jurisdiction is pertinent in this different statutory context, we agree that the language of § 1349(b), "aris[e] out of, or in connection with," does not necessarily require but-for causation.[11]

---

[11] The Fifth Circuit's conclusion to the contrary is not based on its construction of the text of § 1349(b), but rather relies on cases construing 43 U.S.C. § 1333(b) (providing that a specified form of compensation was payable "[w]ith respect to disability or death of an employee resulting from any injury occurring as *the result of* operations conducted on the outer Continental Shelf" (emphasis added)). The Fifth Circuit "adopted a 'but for' test of causation in determining whether a particular injury was *the result of* operations on the shelf," *Herb's Welding v. Gray*, 766 F.2d 898, 900 (5th Cir. 1985) (emphasis added) (citation omitted), and then applied this "but for" test to § 1349(b)(1) without addressing the differences between the text of those provisions, *see Recar v. CNG Producing Co.*, 853 F.2d 367, 369 (5th Cir. 1988) (stating that "we have established a 'but for' test to resolve" the question whether a case "aris[es] out of or in connection with" operations on the OCS" for purposes of

Despite our different approach to construing § 1349(b), our sister circuits' application of § 1349(b)(1) leads to a materially similar result, because "[t]he decisions finding jurisdiction under § 1349" feature "either claims with a direct physical connection to an OCS operation (collision, death, personal injury, loss of wildlife, toxic exposure) or a contract or property dispute directly related to an OCS operation." *Bd. of Cnty. Comm'rs of Boulder Cnty.*, 25 F.4th at 1273 (collecting cases). Therefore, "despite the seemingly broad 'but-for' test," adopted by our sister circuits, "courts have made it clear that a dispute must have a sufficient nexus to an operation on the OCS to fall within the jurisdictional reach of the OCSLA." *Id.* (cleaned up); *see also Mayor & City Council of Baltimore*, 2022 WL 1039685 at *21 ("[A] 'mere connection' between a claimant's case and operations on the OCS is insufficient to show federal jurisdiction if the relationship is 'too remote.'").[12]

We now apply our rule to the Energy Companies' assertions here. The Energy Companies argue that because the Counties assert that their injuries were caused in part by the Energy Companies' cumulative fossil-fuel extraction, and because a portion of this extraction took place on the outer Continental Shelf, the Counties' claims "aris[e] out of, or in

§ 1349(b), but citing only the line of cases construing § 1333(b) (cleaned up)).

[12] Indeed, in *Ford Motor Co.*, the Supreme Court acknowledged the need to impose limiting principles on indeterminate jurisdictional language, stating that "the phrase 'relate to'" in the judge-made rule requiring a lawsuit to "arise out of *or relate to* the defendant's contacts with the forum," before a court can assert specific personal jurisdiction "incorporates real limits, as it must to adequately protect defendants foreign to a forum." 141 S. Ct. at 1026 (citation omitted).

connection with" the Energy Companies' operations on the outer Continental Shelf.  We reject this argument, because the connection between such conduct and the injuries alleged by the plaintiffs here is too attenuated to give rise to jurisdiction. First, the Counties' complaints allege injuries occurring exclusively within their local jurisdictions, not on the outer Continental Shelf.  Second, instead of alleging wrongful *actions* on the outer Continental Shelf, the Counties' claims focus on the defective nature of the Energy Companies' fossil fuel products, the Energy Companies' knowledge and awareness of the harmful effects of those products, and their "concerted campaign" to prevent the public from recognizing those dangers.  These allegations do not refer to actions taken on the outer Continental Shelf.  For these reasons, the Energy Companies have failed to establish that the Counties' tort claims "aris[e] out of, or in connection with" the Energy Companies' operations on the outer Continental Shelf for purposes of jurisdiction under § 1349(b)(1).[13]

---

[13] Relatedly, we also reject the Energy Companies' claim that § 1349(b)(1) gives federal courts jurisdiction over any claim that threatens to impair the recovery of federally owned minerals from the outer Continental Shelf, or that otherwise might affect the oil industry.  This interpretation would give federal courts jurisdiction over any claim that might affect the finances of an energy company that engaged in operations there, even if the claim had no direct connection to events on the outer Continental Shelf, and is contrary to the federal enclave model.  *See Bd. of Cnty. Comm'rs of Boulder Cnty.*, 25 F.4th at 1275 (rejecting an identical argument).

C

We now turn to the Energy Companies' claim that the district court had subject matter jurisdiction under the federal-officer removal statute, 28 U.S.C. § 1442(a)(1).[14]

As currently drafted, § 1442(a)(1) provides for removal of:

> A civil action . . . that is against or directed to . . . [t]he United States or any agency thereof or any officer (or any person acting under that officer) of the United States or of any agency thereof, in an official or individual capacity, for or relating to any act under color of such office or on account of any right, title or authority claimed under any Act of Congress for the apprehension or punishment of criminals or the collection of the revenue.

28 U.S.C § 1442.

In order to invoke § 1442(a)(1), a private person must establish: "(a) it is a person within the meaning of the statute; (b) there is a causal nexus between its actions, taken pursuant to a federal officer's directions, and [the] plaintiff's claims; and (c) it can assert a colorable federal defense." *Riggs v. Airbus Helicopters, Inc.*, 939 F.3d 981, 986–87 (9th Cir.

---

[14] The Supreme Court vacated our prior opinion, *County of San Mateo v. Chevron Corp.*, 960 F.3d 586 (9th Cir. 2020), but did not address our reasoning regarding the federal officer removal statute. *See Baltimore*, 141 S. Ct. at 1543. Therefore, we largely reprise our reasoning in our prior opinion on this issue.

2019) (quoting *Fidelitad, Inc. v. Insitu, Inc.*, 904 F.3d 1095, 1099 (9th Cir. 2018)).  To demonstrate a causal nexus, the private person must show: (1) that the person was "acting under" a federal officer in performing some "act under color of federal office," and (2) that such action is causally connected with the plaintiff's claims against it.  *See Goncalves ex rel. Goncalves v. Rady Child.'s Hosp. San Diego*, 865 F.3d 1237, 1244–50 (9th Cir. 2017).

The parties focus on the first prong: whether the Energy Companies were "acting under" a federal officer's directions. We begin by providing some background.  The federal officer removal statute has existed in some version since 1815. *Willingham v. Morgan*, 395 U.S. 402, 405 (1969).  Although Congress has amended the statute on a number of occasions, *see Watson v. Philip Morris Cos.*, 551 U.S. 142, 147–49 (2007), most recently in 2011, *see* Removal Clarification Act of 2011 § 2, the purpose of the statute has remained essentially the same: its "basic purpose is to protect the Federal Government from the interference with its operations that would ensue were a State able, for example, to arrest and bring to trial in a State court for an alleged offense against the law of the State, officers and agents of the Government acting . . . within the scope of their authority."  *Watson*, 551 U.S. at 150 (cleaned up) (quoting *Willingham*, 395 U.S. at 406). Congress thought that allowing a federal officer to remove a state action was necessary because "[s]tate-court proceedings may reflect 'local prejudice' against unpopular federal laws or federal officials" and "deprive federal officials of a federal forum in which to assert federal immunity defenses."  *Id.* (citation omitted).  Moreover, state-court proceedings may have the effect of impeding or delaying the enforcement of federal law. *Id.*  The federal officer removal statute should be "liberally construed" to fulfill its purpose of allowing federal

officials and agents who are being prosecuted in state court for acts taken in their federal authority to remove the case to federal court. *Id.* at 147 (citation omitted).

When Congress first enacted § 1442(a)(1), the phrase "officer of the United States" was generally understood as a term of art that referred to federal officers who "exercis[ed] significant authority." *Int'l Primate Prot. League v. Adm'rs of Tulane Educ. Fund*, 500 U.S. 72, 81 (1991) (quoting *Buckley v. Valeo*, 424 U.S. 1, 126 (1976)). In 1948, Congress amended the statute to include the language "person[s] acting under" any officer of the United States. Act of June 25, 1948, ch. 646, § 1442, 62 Stat. 869, 938 (codified at 28 U.S.C. § 1442). At the time, this change was understood as extending the section to apply to employees, as well as officers. *Int'l Primate Prot. League*, 500 U.S. at 84 (quoting H.R. Rep. No. 80-308, at A134 (1947)).

The Supreme Court subsequently interpreted the term "person acting under that officer" as extending to a "private person" who has certain types of close relationships with the federal government. *See Watson*, 551 U.S. at 152–53. The Supreme Court has identified a number of factors courts should consider in determining whether a private person is "acting under" a federal officer for purposes of § 1442(a)(1). Among other things, the Court considers whether the person is acting on behalf of the officer in a manner akin to an agency relationship. *See id.* at 151 (private person must be authorized to act "with or for [federal officers]" (alteration in original) (citation omitted)); *see also Goncalves*, 865 F.3d at 1246–47 (holding that a private person qualified as "acting under" a federal officer when it was "serving as the government's agent"); *Cabalce v. Thomas E. Blanchard & Assocs., Inc.*, 797 F.3d 720, 729 (9th Cir. 2015) (noting that

a company's independent-contractor status supported the conclusion that it was not acting under a federal officer). The Court also considers whether the person is subject to the officer's close direction, such as acting under the "subjection, guidance, or control" of the officer, or in a relationship which "is an unusually close one involving detailed regulation, monitoring, or supervision." *Watson*, 551 U.S. at 151, 153 (citation omitted); *see also Leite*, 749 F.3d at 1120, 1124 (holding that a defense contractor properly removed a case under § 1442(a)(1) based, in part, on "the Navy's detailed specifications regulating the warnings that equipment manufacturers were required to provide"). Third, the Court considers whether the private person is assisting the federal officer in fulfilling "basic governmental tasks" that "the Government itself would have had to perform" if it had not contracted with a private firm. *Watson*, 551 U.S. at 153–54; *see also Goncalves*, 865 F.3d at 1246–47 (holding that private person fulfilled a basic governmental task by pursuing subrogation claims on behalf of a government agency). Finally, taking into account the purpose of §1442(a)(1), the Court has considered whether the private person's activity is so closely related to the government's implementation of its federal duties that the private person faces "a significant risk of state-court 'prejudice,'" just as a government employee would in similar circumstances, and may have difficulty in raising an immunity defense in state court. *Watson*, 551 U.S. at 152 (citation omitted).

As the Supreme Court has indicated, and circuit courts have held, a government contractor qualifies as a person "acting under" an officer under certain circumstances. *See id.* at 153–54. *Watson* cited with approval a Fifth Circuit case, *Winters v. Diamond Shamrock Chemical Co.*, which held that a government contractor could remove a state action under

§ 1442(a) because the contractor was acting on behalf of the government to produce Agent Orange, a carcinogenic herbicide used as part of the war strategy in Vietnam, and was acting under the close direction of the federal government which had provided "detailed specifications concerning the make-up, packaging, and delivery of Agent Orange," as well as "on-going supervision . . . over the formulation, packaging, and delivery of Agent Orange."  149 F.3d 387, 399–400 (5th Cir. 1998), *overruled by Latiolais v. Huntington Ingalls, Inc.*, 951 F.3d 286 (5th Cir. 2020) (en banc).   Further, the contractor provided a product that was "used to help conduct a war" and at least arguably "performed a job that, in the absence of a contract with a private firm, the Government itself would have had to perform." *Watson*, 551 U.S. at 154; *see also Goncalves*, 865 F.3d at 1246–47 (holding that a private contractor was "acting under" a federal officer when it was serving as an agent for the government and assisting the government in fulfilling basic duties).

By contrast, a person is not "acting under" a federal officer when the person enters into an arm's-length business arrangement with the federal government or supplies it with widely available commercial products or services. *See Cabalce*, 797 F.3d at 727–29; *cf. Goncalves*, 865 F.3d at 1244–47; *Winters*, 149 F.3d at 398–400.   Nor does a person's "*compliance* with the law (or *acquiescence* to an order)" amount to "'acting under' a federal official who is giving an order or enforcing the law." *Watson*, 551 U.S. at 152.  This is true "even if the regulation is highly detailed and even if the private firm's activities are highly supervised and monitored." *Id.* at 153.  We may not interpret § 1442(a) so as to "expand the scope of the statute considerably, potentially bringing within its scope state-court actions filed against private firms in many highly regulated industries." *Id.*

The Energy Companies argue that they meet the criteria under § 1442(a) to remove the Counties' complaints because they were "persons acting under" a federal officer based on three agreements with the government.[15] They also argue that there is a causal nexus between their actions under those agreements and the Counties' claims. We consider each of these agreements in turn.

We first consider CITGO's fuel supply agreements with the Navy Exchange Service Command (NEXCOM). Under these contracts, CITGO agreed to supply gasoline and diesel fuel to NEXCOM for service stations on approximately forty U.S. Navy installations. The government resold the CITGO fuel at NEXCOM facilities to individual service members. The Energy Companies point to three sets of contractual requirements in the fuel supply agreements which they claim establish the "subjection, guidance or control" necessary to invoke federal jurisdiction, namely: (1) "fuel specifications" that required compliance with specified American Society for Testing and Material Standards and required that NEXCOM have a qualified independent source analyze the products for compliance with those specifications; (2) provisions that give the Navy the right to inspect delivery, site, and operations; and (3) branding and advertising requirements.[16]

---

[15] We have held that corporations are "person[s]" under § 1442(a)(1), *Goncalves*, 865 F.3d at 1244, so there is no dispute that the Energy Companies meet this requirement.

[16] The Energy Companies cite the following sections in the fuel supply agreements. First, the fuel specification provisions require CITGO to "provide high quality gasoline product identical to or the same product as supplied [by] the contractor[']s commercially operated gasoline service stations [(e.g., regular leaded, regular unleaded, and premium unleaded)]." The "[m]otor fuel products supplied" by CITGO were required to comply

This argument fails. The contracts evince an arm's-length business relationship to supply NEXCOM with generally available commercial products. Supplying gasoline to the Navy for resale to its employees is not an activity so closely related to the government's implementation of federal law that the person faces "a significant risk of state-court 'prejudice.'" *Watson*, 551 U.S. at 152 (citation omitted). Accordingly, we hold that CITGO was not "acting under" a federal officer by supplying gasoline and diesel fuel to NEXCOM pursuant to fuel supply contracts.

Second, the Energy Companies point to the 1994 unit agreement[17] for the petroleum reserves at Elk Hills between Standard Oil Company of California (Chevron Corporation's

---

with the generic standards promulgated by the American Society for Testing and Materials, and the Navy agreed to "have a qualified independent source analyze the products provided [by CITGO]," including any product that was "suspected of being faulty/inferior." Second, the inspection provisions gave the Navy the right to "visually check truck compartment(s) before and after deliveries" of fuel, and to conduct "general operational reviews," which "might also include inspections of . . . vehicles." Third, the branding provisions require CITGO to "supply all necessary equipment, including signage, for each facility," to "incorporate the Government logo on at least three . . . provided signage fixtures," and to supply "[a] standard service station rotating-fixed neon or incandescent street corner station identification sign . . . for each Government fueling station." And CITGO could submit "proposals on [CITGO] branded product[s]," but the government was not obligated to market "said product under [CITGO's] brand or trade name."

[17] "A unit agreement was at that time and still is a common arrangement in the petroleum industry where two or more owners have interests in a common pool. Under such an arrangement, the pool is operated as a unit and the parties share production and costs in agreed-upon proportions." *United States v. Standard Oil Co. of Cal.*, 545 F.2d 624, 627 (9th Cir. 1976) (per curiam).

predecessor in interest) and the U.S. Navy.  We have detailed the history of this unit agreement at length in our prior decisions.  *See Standard Oil Co. of Cal.*, 545 F.2d at 626–28. In brief, Standard owned one-fifth and the Navy owned four-fifths of the approximately 46,000 acres comprising the Elk Hills reserves.  As is common in the oil exploration and production industry, the two landowners entered into a unit agreement to coordinate operations in the oil field and production of the oil.  Because the Navy sought to limit oil production in order to ensure the availability of oil reserves in the event of a national emergency, the unit agreement required that both Standard and the Navy curtail their production and gave the Navy "exclusive control over the exploration, prospecting, development, and operation of the Reserve."  To compensate Standard for reducing production, the unit agreement gave Standard the right to produce a specified amount of oil per day (an average of 15,000 barrels per day).  Both parties could dispose of the oil they extracted as they saw fit, and neither had a "preferential right to purchase any portion of the other's share of [the] production."

Standard's activities under the unit agreement did not give rise to a relationship where Standard was "acting under" a federal officer for purposes of § 1442.  Standard was not acting on behalf of the federal government in order to assist the government in performing a basic government function. Rather, Standard and the government reached an agreement that allowed them to coordinate their use of the oil reserve in a way that would benefit both parties:  the government maintained oil reserves for emergencies, and Standard ensured its ability to produce oil for sale.  When Standard extracted oil from the reserve, Standard was acting independently, *see Cabalce*, 797 F.3d at 728–29, not as the Navy's "agent," *Goncalves*, 865 F.3d at 1246; *see also* H.R.

Rep. No. 112-17, pt. 1, at 3 (2011) ("Removal is allowed only when the acts of Federal defendants are essentially ordered or demanded by Federal authority . . ."). And Standard's arm's-length business arrangement with the Navy does not involve conduct so closely related to the government's implementation of federal law that the Energy Companies would face "a significant risk of state-court 'prejudice.'" *Watson*, 551 U.S. at 152 (citation omitted).[18]

Finally, we consider the Energy Companies' lease agreements, entitled "Oil and Gas Lease of Submerged Lands Under the Outer Continental Shelf Lands Act." Under these standard-form leases, the government grants the lessee the right to explore and produce oil and gas resources in the submerged lands of the outer Continental Shelf, and in exchange the lessee agrees to pay the government rents and royalties. The Energy Companies argue that the lessee Energy Companies were "acting under" a federal officer because the leases require that the lessees drill for oil and gas pursuant to government-approved exploration plans and that the lessees sell some of their production to certain buyers; specifically, lessees must offer twenty percent of their

---

[18] At oral argument, the Energy Companies argued for the first time that Standard was "acting under" a federal officer pursuant to the Naval Petroleum Reserves Production Act of 1976, Pub. L. 94-258, § 201, 90 Stat. 303 (1976), which directed the Secretary of the Navy to "produce such reserves [including the Elk Hill reserve] at the maximum efficient rate consistent with sound engineering practices for a period not to exceed six years" and to "sell or otherwise dispose of the United States share of such petroleum produced from such reserves." § 201, 90 Stat. at 308. Nothing in the record indicates that the Secretary of the Navy "ordered or demanded," H.R. Rep. No. 112-17, pt. 1, at 3 (2011), *reprinted in* 2011 U.S.C.C.A.N. 420, 422, that Standard produce oil on behalf of the Navy. Therefore, the Energy Companies' reliance on this Act is misplaced.

production to "small or independent refiners," and must give the United States the right of first refusal in time of war or "when the President of the United States shall so prescribe."

This argument also fails. The leases do not require that lessees act on behalf of the federal government, under its close direction, or to fulfill basic governmental duties. Nor are lessees engaged in an activity so closely related to the government's function that the lessee faces "a significant risk of state-court 'prejudice.'" *Watson*, 551 U.S. at 152 (citation omitted). In fact, the lease requirements largely track statutory requirements, for instance, that the lessee offer 20 percent of the "crude oil, condensate, and natural gas liquids produced on [the] lease . . . to small or independent refiners," 43 U.S.C. § 1337(b)(7), and that "[i]n time of war, or when the President shall so prescribe, the United States shall have the right of first refusal to purchase at the market price all or any portion of any mineral produced from the outer Continental Shelf," § 1341(b). Mere "compl[iance] with the law, even if the laws are 'highly detailed' and thus leave [an] entity 'highly regulated,'" does not show that the entity is "acting under" a federal officer. *Goncalves*, 865 F.3d at 1245 (quoting *Watson*, 551 U.S. at 151–53). We conclude that the federal government's willingness to lease federal property or minimal rights to a private entity for that entity's commercial purposes does not, without more, constitute the kind of assistance required to establish that the private entity is "acting under" a federal officer. Accordingly, the leases on which the defendants rely do not give rise to the "unusually close" relationship where the lessee was "acting under" a federal officer. *Watson*, 551 U.S. at 153.

Because we conclude that the Energy Companies have not carried their burden of proving by a preponderance of the evidence that they were "acting under" a federal officer, we do not reach the question whether actions pursuant to the fuel supply agreement, unit agreement, or lease agreement had a causal nexus with the Counties' complaints, or whether the Energy Companies can assert a colorable federal defense. *See Fidelitad*, 904 F.3d at 1099.

### D

We turn next to the Energy Companies' argument that the district court had removal jurisdiction over the complaints under 28 U.S.C. § 1452(a) because they are related to bankruptcy cases involving Peabody Energy Corp., Arch Coal, and Texaco, Inc.

Under § 1452(a), "[a] party may remove any claim or cause of action in a civil action" (subject to certain exceptions) if the district court "has jurisdiction of such claim or cause of action under [28 U.S.C. § 1334]." Under § 1334(b), in turn, "the district courts shall have original but not exclusive jurisdiction of all civil proceedings arising under title 11, or arising in or related to cases under title 11," again with exceptions not applicable here.[19]  In sum, a

---

[19] 28 U.S.C. § 1334(b) provides:

> Except as provided in subsection (e)(2) [(relating to claims arising from employment of professionals under 11 U.S.C. § 327)], and notwithstanding any Act of Congress that confers exclusive jurisdiction on a court or courts other than the district courts, the district courts shall have original but not exclusive jurisdiction of all

defendant may remove a civil action if the district court has jurisdiction over the civil action because it is "related to cases under title 11." *Id.*

In defining the term "related to" in this context, we have differentiated between bankruptcy cases that are pending before a plan has been confirmed and bankruptcy cases where the plan has been confirmed and the debtor discharged from bankruptcy. *See In re Pegasus Gold Corp.*, 394 F.3d 1189, 1193–94 (9th Cir. 2005). While a bankruptcy case is pending, we have defined "related to" broadly: A proceeding is "related to" a bankruptcy case when "*the outcome of the proceeding could conceivably have any effect on the estate being administered in bankruptcy*." *In re Fietz*, 852 F.2d 455, 457 (9th Cir. 1988) (citation omitted). But the same term "related to" has a more limited meaning after a plan has been confirmed. *See Pegasus Gold*, 394 F.3d at 1194. A proceeding that arises after a plan has been confirmed is "related to" a bankruptcy case only if there is "a close nexus to the bankruptcy plan or proceeding." *Id.* at 1194 (quoting *In re Resorts Int'l, Inc.*, 372 F.3d 154, 167 (3d Cir. 2004)). In defining "close nexus," we have indicated that "matters affecting 'the interpretation, implementation, consummation, execution, or administration of the confirmed plan will typically have the requisite close nexus'" to a bankruptcy case. *Id.* at 1194 (quoting *Resorts Int'l*, 372 F.3d at 167).

We take a holistic approach to determining whether a proceeding that arises after a plan has been confirmed has a close nexus to that plan. We have explained that the close nexus test "requires particularized consideration of the facts

---

civil proceedings arising under title 11, or arising in or related to cases under title 11.

and posture of each case," and "can only be properly applied by looking at the whole picture." *In re Wilshire Courtyard*, 729 F.3d 1279, 1289 (9th Cir. 2013). At the same time, we recognize that it is necessary to avoid an interpretation of "related to" in the post-confirmation context that "could endlessly stretch a bankruptcy court's jurisdiction." *Pegasus Gold*, 394 F.3d at 1194 n.1; *see also Resorts Int'l*, 372 F.3d at 164 (holding that "bankruptcy court jurisdiction 'must be confined within appropriate limits and does not extend indefinitely, particularly after the confirmation of a plan and the closing of a case'" (citation omitted)). Thus, we have held that a "bankruptcy court did not retain 'related to' jurisdiction for [a] breach of contract action that could have existed entirely apart from the bankruptcy proceeding and did not necessarily depend upon resolution of a substantial question of bankruptcy law." *In re Ray*, 624 F.3d 1124, 1135 (9th Cir. 2010).

We now turn to the Energy Companies' claims that the Counties' complaints have a sufficiently close nexus to the Peabody Energy and Texaco, Inc. bankruptcy cases.[20] First, the Energy Companies claim that the Counties' complaints have a sufficiently close nexus to the Peabody Energy Corp.'s bankruptcy case because the complaints require an interpretation of Peabody's bankruptcy plan. According to the Energy Companies, a bankruptcy court has already interpreted the plan in response to the Counties' complaints. Specifically, the Counties here filed their complaints a few months after Peabody's bankruptcy plan was confirmed and became effective in April 2017. *In re Peabody Energy Corp.*, No. 16-42529-399, 2017 WL 4843724 at *1 (Bankr. E.D. Mo.

---

[20] The Energy Companies do not raise a distinct argument as to Arch Coal, so we do not address this issue.

Oct. 24, 2017). In July 2017, Peabody filed a motion to enjoin the Counties from prosecuting their complaint against Peabody and to dismiss those actions with prejudice on the ground that their claims had been discharged in bankruptcy. *Id.* The bankruptcy court granted the motion and directed the Counties to dismiss their causes of action against Peabody Energy with prejudice. *See id*.[21] The Energy Companies allege that given the bankruptcy court's need to interpret Peabody Energy's confirmed plan, there is a close nexus between the plan and the Counties' complaints.

We disagree. As stated above, we take a holistic look at "the whole picture." *Wilshire Courtyard*, 729 F.3d at 1289. As a general rule, proceedings that merely require the court to read a confirmed plan to determine whether it bars certain claims that arose before the confirmation date are not proceedings "*affecting* the interpretation [or] implementation" of a plan. *Pegasus Gold*, 394 F.3d at 1194 (cleaned up) (emphasis added). Typically, where the district court's review of a plan involves merely the application of the plan's plain or undisputed language, and does not require any resolution of disputes over the meaning of the plan's terms, the review does not "depend upon resolution of a substantial question of bankruptcy law." *Ray*, 624 F.3d at 1135.

---

[21] The Eighth Circuit affirmed this ruling on appeal. *See In re Peabody Energy Corp.*, 958 F.3d 717 (8th Cir. 2020). The Counties therefore dismissed Peabody Energy and Arch Coal from the complaint in June 2020. But at the time of the district court's remand order (on July 10, 2018), the Counties were still appealing the bankruptcy court's order directing the Counties to dismiss their complaint against Peabody. In determining whether the district court had removal jurisdiction, we must consider the events at the time of its ruling. *See Spencer v. U.S. Dist. Ct. for the N. Dist. of Cal.*, 393 F.3d 867, 871 (9th Cir. 2004); *County of San Mateo v. Chevron Corp.*, 294 F. Supp. 3d 934 (N.D. Cal. 2018).

Therefore, in the usual case, such a review would lack the close nexus with the bankruptcy case necessary for "related to" jurisdiction.

Here, the Energy Companies have not argued that the district court would have to interpret disputed language in Peabody Energy's confirmed plan in order to determine whether the Counties' complaints were barred.  Nor could they, because at the time of removal, Peabody Energy had already elected to seek an order enforcing the discharge and injunction provisions of the Chapter 11 plan in bankruptcy court.  This means that at the time of removal, the district court was not presented with any matters requiring interpretation of the confirmed plan, which was taking place on a different jurisdictional pathway.  And even if the district court had been required to review a plan, the Energy Companies have not argued that such a review would "depend upon resolution of a substantial question of bankruptcy law."  *Id*.  Accordingly, under the circumstances of this case, the complaints before the district court were not "related to" Peabody Energy's bankruptcy case for purposes of § 1334(b), and the district court did not have removal jurisdiction over the complaints under § 1452 on that basis.

We next turn to the Energy Companies' argument that the Counties' complaints have a sufficiently close nexus to Texaco, Inc.'s bankruptcy case.  According to the Energy Companies, Texaco, Inc.'s plan (which was confirmed some time in the 1980s) bars various claims arising against Texaco prior to March 15, 1988, so the Counties' proceedings would involve interpretation of Texaco's plan.  Again, we disagree.  As with Peabody Energy, the Energy Companies have not argued that the district court would have to interpret disputed language in Texaco's confirmed plan in order to determine

whether the Counties' complaints were barred. Moreover, Texaco's relationship to the complaints is attenuated: the Counties have not named Texaco in their complaints, and the Energy Companies claim Texaco is a defendant only because the complaints allege that Chevron's subsidiaries also engaged in culpable conduct. The district court would not have occasion to look at Texaco's plan unless it first determined that Texaco was a proper defendant who was liable for damages, and also determined that the Counties' claims arose before 1988. Under our "particularized consideration of the facts and posture" of this case, *Wilshire Courtyard*, 729 F.3d at 1289, we conclude that the Counties' case does not have the close nexus to Texaco's confirmed plan necessary to give the district court jurisdiction under § 1334(b) or removal jurisdiction under § 1452. Therefore, we reject this basis of jurisdiction.**[22]**

E

Finally, we turn to the Energy Companies' argument that the district court had admiralty jurisdiction over this case. Only Marathon Petroleum Corporation preserved this argument by raising admiralty jurisdiction as a basis for

---

**[22]** Because we decide on this ground, we need not reach the question whether removal of the claim under § 1334 is barred by § 1452(a), which prohibits the removal of a civil action by a governmental unit "to enforce such governmental unit's police or regulatory power." Nor do we need to address 28 U.S.C. § 1334(c)(2), which provides that "[u]pon timely motion of a party" the district court must abstain from hearing a proceeding based on a state law claim where the only source of jurisdiction is § 1334.

removal in its notice of removal.[23]  According to Marathon, because the Counties' claims are based on fossil fuel extraction that occurs on vessels engaged in maritime activities, they fall within the Constitution's grant of original jurisdiction over "all Cases of admiralty and maritime Jurisdiction."   U.S. Const. art. III, § 2, cl.1; *see also* 28 U.S.C. § 1333(1).[24]

We reject this argument because maritime claims brought in state court are not removable to federal court absent an independent jurisdictional basis.  The relevant jurisdictional statute, 28 U.S.C. § 1333(1), gives a district court original jurisdiction of "[a]ny civil case of admiralty or maritime jurisdiction, saving to suitors in all cases all other remedies to which they are otherwise entitled." 28 U.S.C. § 1333(1). The "saving to suitors" clause of § 1333(1) "leave[s] state courts 'competent' to adjudicate maritime causes of action in proceedings 'in personam,' that is, where the defendant is a person, not a ship or some other instrument of navigation."

---

[23] The other Energy Companies failed to invoke admiralty jurisdiction and therefore forfeited this ground of removal.  Contrary to the Energy Companies' argument, their reference to "federal common law" in their notice of removal is insufficient to invoke this basis of jurisdiction.  *See O'Halloran v. Univ. of Wash.*, 856 F.2d 1375, 1381 (9th Cir. 1988); *see also* 28 U.S.C. § 1446(a) (requiring that a notice of removal contain "a short and plain statement of the grounds for removal").

[24] 28 U.S.C. § 1333(1) provides:

The district courts shall have original jurisdiction, exclusive of the courts of the States, of:

(1) Any civil case of admiralty or maritime jurisdiction, saving to suitors in all cases all other remedies to which they are otherwise entitled.

*Ghotra by Ghotra v. Bandila Shipping, Inc.*, 113 F.3d 1050, 1054 (9th Cir. 1997) (quoting *Madruga v. Superior Ct. of Cal.*, 346 U.S. 556, 560–61 (1954)). This means that when a plaintiff brings a maritime cause of action against a person in state court, a federal court lacks admiralty jurisdiction over that claim. *See id.* at 1055–56. In order to remove such a claim to federal court, the defendant must assert some other basis of jurisdiction, such as diversity jurisdiction. *See id.*; *see also Morris v. Princess Cruises, Inc.*, 236 F.3d 1061, 1069 (9th Cir. 2001).

Even assuming that the Counties' claims in this case qualify as maritime claims, the Counties chose to bring these claims in state court. Under the "saving to suitors" clause, these maritime claims are not removable to federal court based on admiralty jurisdiction alone.[25]

## III

We have long held that "removal statutes should be construed narrowly in favor of remand to protect the jurisdiction of state courts." *Harris v. Bankers Life and Cas. Co.*, 425 F.3d 689, 698 (9th Cir. 2005). This rule of construction is based on the long-standing principle that "[d]ue regard for the rightful independence of state governments, which should actuate federal courts, requires that they scrupulously confine their own jurisdiction to the

---

[25] The Energy Companies do not "specifically and distinctly," *United States v. Kama*, 394 F.3d 1236, 1238 (9th Cir. 2005), argue that the "saving to suitors" clause only preserved the right to pursue non-maritime remedies, or that the Federal Courts Jurisdiction and Venue Clarification Act of 2011 amended the removal statute, 28 U.S.C. § 1441, so as to allow removal based on admiralty jurisdiction alone. Therefore, those arguments are waived. *See id.*

precise limits which the statute [authorizing removal jurisdiction] has defined." *Healy v. Ratta*, 292 U.S. 263, 270 (1934). In keeping with these principles, the Supreme Court has repeatedly affirmed its "deeply felt and traditional reluctance . . . to expand the jurisdiction of federal courts through a broad reading of jurisdictional statutes." *Merrill Lynch, Pierce, Fenner & Smith Inc. v. Manning*, 578 U.S. 374, 389–90 (2016) (citation omitted). Our adherence to this doctrine does not change merely because plaintiffs raise novel and sweeping causes of action. We therefore reject the broad interpretations of removal jurisdiction urged on us by the Energy Companies and affirm the district court's remand order.

**AFFIRMED.**